UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTON/BAUER, INC. | | |
| | PLAINTIFF | CIVIL ACTION |
| VS. | | NO. 3:01-CV-577 (CFD) |
| | | |
| PAG, LTD. | | |
| | DEFENDANT | |
| VS. | | |
| | | |
| ANTON/BAUER, INC. AND | | |
| ALEX DESORBO | | MAY 25, 2004 |
| | DEFENDANT | |

## MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF, ANTON BAUER, INC.'S MOTION FOR SUMMARY JUDGMENT

At issue in this dispute is United States Patent No. 4,810,204 (the "'204 Patent"). Pursuant to Fed. R. Civ. P. 56(c) and D. Conn. L. Civ. R. 56 & 7(a), the plaintiff, Anton Bauer, Inc. ("Anton/Bauer"), submits this memorandum of law in support of its motion for summary judgment on the defendant, PAG, Ltd.'s ("PAG") implied license defense.

In order to succeed on its implied license defense, PAG must satisfy the following factors. First, PAG is obligated to show that the circumstances of the sale of the female plate plainly indicate that an implied license should be inferred. Second, PAG must demonstrate that the female plate of the '204 Patent has no non-infringing use. PAG cannot satisfy either prong of its implied license defense. The circumstances of sale surrounding Anton/Bauer's female plate show that Anton/Bauer has never abandoned its intellectual property rights. Moreover, during the course of discovery specifically directed to the implied license issue, Anton/Bauer has identified a wide variety of non-infringing uses of the '204 Patent's female plate. For all of these

reasons set forth in greater detail below, Anton/Bauer respectfully requests that its motion for summary judgment be granted and that PAG's cross-motion be denied.

## I.    PROCEDURAL HISTORY

Anton/Bauer commenced this action under the patent laws of the United States, 35 U.S.C. § 271 et seq., for infringement of the United States Patent owned by Anton/Bauer, the '204 Patent.    In its Answer, PAG raised numerous counterclaims against Anton/Bauer for attempted monopolization and monopolization under 15 U.S.C. § 2, violation of 15 U.S.C. § 1125(a) (the Lanham Act § 43(a)), violation of Conn. Gen. Stat. § 42-110b and § 42-110g ("CUTPA"), and for defamation.    PAG further sought a declaratory judgment on the basis of invalidity and noninfringement of the '204 Patent.    Additionally, PAG filed a Third Party Complaint against Anton/Bauer and Alex DeSorbo ("Mr. DeSorbo") asserting violations of Federal unfair competition, false description and false representation under 15 U.S.C. § 1125(a), violation of CUTPA, and for defamation.

On June 12, 2002, this Court, after a multi-day hearing on Anton/Bauer's Motion for Preliminary Injunction, granted said preliminary injunction ("Court's Decision").    Summarily stated, the District Court granted the preliminary injunction on the basis that the validity of the patent in suit was not questioned (Court's Decision at 5), nor was there any doubt as to PAG's contributory and induced infringement of that patent.  Id. at 14-15.  The Court went on to hold that PAG's defenses of implied license, exhaustion, staple article and permissible repair lacked merit.  Id. at 7-15.  Thereafter, PAG appealed the granting of that preliminary injunction.  The Federal Circuit reversed this Court's ruling on May 21, 2003. Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343 (Fed. Cir. 2003).  The Federal Circuit concluded that Anton/Bauer could not demonstrate likelihood of success on the merits in the face of PAG's implied license defense, at least not based upon the record then before the court.

2

On June 6, 2003, PAG renewed its Motion for Summary Judgment, originally filed on April 1, 2003, wherein it argued that the implied license defense necessitated a finding of non-infringement in its favor. The parties subsequently engaged in substantial motion practice over the issue of whether or not Anton/Bauer was entitled to conduct discovery under Rule 56(f) of the Federal Rules of Civil Procedure in order to respond to PAG's renewed motion for summary judgment. After oral argument, this Court allotted the parties ninety days, which was subsequently extended by further order of the Court, to complete discovery solely on the issue of PAG's implied license defense. This motion followed.

## II.     FACTUAL BACKGROUND

Plaintiff, Anton/Bauer is a corporation duly organized and existing under the laws of the State of Delaware having its principal place of business at 14 Progress Drive, Shelton, Connecticut 06480. Anton/Bauer is in the business of manufacturing battery packs especially designed for use to power professional portable video cameras. See Stipulated Facts of Plaintiff Anton Bauer, Inc. and PAG, Ltd., dated June 6, 2001. ("Stipulation"), Exhibit A,[1] at ¶ 5. Anton/Bauer's battery packs are constructed to incorporate a releasable connection between the camera and batteries contained within the pack as shown and claimed in U.S. Patent No. 4,810,204. The battery pack connection of the '204 patent-in-suit includes (1) a flat female plate (known as the Gold Mount™) having a plurality of keyhole slots and at least one elongated electrical terminal (the female plate is also manufactured by Anton/Bauer and is normally affixed to the camera or other electrically operated device, such as a battery charger); and (2) a flat male plate including a plurality of shaped headed projections adapted to be received in the keyhole slots to releasable lock the female and male plates together, the male plate also including at least

---

[1]     All exhibits referenced in this memorandum of law are attached to Anton/Bauer's Local Rule 56(a)1 Statement dated May 25, 2004.

one elongated electrical terminal which mates with the electrical terminal on the female plate when the plates are locked together (the male plate is usually a portion of the housing of the pack containing an electrical battery or AC-to DC power source for powering the camera through the mating terminal connection); and (3) a releasable locking means on the female plate for engaging at least one of the headed projections for locking and preventing relative movement between the plates once they are assembled in mating relation. See Ex. A, Stipulation at ¶6. The '204 patent-in-suit comprises 18 claims. Plaintiff asserts that PAG has infringed claims 9 and 11 of the '204 patent. See id., Stipulation at ¶21. Claims 9 and 11 of the '204 patent require, inter alia, a "male plate," a "female plate," and a "releasable locking mechanism on said female plate." See id., Stipulation at ¶22. The "releasable locking mechanism on said female plate" required by the claims of the '204 patent must comprise (1) at least one rotatable member on the backside of the female plate, (2) a pin on said rotatable member between said member and the backside of the female plate, and (3) a means urging the member to a closed condition with said pin disposed in the path of movement of said headed projection inserted in said slot. See id., Stipulation at ¶23.

The battery packs at issue in this lawsuit are primarily directed to the professional camera/battery market. In this market, Anton/Bauer generally sells the female plate in two ways. See id., Stipulation at ¶11. The first instance occurs when a camera manufacturer purchases a Gold Mount™ "female plate" directly from plaintiff. The Gold Mount™ generically includes female plates of the type described in the '204 patent. The camera manufacturer incorporates the "female plate" into a camera as an OEM-type part, and then, sells the camera with the Gold Mount™ "female plate" attached thereto to the public. See id., Stipulation at ¶12. The second instance occurs when plaintiff sells its Gold Mount ™ "female plate" to end users, such as individuals or major television networks, as an after-market product. Id. See also Ex. B, a true

and accurate copy of select pages of the Depo. of Alex DeSorbo at p. 41, lines 23-24, p. 42, lines 6-10 [hereinafter, "DeSorbo Dep."].[2] Either way, the only way for the end user, a would-be direct infringer, to obtain the "releasable locking means on said female plate" required by claims 9 and 11 of the '204 patent, is by the sale, authorization, and consent to use by plaintiff. See Ex. A, Stipulation at ¶13. Anton/Bauer also manufactures and sells battery chargers for recharging its batteries. Anton/Bauer's charger employs the connection described in the preceding paragraph. See id., Stipulation at ¶7.

Defendant, PAG, Limited ("PAG") is a United Kingdom corporation based in London, England. PAG introduced its PAG L75 battery pack in the United States in April of 2000. See id., Stipulation at ¶1. The PAG L75 battery pack in question may be fitted to plaintiff's Gold Mount™ products employing a female plate with a latch as shown in Figs. 14-19 of the '204 Patent. See id., Stipulation at ¶2. PAG's accused L75 battery packs employ the male plate of the claimed releasable connection. See id., Stipulation at ¶3.

## III.  STANDARD OF REVIEW ON SUMMARY JUDGMENT IN FEDERAL CIRCUIT

Patent cases are no different from any other type of litigation in terms of the burden placed on a summary judgment movant by Rule 56 of the Federal Rules of Civil Procedure. Howes v. Medical Components, Inc., 814 F.2d 638, 643 (Fed. Cir. 1987); SRI Int'l v. Matsushita Electric Corp., 775 F.2d 1107, 1116 (Fed. Cir. 1985). On a motion for summary judgment, the Court will construe all facts in the light most favorable to the non-movant. Dynacore Holdings Corp v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

[2]  All pages of the DeSorbo Depo. cited herein are reproduced chronologically in Exhibit B.

that the moving party is entitled to judgment as a matter of law." International Rectifier Corp. v.

Ixys Corp., 361 F.3d 1363, 1369 (Fed. Cir. 2004) (quoting Fed. R. Civ. P. 56(c)); see also

Dynacore Holdings, 363 F.3d at 1273.

## IV.    DISCUSSION OF LAW

### A.    Standard of Implied License Defense

The implied license defense is grounded in the notion that a patent holder should be

estopped from claiming infringement where its actions have clearly demonstrated that it has

abandoned the intellectual property rights embodied in its patent by implicitly creating a license

for the use of the products covered by its patent.  See generally Wang Laboratories. Inc. v.

Mitsubishi Electronics America. Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997) Within the context

of patent law, "an implied license merely signifies a patentee's waiver of the statutory right to

exclude others from making, using or selling the patented invention." Id. (citation omitted).

The Federal Circuit has held that "[a] patentee grants an implied license to a purchaser when (1)

the patentee sells an article that has no noninfringing uses and (2) the circumstances of the sale

plainly indicate that the grant of a license should be inferred." Anton/Bauer. Inc. v. PAG. Ltd.,

329 F.3d 1343, 1350 (Fed. Cir. 2003).  Although the availability of a non-infringing use can

involve issues of fact, see, e.g., LG Electronics. Inc. v. Asustek Computer. Inc., 01-1552 CW,

2002 WL 31996860, *4 (N.D. Cal. Aug. 20, 2002), the existence of an implied license is

ultimately a question of law, see Glass Equipment Dev.. Inc. v. Besten. Inc., 174 F.3d 1337,

1341 (Fed. Cir. 1999).  Notably, it is the party asserting the defense who has the burden to prove

both prongs of the implied license test.  Glass Equipment, 174 F.3d at 1342.

The "circumstances of sale" prong of the implied license test requires a fact-based

determination, Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Corp., 123 F.3d

1445, 1453 (Fed. Cir. 1997), as to whether the actions undertaken by the patentee have led another to believe it can practice the patented combination in an infringing manner with immunity. Wang, 103 F.3d at 1582. The courts have considered circumstances such as whether the infringer was coaxed by the patentee to enter the market, where the infringer was provided with designs and suggestions and led to believe it could infringe, and where the patentee unreasonably delayed in bringing the action. Wang, 103 F.3d at 1582.

In assessing the non-infringing alternatives prong of the implied license test, the alleged infringer must show that the article at issue has no noninfringing uses. See, e.g., United States v. Univis Lens, 316 U.S. 241, 249 (1942); Met-Coil Systems Corp. v. Kosners Unlimited, Inc., 803 F.2d 684, 685-87 (Fed. Cir. 1986) (affirming decision of district court). The Court is not concerned with whether the non-infringing alternatives are the most profitable, but only whether they are "reasonable." Glass Equip. Dev., Inc., 174 F.3d at 1343. This requirement places a heavy burden on the accused infringer because a noninfringing use may be broadly understood and need only be reasonable or practical. See, Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 925 (Fed. Cir. 1974) (considering resale, modification, and idle time as reasonable noninfringing uses); see also General Elec. Co. v. Continental Lamp Works, Inc., 280 F. 846, 851 (2d Cir. 1922) (considering whether an element of a patented combination has no practical use other than in the practice of the invention). The law does not even require that reasonable non-infringing uses be of a commercial nature; "general scientific research and study" may constitute a non-infringing use. Trustees of Columbia Univ. v. Roche Diagnostics GMbH, 272 F. Supp. 2d 90, 115 (D. Mass. 2002).

## V.    ARGUMENT

### 1.    Circumstances of Sale

The first prong of the implied license test addresses the circumstances of the sale.  In this case, PAG has argued that the circumstances by which Anton/Bauer sells its female plate are such that end users would assume they have an implied right to use the PAG infringing male plate without violating the '204 patent.  More specifically, PAG has argued that the absence of any express declaration by Anton/Bauer advising purchasers of limitations to which the female plate may be put eliminates Anton/Bauer's ability to seek the protections afforded by the '204 patent.  Anton/Bauer submits that argument has no force.

While Anton/Bauer does not dispute that the sale of its female plates are not accompanied by express restriction as to the specific uses to which the female plate may be used, that fact alone is not enough for PAG to be entitled to judgment on the circumstances of sale prong of the implied license test.  When the Federal Circuit was presented with this issue after the Court's decision, the only fact it had before it was the acknowledged fact that Anton/Bauer's sale of its female plates were unaccompanied by an express restriction.  Anton/Bauer, 329 F.3d at 1351.  It had no record, however, as to any other circumstances that surrounded the sale.  Nor did the Federal Circuit have knowledge of the legitimate, non-infringing uses to which the female plate may be put. These alternatives to direct infringment clearly illustrate the circumstances within the marketplace which demonstrate the knowledge, understanding and acceptance by the market at large of the ownership and legitimate source of both components of the '204 combination.

As noted, Anton/Bauer's female plates are sold principally to camera manufacturers like Panasonic, which attach them to the back of their cameras and which, in turn, promote use of the Anton/Bauer male plates (the battery pack side of the combination).  See Ex. B, DeSorbo Depo. at p. 162.  The resulting purchase of the male plates are made exclusively through Anton/Bauer

or its authorized dealers or distributors.  See Affidavit of Alex DeSorbo ("DeSorbo Aff."), attached as Exhibit C, at ¶¶ 3-4.  In a small percentage of other instances, Anton/Bauer sells either component of the combination directly to a purchaser, sells the female plate to parties who want to replace a different camera female plate (for example, one containing a Sony or a PAG female plate) with the Anton/Bauer female plate, or sells the female plates to other manufacturers for any number of non-infringing uses . Id. at ¶ 5.

Anton/Bauer's intention whenever it sells its female plate is that it be used only in combination with an Anton/Bauer male plate attached to a battery pack or in some noninfringing alternate manner. Id., DeSorbo Aff. at ¶ 6. Anton/Bauer has not condoned the use of any other male plate to be used with the '204 female plate. Id. at ¶ 7. Indeed, quite the opposite is true. Anton/Bauer plates, both the female and male, are marked with the '204 patent number to advise the purchaser/end user that the device is protected by a patent. Id. at ¶ 7. See also 35 U.S.C. § 287(a). Panasonic, the camera manufacturer who purchases the largest portion of Anton/Bauer's female plates to incorporate on its cameras, specifically advertises the use of the female plate with the Anton/Bauer male plate. Id., DeSorbo Aff. at ¶ 3. Anton/Bauer likewise advertises its female and male plates to be utilized in combination with one another. Id. at ¶ 7. And, Anton/Bauer states in writing that the warranty attached to its female plate is declared void in the event that its female plates are used with, among other things, unauthorized attachments, including infringing battery packs. Id. at ¶ 10.

Anton/Bauer has also been vigilant in enforcement of its intellectual property rights.  It has sued for infringement of its patent rights in several cases involving the predecessor battery pack combination to the '204 patent, Anton/Bauer Inc. v. Energex Systems Corporation, No. 93 Civ. 4682 (DLD) (S.D.N.Y.) (directed to the '204, 4,218,107 ('107) & 4,550,968 ('968) patents)

9

and <u>Anton/Bauer Inc. v. Pana-tek Inc.</u>, 3:98 CV 604 (CFD) (D. Conn.) (directed to the '107, '204, 4,822,296 & '968 patents). <u>Id.</u>, DeSorbo Aff. at ¶ 11. Further, Anton/Bauer has advised its dealers and distributors by letters dated April 23, 2001 and April 6, 1998, both before and after this litigation was commenced, that it did not condone infringing uses of its Anton/Bauer female plates. <u>Id.</u> at ¶ 12. These enforcement mechanisms exemplify the restriction Anton/Bauer has conveyed to the market on the infringing use of its female plates.

Further, given the presence of the number of commonly accepted, non-infringing uses of the Anton/Bauer female plate, no express restriction *could* be made. This is a fundamental point which the Federal Circuit did not and could not consider because it believed there were no non-infringing alternatives. <u>See</u> <u>Anton/Bauer</u>, 329 F.3d at 1351. That is, in the hypothetical situation where the purchaser's only choice is between combinations involving an infringing use and the intended, permitted use (which is what the Federal Circuit assumed the facts to be), failure of the patentee to advise the purchaser of which use is acceptable should be held against a patentee. But, where the purchaser's alternatives to the intended and permitted use involve both infringing and non-infringing <u>alternatives,</u> an express restriction cannot be made. This is because third parties who make non-infringing alternatives have recognized the restrictions imposed by the patent and designed legally acceptable options. In such instances, it is in Anton/Bauer's interest to welcome these alternatives since it increases the market's acceptance of Anton/Bauer's mounts. Moreover, in such situations, the patentee, Anton/Bauer, could not attempt to restrict the non-infringing uses because that would arguably run afoul of the antitrust laws and its own legitimate self-interest.

Importantly, PAG, which bears the burden on this defense, admits that it has no information related to the circumstances by which Anton/Bauer's products are sold. See Fed. R.

Civ. P. 30(b)(6) Deposition of PAG, Ltd., through David Hardy ("PAG Depo."), excerpts of which are reproduced at Exhibit D, at p. 32.[3]  It therefore has no knowledge to refute Anton/Bauer's position that the industry shares the same understanding Anton/Bauer has, to wit, that Anton/Bauer has restricted the use of its female plates to circumstances which do not infringe its '204 patent. See Exhibit C, DeSorbo Aff. at ¶ 6.[4]  Anton/Bauer submits that in the absence of such evidence, PAG must be deemed to have failed in meeting this burden and therefore this prong of the implied license test must be construed in Anton/Bauer's favor.

### 2.    Non-Infringing Alternatives

The second prong of the implied license test is directed to whether or not there exists non-infringing uses of the non patented female plate component of the patent combination. See Anton/Bauer, Inc., 329 F. 3d at 1350.  An analysis of infringement – and therefore non-infringement – involves two steps. Scanner Technologies Corp. v. Icos Vision System. Corp., N.V.,--- F.3d ---, WL 868404, slip op. at p.4 (Fed. Cir. April 23, 2004).

First, the court must determine the scope and meaning of the claims in issue. Id.  The standard for interpreting claim terms is well established:

> The language of the claim defines the boundary of its scope. . . . Accordingly, the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim. . . . Claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains.  . . .  The words used in the [claim] are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence.

Scanner Technologies Corp., supra, at p.5; see also Deering Precision Instruments. LLC v. Victor Distribution Systems. Inc., 347 F.3d 1314, 1322 (Fed. Cir. 2003) (patent claim

---

[3]    All pages of the PAG Depo. cited herein are reproduced chronologically in Exhibit D.

[4]    This court previously concluded that PAG had offered no evidence which identified any circumstances of sale that conveyed the existence of or implied license to the industry.  See Court's Decision, attached as

construction analysis begins with the ordinary meaning of a disputed claim term); Invitrogen Corp. v. Biocrest Mfg., L.P., 327 F.3d 1364, 1367 (Fed. Cir. 2003) (patent claim language generally carries the ordinary meaning of the words in their normal usage in the field of invention at the time of invention).

Typically, courts will resort initially to the relevant dictionary definitions to determine "ordinary meaning." See E-Past Technologies, Inc. v. 3 Com Corp., 343 F.3d 1364, 1367 (Fed. Cir. 2003). To further aid in the claim construction process, a court may also examine the specification, the prior art, and other evidence, such as the understanding of skilled artisans at the time of invention, to discern the context and normal usage of the words in the patent claim. Alloc, Inc. v. International Trade Com'n., 342 F.3d 1361, 1368 (Fed. Cir. 2003). This intrinsic record can also resolve ambiguity in the claim language, or where clear, trump an inconsistent dictionary definition. Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364, 1367-1368 (Fed. Cir. 2003). When a patent claim term has multiple dictionary definitions, the construing court must consult the intrinsic record to identify which of the different possible meanings is most consistent with the use of the term by the inventor. Tehrani v. Hamilton Medical, Inc., 331 F.3d 1355, 1361 (Fed. Cir. 2003).

While certain terms may be at the center of a patent claim construction debate, the context of surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms. Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299 (Fed. Cir. 2003); Arlington Industries, Inc. v. Bridgeport Fittings, Inc., 345 F.3d 1318, 1325 (Fed. Cir. 2003).

.

---

Exhibit E, at 13. This finding was not reversed on appeal, other than with respect to the Federal Circuit's discussion of the absence of an express restriction.

The second step the court exercises in an infringement analysis is to compare the allegedly infringing device (or non-infringing device) to the claims as then construed. Scanner Technologies Corp. vs. Icos Vision Systems Corp., N.V., F.3d 2004 WL 868404, slip op. at p.4 (Fed. Cir. April 23, 2004). Summary judgment of non-infringement is appropriate "if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." Id. (citation and internal quotations omitted).

### A.    The Anton/Bauer Female Plate to the '204 Patent Has Numerous Noninfringing Uses

PAG maintains that the '204 Patent female plate has no other uses outside of the combination taught by the '204 Patent. (A true and accurate copy of the '204 Patent is attached as Exhibit F). The basis for PAG's conclusion in this regard is allegedly Anton/Bauer's stipulation as to this fact. There is no indication that PAG has performed any analysis whatsoever of this issue. As Anton/Bauer has argued previously, it has never agreed to this point.[5] Indeed, as the record presented here reveals, even PAG knows the claim is untrue. In fact, the frailty of PAG's implied license defense has been fully exposed during the course of discovery on this issue. Anton/Bauer has identified four categories of products with which the female plate of the '204 Patent are used in a noninfringing manner. In the face of this evidence, PAG cannot raise any genuine dispute as to the existence of non-infringing alternatives and this motion should be granted.

The relevant claims in this case are Claims 9 and 11 of the patent. Claim 9 is an independent claim; Claim 11 depends upon Claim 9. Anton/Bauer submits that the meaning of

---

[5]    In reopening discovery on the implied license question, this Court has rejected PAG's argument. As such, PAG can no longer hide behind its misconstruction of Anton/Bauer's statements to try to support this defense.

both claims should be determined from the language of the claims themselves, construed in it ordinary and customary meaning. Such meaning is fully consistent with and supported by the specification, the prior art and other intrinsic evidence.

### Claim 9:

9. A releasable connection for a battery pack or the like comprising a relatively flat male plate and a relatively flat female plate,
said plates being adapted to be releasably locked
35  together in connected position;
said female plate including a plurality of depending slots, and at least one elongate terminal, said terminal and slots being elongate in the same direction;
said male plate including a plurality of spaced
40  headed projections with there being one for each slot and with each projection having head and leg portions, and at least one elongated mating terminal;
said male plate being positioned abutting the female
45  plate with the legs of the projections being located in associated slots and with the one terminal within the mating terminal;
releasable locking means on said female plate for engaging at least one of the headed projections in
50  one of said slots to lock said plates in connected position by preventing relative movement between said plates in the direction of said slots by maintaining the engagement of said locking means with said headed projection until said locking means is re-
55  leased; and said releasable locking means includes at least one rotatable member on the backside of the female plate;
a pin on said rotatable member between said member and the backside of said female plate; and
60  means urging the member to a closed condition with said pin disposed in the path of movement of said headed projection inserted in said slot.

### Claim 11

11. The invention as defined in claim 9 wherein said urging means is a torsion spring disposed between the

13

bottom of said rotatable member and a fixed support on the backside of said female plate.

As relevant here, there are four key elements of Claim 9:

- 1)  a direct, releasable connection for a battery pack or the like, comprised of a single male plate and a single female plate

- 2)  a mechanical connection formed when a plurality of headed projections on the male plate are located within depending slots on the female plate, and

14

- 3) an electrical connection formed when the elongated electrical terminal(s) on the male plate are inserted in the corresponding electrical terminal(s) of the female plate;

- 4) which connection includes a releasable, locking means created by a locking means located on the female plate engages one of the headed projections on the male plate to lock the plates together, which releasable locking means consists of a rotable member on the backside the female plate which rotable member has a pin located between the member and the backside of the plate and a means to move the member into a closed condition thereby placing the pin in the path of movement of the headed projection, and which locking means is released when the rotable member is rotated in the opposite direction and the pin is removed from the path of the headed projection.[6]

Anton/Bauer submits that these elements are readily apparent from the language of the claims, the patent specification, and the stipulation between the parties. See Ex. G, Wilson Aff. at ¶¶ 7-8, and 10; Ex. A, Stipulation at ¶ 6.

While PAG's contention has been that the only use for Anton/Bauer's female plate practices each of these elements, it is now clear that a wide variety of manufacturers have displayed their ingenuity in manufacturing and marketing numerous devices which do not impair Anton/Bauer's intellectual property rights. These manufacturers have acknowledged the construction of the Patent and the protections afforded to Anton/Bauer since 1989. Rather than infringe the Patent, they have in some instances worked with Anton/Bauer in designing these creative alternatives. Anton/Bauer has identified these devices below and discussed in the context of each what elements of claim 9, as construed, are missing.

---

[6] Claim 11 simply describes one possible alternative of the releasable locking means set forth in Claim 9, to wit, a torsion spring disposed between the bottom of the rotatable member and a fixed support on the back side of the female plate. (See Aff. of Anton Wilson, (hereinafter "Wilson Aff."), attached as Exhibit G, at ¶9.

### 1.    Devices That Have No Electrical Connection

The first category of noninfringing alternatives are those devices that do not form the "electrical connection". This category of devices employs the mechanical mounting elements of the '204 Patent without forming any electrical connection to or with the '204 female plate. Examples of these devices include the following:

- Camplex Corp. ("Camplex"), CP 301B (See discussion infra);

- Camplex 601 (See discussion infra);

- Aspen Electronics, Inc. ("Aspen") Model # Dual NP/AB (a/k/a 2NP AB). This device is depicted in Exhibit H, and described in Aspen's 1999 Product Catalogue, Exhibit I, at PAG Bates #000995;

- Aspen PSM-160. This device is depicted in Exhibit J, and described in Aspen's 1999 Product Catalogue, Exhibit I, at PAG Bates #000994 and #000998.

- Absolute # VB-NH 13 A4. This device is depicted in Exhibit K and described in the DeSorbo Aff., Exhibit C, at ¶ 23.

- Telecast Fiber Systems Copperhead Power Plus (See discussion infra).

- Bexel hanger assembly (See discussion infra).

As the patent teaches, Claim 9 requires the female plate to have "a plurality of depending slots, and at least on elongate terminal, said terminal and slots being elongated in the same direction" and the male plate to have "a plurality of spaced headed projections with there being one for each slot and with each projection having head and leg portions, and at least one elongated mating terminal." See Ex. F, '204 Patent, Column 12, lines 36-43. The male plate is then positioned abutting the female plate with the legs of the projections being located in

associated slots and with the one terminal within the mating terminal[.]"[7]  A terminal is defined as "a device attached to the end of a wire or cable or to a piece of electrical apparatus for convenience in making connections."  Webster's Third New Int'l Dictionary Unabridged, p. 2359 (1993).  "Abutting" is defined as "to border on :  reach or touch with an end."  Id. at p. 8.  The claim thus teaches an electrical connection between the plates formed when the female plate's elongated terminal is joined (i.e. abutted) with the elongated mating terminal on the male plate.  See Ex. G, Wilson Aff. at ¶¶ 7 & 10.  Indeed, Claim 9 requires that the male plate be positioned so that the terminals of the male and female plate actually connect: "with the one terminal within the mating terminal."  Ex. F, '204 Patent, Col. 12, lines 46-47.

The patent specification also makes clear that these terminals are electrical in nature.  See Ex. F, '204 Patent at Col. 6, lines 53-55; Col. 7, lines 31-44; Col. 8, lines 23-28.  The female plate is secured to the electrical device, id. at Col. 6, lines 23-26; Col. 8, lines 66-67, and the male plate "constitutes one side of a closed container, which contains rechargeable batteries," id. at Col. 6, lines 24-28; Col. 8, lines 65-66.  The terminals on the female plate permit the electrical connection to the device from the reverse side of the plate.  Id. at Col. 6, lines 50-54.  The terminal on the male plate has a female contact terminal block in the housing for "receiving the companion female electrical contact terminal."  Id. at Col. 7, lines 21-22.  These female contact terminals, in turn, are connected by wires to the battery.  Id., lines 30-35.  Once the plates are joined, the "male terminals received in the female contact terminals in holes will self-align and make appropriate contact."  Id. at 37-39.  When the releasable connection is detached, "the entire male plate and headed projections can be moved up and out of corresponding keyhole slots,

---

[7]    It is clear from this language that the "projections" and the "terminals" serve different functions.  The inventor's choice of different terms in close proximity to each other creates a strong presumption of different meanings.  See, e.g. Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1579 (Fed.

breaking the electrical connection between the terminal contacts on the male and female plates." Id. at Col. 8, lines 35-42.

Manufacturers of this first category of devices recognize that the '204 female plate can be utilized for something other than forming an electrical connection for a battery (or the like). Rather, they employ the '204 female plate as a docking means to the camera, a means by which to make a mechanical, but not electrical, connection. See Ex. G, Wilson Aff. at ¶22. Absent from these devices is the elongated terminals of the male plate. Thus, the docking cannot result in an electrical connection as taught by the patent. Once attached, these manufacturers' innovative technology can be used in conjunction with the camera. In the literal language of the claim, the male plate does not include "at least one elongated mating terminal" (Ex. F, '204 Patent, Col. 12 at lines 42-43), and the male and female plates do not have their respective terminals positioned "with one terminal within the mating terminal" (id. at lines 46-47).

By way of example, Telecast's Copperhead "Powerplus" is a fiber optic multiplexing system that is mounted directly to the back of a camera by use of the '204 female plate. See Aff. of James B. Hurwitz ("Hurwitz Aff."), attached as Exhibit L, at ¶ 6;[8] see also Aff. of Thomas Dickinson ("Dickinson Aff."), attached as Exhibit M, at ¶ 8.[9] This device is utilized in remote TV production and eliminates the need for triaxial adapters or other electrical cables at both the camera and the remote equipment which can often inhibit the ease with which remote shooting is performed. See Ex. L, Hurwitz Aff. at ¶ 6. A fiber optic cable on the device carries upstream and downstream television signals between the camera mountable tranceiver and a remote base

---

Cir. 1996).. As discussed below, the projections serve a function of establishing the mechanical connection. (See discussion infra). The terminals, on the other hand establish the electrical connection.

[8]    Hurwitz is the Western United States Regional Sales Manager for Telecast Fiber Systems, Inc., the manufacturer of Telecast's Copperhead "Power Plus". He is also the project manager for the "Copperhead" device. See Ex. L, Hurwitz Aff. at ¶ 91.

station transceiver. Id. The Copperhead "Powerplus" is powered directly through a hybrid copper/fiber optic cable, as opposed to any battery source and elongated terminals. Id. at ¶8; Ex. M, Dickinson Aff. at ¶ 9. As such, there is no electrical connection, within the meaning of the '204 Patent, employed in this device, which would be present if it were powered through a battery pack or the like through the '204 plate.

A second example of this category is the Camplex devices. The Camplex CP-301B and CP-601 can be equipped with a plate that allows these devices to mechanically dock to the Anton/Bauer female plate attached to the camera. See Aff. of J. Thomas Webb ("Webb Aff."), attached as Exhibit N, at ¶ 7.[10] Generally, the CP-301B multiplexes video and audio signals through a single coax cable between the production control center and the camera location. See id. at ¶ 5. This provides an alternative to the heavy multicore or more expensive triax cables that are typically necessary to perform this function. The CP-601 is another modular system designed by Camplex that sends component video signals from the camera to a control point on a single cable. See id. at ¶ 6. The docking plate is known as CAB-23. It is depicted in Camplex's brochure. See id. at Exhibit N, at Ex. 1 at 15 and Exhibit 3. It is a simple plate attached to the side of the Camplex device with three projections that mate with the '204 female plate. It permits these Camplex devices to be mechanically connected to the AB female plate. See Ex. B, Webb Aff. at ¶¶ 7-8. However, there is no electrical terminal and therefore there is no electrical connection.[11] Id. at ¶¶ 8-9. Rather, the devices are powered through a cable connected to a

---

[9] Dickinson is the General Manager of Bexel Corp., the largest renter of professional video, audio and customer specialty rental configurations in the world. See Ex. O, Dickinson Aff. at ¶¶ 2-3.

[10] Webb is the Chief Executive Officer of Camplex Corp., which designs, makes and markets electronic signal conveyance products for the television production industry. See Ex. N, Webb Aff. at ¶¶ 2-3.

[11] Recognizing that Anton/Bauer held the '204 Patent given the marking on its plates, Camplex advised Anton/Bauer of its intention to manufacture its devices before they were ever manufactured. See Ex. N, Webb. Aff. at ¶12.

stationary power source or battery pack which runs directly to the camera, not the female plate. Id. at ¶ 9.[12] There is thus is no electrical connection as described in the '204 Patent.

A third example is described by Tom Dickinson of Bexel Corp. See Ex. M, Dickinson Aff. at ¶ 10. Bexel has affixed the female plate to the underside of the camera, with no electrical connection to the camera itself. It simply acts as a hanger assembly. Bexel then uses that female plate to attach camera accessories, such as the Copperhead device, for simple convenience, not for effectuating an electronic connection.

### 2.    Devices That Have No Mechanical Connection

The second category of noninfringing alternative uses of the '204 female plate consists of those devices that do not form the mechanical connection taught under the '204 Patent. A representative example of this category is the NP/AB which was originally manufactured by Aspen Electronics, Inc. and is now sold by Anton/Bauer. This device is depicted at Exhibit O and described in Aspen's Product Catalogue, Exhibit I, at PAG Bates #000994.

Claim 9 requires a releasable, mechanical connection. The very first claim element requires that the male and female plates be "releasably locked together in a connected position." Ex. F, '204 Patent at Col. 12, lines 34-35. The mechanical connection required for infringement is further limited because the claim requires the female plate to have "a plurality of depending slots... elongated in the same direction" and the male plate to have "a plurality of spaced headed projections there being one for each slot and with each projection having head and leg portions...." Id., lines 36-43. The plates are "releasably locked together in connected position," id. at Col. 12, lines 34-35, when the male plate is "positioned abutting the female plate with the

---

[12]    Camplex also makes a sleeve for an on-board Anton/Bauer battery. See Ex. N, Webb Aff. at ¶¶ 10-11, and Exhibit 1 at 15. Recognizing Anton/Bauer's intellectual property rights, when designing this sleeve, Camplex coordinated its manufacturer with Anton/Bauer, id. at ¶ 12, further demonstrating circumstances

legs of the projections being located in associated slots...." Id. at 44-47. The specification also makes this clear, specifically detailing the way in which the two plates are coupled together. Id. at Col. 8, line 65 to Col. 9, line 18; see also Ex. G, Wilson Aff. at ¶ 7.

This mechanical connection required must also embody a releasable locking means whereby at least one headed projection on the male plate inserted into the female plate is locked in a connected position until that locking is released. See Ex. F, Col. 12, lines 48-54. This releasable locking must include "at least one rotating member on the backside of the female plate" id., lines 56-57, which rotatable member must further contain a pin "between said member and the backside of the female plate... and a means for urging the member to a closed condition with said pin disposed in the path of movement of said headed projection inserted into the slot," id., lines 53-63. This element is explained in the specification. See id., Col. 7, line 55 to Col. 8, line 47; Ex. G, Wilson Aff. at ¶ 8. These limitations on the claim are expressly stated in the claim language and cannot be ignored in any assessment of infringement.

The Aspen NP/AB device employs the three stud mount system for interfacing NP style batteries with the Anton/Bauer female plate. See Ex. C., DeSorbo Aff. at ¶ 13. This device, however, does not employ the specific mechanical connection with releasable locking means which allows for the quick release capability taught under the '204 Patent. Id. The Aspen NP/AB has a different mechanical connection. One of its headed projections is purposely smaller to avoid engaging the pin assembly of the female plate locking means discussed in claim 9. Id. Aspen forms its locking connection by the use of a lever on its male plate which engages the perimeter of the Anton/Bauer female plate when the two are fully mated. Id. The Aspen NP/AB release is also different from claim 9. To release the Aspen adapter, the user must

---

in the marketplace of the recognized implicit restrictions on the use of the '204 components and the knowledge of the community of Anton/Bauer's combination patent.

depress the lever on the side of the adapter, releasing the adapter from the '204 female plate, and moving the two components apart. Id. This release mechanism for this device fails to embody several of the claim limitations, the absence of any one of which precludes literal infringement.

### 3.    Devices That Have No Direct Connection

The third category of noninfringing alternatives consists of those devices that form both an electrical and mechanical connection but do so with intervening elements, connectors, or components between a battery and the DC device in a manner not taught in the '204 Patent. This is perhaps the most prolific area of noninfringing alternatives to direct infringement. It consists essentially of adapters designed to fit to the '204 female which, by their very nature, prevent the direct releasable connection for a battery pack or the like to a DC device that is central to the '204 Patent. By adapting the female plate of the '204 to allow batteries of other designs to be releasably connected, the '204 patent is thoroughly circumvented and the use of these adapters are non-infringing. The following devices are illustrative of this non-infringing category:

- PAG 9518 PAGlok Connector (See discussion infra);

- Anton/Bauer NP/BP Battery Adapter (See discussion infra);

- Frezzolini Energy Systems, Inc. ("Frezzolini") HM-NP1-1 Battery Case With Gold Mount Adapter. This device is depicted in Frezzolini's Product Catalogue, Exhibit P, at Bates # 001046.

- Frezzolini NP-1 3PI 3-Position NP-1 Battery Case With Gold Mount Adapter. This device is depicted in Frezzolini's 2004 product catalogue, Exhibit Q, at 17.

- IDX A-AB2E V-Mount Adapter Plate. This device is depicted in IDX's product catalogue, Exhibit R, at Bates #000945.

- IDX NH-100 AB Single NP-1 Holder Box With Anton/Bauer Gold Mount Plate. This device is depicted in Exhibit S, and described in IDX's Product Catalogue, Exhibit R, at Bates #000950.

- IDX NH-201 AB Dual NP-1 Holder Box With Anton/Bauer Gold Mount Plate. This device is depicted in IDX's Product Catalogue, Exhibit R, at Bates #000950.

- Frezzolini ABS 01 FR Adapter Plate f/Anton/Bauer Mounts to Sony batteries. This device is depicted in Exhibit T.

- Anton/Bauer ABSO XLR. This device is depicted in Anton/Bauer 2003 Product Catalogue, Exhibit U, at 14 and described in the DeSorbo Aff., Exhibit C, at ¶24; <u>see</u> <u>also</u> photographs at Exhibit U.

The claim language of claim 9 of the '204 Patent clearly describes "[a] releasable connection for a battery pack or the like compromising <u>a</u> <u>relatively</u> <u>flat</u> <u>male</u> <u>plate</u> and <u>a</u> <u>relatively</u> <u>flat</u> <u>female</u> <u>plate</u>[.]" Ex. F, '204 Patent at Col. 12 at lines 31-33. "A battery pack means a series of cells connected in such a way to form a battery." <u>See</u> Ex. B, DeSorbo Depo., at p. 65, lines 1-2; <u>see</u> <u>also</u> <u>Webster's Third New Int'l Dictionary Unabridged</u> p. 187 (1993) (defining a battery as "a group of two or more cells connected together to furnish electric current"). "Or the like" refers to some other power source. <u>See</u> Ex. B, DeSorbo Depo. at p. 66, lines 17-20. As taught by Claim 9, the connection to the battery pack consists of only two elements, a female plate (which typically is secured to the device to be powered, e.g., the camera (Ex. F, '204 patent, Col. 8, lines 66-67), and the male plate (which is typically part of the battery pack container (<u>id</u>., lines 65-66). The first claim element requires "said plates being adapted to be releasably locked together in a connected position." <u>Id</u>., lines 34-35. By describing the limitation with language which contains both "locked together" and "connected," this element

23

teaches the union for the battery pack or the like must be immediate and without any intervening component, in other words, connected directly to each other. This direct connection is additionally important because it is through the direct connection of the plates and the releasable locking means on the female plate that the battery pack or the like is released. See discussion supra; Ex. G, Wilson Aff. at ¶ 8.

In the professional camera industry, there are four significant battery mounting types: Anton/Bauer, PAG, Sony v-wedge and NP types. See Ex. C, DeSorbo Aff. at ¶ 15. Each of these battery types are configured in such a way so that it regularly mates with its own unique connector plate and are incompatible with one another by design. Id. As PAG has acknowledged:

> There are various types of battery (sic) for such cameras and it is not uncommon that the cameraman may wish or have to use two or more different types of battery for the camera. This may be because he/she wishes to take advantage of different characteristics of the batteries or because of availability. This has only been possible by providing an adapter between the camera fixings and the battery fixings.

See PAG's U.S. Patent No. 6,638,086 B2, attached as Exhibit V, at Col. 1, lines 17-23. Given the fact that individuals may desire to utilize different types of batteries with different mounting configurations on the same camera, as PAG admits, it has become a common practice for manufacturers to produce adaptors "which fit between a battery of different type and the camera, charger or other item." Id. at Col. 2, lines 36-37; see also Ex. G, Wilson Aff. at ¶¶ 18-20.

Ironically, although it has asserted an implied license defense, PAG itself cannot escape the fact that it manufactures the PAG 9518, an adapter which is specifically marketed by PAG to permit the use of PAG batteries with an Anton/Bauer female plate. This device is depicted in Exhibit W and described in the 2003 PAG Product Catalogue, Exhibit X, at Bates #000903. PAG's Product Catalogue, Exhibit X at Bates #000903, shows an Anton/Bauer female mount to

24

which the 9518 is attached for use with a PAGlok battery. (Notably, the same picture also demonstrates a direct infringement through use of the L75 with no adapter plate.) Indeed, PAG admits that its model 9518 "adapts PAGlok batteries with Anton/Bauer type mounts." See Ex. Y, a true and accurate copy of PAG's Supplemental Resp. to Plaintiff's Ints. at #6. The PAG 9518 enables camera operators to utilize PAG batteries in conjunction with a camera that is equipped with an Anton/Bauer female plate connector. The connection, however, is not as is taught by Claim 9 as it consists of four elements: Anton/Bauer female plate + compatible Anton/Bauer male plate connection + PAG female plate + PAG compatible male plate connection with battery. See DeSorbo Aff., Exhibit C, at ¶17; Wilson Aff., Exhibit G, at ¶ 20. Accordingly, the adapter does not practice a "releasable" connection for a battery pack or the like comprised of only two plates, the female and male. The 9518 adapter, like the other adapters in this category, has intervening elements between the DC device and the battery other than the Anton/Bauer female and male plates, to wit, the female and male components of the PAG battery connection. The release when activated on the Anton/Bauer female plate releases the adapter only; the battery remains attached to the adapter and can neither be replaced nor charged. DeSorbo Aff., Exhibit C, at ¶ 7.In order to release the battery, the user must activate the release mechanism on the PAG plates. Stated another way, a battery or the like can only be released from the adapter by employing the PAG release mechanism. DeSorbo Aff., Exhibit C, at ¶ 16.

A second example is the Anton/Bauer NP/BP Battery Adapter. This device is depicted in Exhibit Z, and described in Anton/Bauer's 2003 Product Catalogue, Exhibit U, at 22. In this device, a version of the male plate is affixed to a container that, in turn, is capable of holding an NP battery. The container is then connected to the camera through the female plate. There is no direct electric connection to a battery or the like. Rather, the direct connection from the battery

pack is to the container that holds the battery. In fact, the battery is removed by lifting the lid on the container while the container remains affixed to the adapter plate and the female plate. The '204 releasable connection only releases the adapter from the female '204 plate, not the battery from the adapter. (Ex. C, DeSorbo Aff. at ¶ 18; Ex. B, DeSorbo Depo. at p. 66, lines 2-7.)

The other devices set out above similarly incorporate the additional elements as utilized in the PAG Model 9518 and as such, go beyond the scope of the teachings of the '204 Patent of a single male and female plate one each attached to either a "battery or the like" and a DC device forming the "releasable connection for a battery or the like".

### 4.     "Sandwich" Devices That Are Not a Battery Pack or the Like

The fourth category of noninfringing devices consists of secondary devices (not a DC power source) designed to mount to a '204 female plate attached to the primary device (e.g. as a camera). For convenience, this category of devices may be referred to as "Sandwich" devices. Devices falling within this category include the following:

- Azden Model 1000 URX/AB. See discussion infra.

- JVC Professional Products Corp. ("JVC") Focus Enhancements Model DR-DV 5000. See discussion infra.

- JVC Professional Products Corp. ("JVC") Focus Enhancements Fire Store FS-3. See discussion infra.

- Miranda Corp. DVC 820XXX. This device is depicted in Exhibit AA and described in the Dickinson Aff., Exhibit M, at ¶¶ 12-17.

- Everetz F9-2410 MD. This device is depicted in Exhibit BB and described in the Dickinson, Exhibit M, at ¶¶ 18-19.

- Anton/Bauer QR WRB 25. This device is described in Anton/Bauer's 2003 Product Catalogue, Exhibit U, at 21.

- Preston F I & Z remote servo focus and zoom system. This device is described in the Dickinson Aff., Exhibit M, at ¶¶ 10-11.

- Telecast Copperhead. This device is described in the Hurwitz Aff., Exhibit L, at ¶¶ 6-8.

As previously noted, Claim 9 teaches "[a] releasable connection <u>for a battery pack or the like</u>." The sandwich devices falling within this category include products such as wireless remote audio, hard disk video recording devices, and high definition TV signal converters, among others. <u>See</u> Ex. G, Wilson Aff. at ¶ 22. None concern a battery pack or the like. Rather, these types of devices form a first connection employing the '204 male and female plates and then, in some instances, a second connection employing a second '204 female plate to mate with the male plate of the battery. The first connection does not form a releasable connection for a battery pack or the like and, as such, does not intrude upon the teachings of the '204 Patent.

By way of illustration, Focus Enhancements Model Nos. FS-3 and DR-DV 5000, made by JVC Professional Products Corporation, when attached to a camera, allow the photographer to shoot video direct-to-disk or simultaneously to tape and disk. These devices are depicted in Exhibit CC and described in the Dickinson Aff., Exhibit M, at ¶¶ 20-21 and DeSorbo Aff., Exhibit C, at ¶ 18. The FS-3 is sold with a male plate that connects with the '204 female plate on the camera. The unit is powered either remotely through a battery belt or a stationery power supply, <u>see</u> Ex. M, Dickinson Aff. at ¶ 21; Ex. C, DeSorbo Aff. at ¶ 18, or the unit may contain a second '204 female plate to which a battery connection may be made, Ex. M, Dickinson Aff. at

¶ 21.[13] In both instances, the device attached to the camera by use of the female and male plates is not a connection for a battery pack or the like and thus there is no infringement. The battery, when a change is required, is released from the back-most connection; the device is not released to change the battery. Id.; Ex. C, DeSorbo Aff. at ¶ 18.

Another example is Azden Corporation's 1000 URX device, which allows broadcast wireless receivers to be connected directly to the camera by use of the camera's Anton/Bauer female plate and an Anton/Bauer male plate attached directly to the receiver. This device is depicted in Exhibit DD, and described in the Dickinson Aff., Exhibit M, at ¶23. The 1000 URX version attaches to the camera with velcro strips. The 1000 URX AB attaches by use of the '204 female plate. See Ex. M, Dickinson Aff. at ¶ 23 & Ex. C, DeSorbo Aff. at ¶¶ 19-20. This device may be powered remotely (with no battery pack or the like) or the user may attach an Anton/Bauer battery pack with a second '204 male plate to a second female plate located on the outside of the receiver. See Ex. M, Dickinson Aff. at ¶ 23; Ex. C, DeSorbo Aff. at ¶ 20. Either way, the receiver is neither a battery pack or the like and thus the '204 claims are not infringed. See Ex. C, DeSorbo Aff. at ¶ 20.

Each of these devices in this category do not infringe the '204 combination in that they are not, under any reasonable interpretation, "a battery or the like". In the cases where a second '204 combination may be employed to power the "sandwich" device (and perhaps the camera), the only "releasable connection for a battery or the like" is this second combination − the first remains the releasable connection only for the accessory device.

While PAG has continuously claimed that the Anton/Bauer female plate could be used in no other manner than that taught by the '204 Patent, the vast array of devices identified above

---

[13] Focus Enhancements, in fact, sells units with Sony, Anton/Bauer or PAG configurations.

clearly demonstrate otherwise. The adapters allow the end-user to use the female plate with another manufacturer's batteries without infringing the patent. The mechanical connection and sandwich devices permit use of the female plate with any number of devices having nothing to do with the batteries. Simply stated, while PAG may have seen fit to adopt the teachings of the '204 Patent as its own by products like the L75, others within this industry have demonstrated great ingenuity in utilizing the Anton/Bauer '204 female plate for uses which do not intrude upon Anton/Bauer's intellectual property rights. Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1353 (Fed. Cir. 2001) (To establish literal infringement of a patent claim, all elements of the claim must be embodied in the accused system). Accord Cole v. Kimberly-Clark Corp., 102 F.3d 524, 532 (Fed. Cir. 1996). Given the existence of these noninfringing alternatives, PAG cannot succeed on its implied license defense as a matter of law. As such, Anton/Bauer is entitled to summary judgment on this issue.

**B.    PAG Cannot Refute Anton/Bauer's Evidence of Noninfringing Alternatives**

Even were PAG to now disagree with the categories of noninfringing alternatives presented to it by Anton/Bauer during the course of discovery, PAG cannot present countervailing evidence on this issue. As previously noted, PAG bears the burden of proof in its implied license defense. In the face of this defense, Anton/Bauer has identified numerous devices that qualify as noninfringing alternatives. Surprisingly, PAG has taken no position on whether these devices in fact refute its implied license defense. PAG's conscious decision to perform no analyses whatsoever of the noninfringing devices qualifies as a waiver of this defense and as such, PAG can present no evidence to this Court which contradicts Anton/Bauer's assertions in this regard. This is confirmed by PAG's 30(b)(6) deposition testimony in this matter. Examples of this will be explored in greater detail below.

During the course of PAG's 30(b)(6) deposition, Anton/Bauer's counsel inquired as to whether PAG had any position concerning whether the devices identified by Anton/Bauer in its discovery responses qualified as a noninfringing alternative. Throughout its deposition, PAG confirmed that it had no position on these devices. The following deposition testimony is illustrative of this fact.

Q.    Have you done anything, sir, made any effort whatsoever to make a determination of whether or not there are any noninfringing alternative uses of the '204 female plate?

A.    Yes, sir. . . . We refer the matter to our attorneys.

Q.    Okay. But other than that you have done nothing?

A.    No, we don't even see ourselves as qualified.

Q.    Mr. Gardener has done nothing?

A.    Nothing.

Q.    Mr. Lavender has done nothing?

A.    Nothing.

Q.    Both father and son?

A.    Nothing but refer the matter to our legal attorneys.

Q.    And notwithstanding the fact that you were noticed for a deposition to talk about these noninfringing alternatives, you didn't do any independent analysis on behalf of PAG to make your own determination as to whether there are noninfringing alternatives?

A.    Correct.

Q.    Neither did Mr. Gardener?

A.    No.

Q.    Nor the Lavenders?

A.    No.

Q.    Nor anyone else at PAG?

A.    No.

(See Ex. D, PAG Depo. at pp. 135-36.)  This testimony evidences that PAG has not only abandoned its implied license defense and has not seen fit to present a countervailing position to Anton/Bauer's with respect to the availability noninfringing alternatives, but clearly had no basis for its proposition that there are no other uses for the '204 female plate. Having never made an analysis of the devices in the marketplace PAG was lacking of any knowledge to put forth an implied license defense at all.

Anton/Bauer's counsel focused PAG to various individual devices during the course of the 30(b)(6) deposition where PAG confirmed that it had no idea whether the corresponding alternative was non-infringing.  See id. at pp. 122-123 (concerning IDX NH-100 AB); pp. 171-172 (Anton/Bauer NP-BP Adaptor); pp. 193-94 (Aspen NP/AB); pp. 197-198 (Azden Model 1000 URX/AB); pp. 198-199 (ABSO XLR); pp. 204-206 (Focus Enhancements Model DR-DV 5000); pp. 207-208 (Focus Enhancements Fire Store FS-3); pp. 117-120 (Sony SOABSO1FR); pp. 120-134 (IDX NH-100AB); pp. 198-99 (Anton/Bauer ABSO XLR); pp. 213-216 (Camplex CAB-23); pp. 216-221 (Aspen PSM-160); pp. 222-223 (Absolute VB-NH13A4).

It is PAG that bears the burden of proof on each aspect of the implied license defense, not Anton/Bauer.  Anton/Bauer in its 30(b)(6) deposition notice alerted PAG that it intended to inquire on the topic of noninfringing alternatives, including those items identified in response to PAG's own discovery requests. Despite this fact, PAG did nothing to prepare itself in this regard and affirmatively indicated that it did not have a position on this issue. PAG "was not at liberty . . . to delay reviewing information on those topics until after the deposition" and attempt to create an issue at some later date.  Newport Electronics, Inc. v. Newport Corp., 157 F Supp. 2d 202,

220 (D. Conn. 2001). It is well-established that a party may not produce unprepared witnesses in response to a 30(b)(6) deposition notice. The policy behind this doctrine is clear as litigation is not a game of hide and seek. As one Court has aptly noted,

> If need be, the responding party "must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits."... Any other interpretation of the Rule would allow the respondent corporation to "sandbag" the deposition[ ] process "by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before trial."... We understand that the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation, that is involved in litigation, can be fully and fairly explored.

Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638-39 (D. Min. 2000) (internal citations omitted).

By its conduct, not only has PAG failed to take any position on whether the devices themselves infringe upon the '204 Patent, they have also abandoned any position with respect to the business reasonableness of these devices. Indeed, PAG itself has been manufacturing and selling the Model No. 9518 non-infringing adapter for years prior to the introduction of the L75 infringing product to the marketplace. The 9518 adapter is just one of the many prolific examples of how manufacturers have designed adapter plates to permit the use of batteries of incompatible types, providing the purchaser of the '204 female plate with viable, available, reasonable and commercially accepted alternatives to infringement of the '204 combination. The other categories of non-infringing alternatives noted by Anton/Bauer demonstrate uses of the female plate to attach products to the camera not anticipated by the teachings of the patent as they are not "battery packs or the like." Each of these items are being actively marketed by their manufacturers and, in some instances, reflect innovative and cutting edge technology in the professional camera industry. All of these categories, demonstrate that the female plate can be

32

used in a variety of ways that are not infringing – from the attachment of devices not contemplated by the patent teachings to the use of batteries otherwise incompatible with the female plate. A direct infringer thus has alternatives to infringement – from being able to power the camera to using the female plate for a completely different use than the patent teaches to adapting other batteries to the female plate. Likewise, PAG had alternatives to inducing infringement, had marketed alternatives in the past and had no basis in fact or evidence for its defense that it was shielded by an implied license inferred by a direct infringer.

## VI.    CONCLUSION:

The existence of this vast array of non-infringing alternatives coupled with the circumstances of Anton/Bauer's sales of its female plate undermine both prong's of PAG's implied license defense. As such, Anton/Bauer is entitled to summary judgment on PAG's implied license defense.

PLAINTIFF/COUNTERCLAIM DEFENDANT
ANTON/BAUER, INC. and ALEX DeSORBO

By: _____

James T. Shearin, Esq. – ct 01326
Brian C. Roche, Esq. – ct 17975
Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT  06601-7006
Phone:  (203) 330-200
Facsimile:  (203) 576-8888

Allen D. Brufsky, Esq. – ct 04490
475 Galleon Drive
Naples, Florida 34102
(239) 261-9393
(239) 261-9696

## CERTIFICATION

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on the date hereon to all counsel and pro se parties of record, via certified mail/return receipt requested.

Stephen R. Risley, Esq.
J. Scott Culpepper, Esq.
Thomas, Kayden, Horstemeyer & Risley, L.L.P.
100 Galleria Parkway, Suite 1750
Atlanta, Georgia 30339

Brien Horan, Esq.
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06013

James T. Shearin – ct 01326
Brian C. Roche  – ct 17975

BPRT/57052.2/JTS/517905v1