## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANTON/BAUER, INC.,                      )
    Plaintiff,                      )
                                    )        Civil Action
v.                                      )        File No.: 3:01-CV-577-CFD
                                    )
PAG, LTD.,                              )
    Defendant,                      )
                                    )
v.                                      )
                                    )
ANTON/BAUER, INC. and ALEX              )
DESORBO,                                )
    Counterclaim and Third Party        )
    Defendants                      )
_____)


## DEFENDANT, PAG LTD'S, OPENING CLAIM CONSTRUCTION
## ("*MARKMAN*") MEMORANDUM


Stephen R. Risley (ct22652)                 Jason M. Kuselias (ct20293)
J. Scott Culpepper (ct22653)                ROBINSON & COLE, LLP
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.      280 Trumbull Street
2600 One Atlanta Plaza                      Hartford, Connecticut 06103
950 East Paces Ferry Road, NE              Telephone: 860-275-8200
Atlanta, Georgia 30326                      Facsimile: 860-275-8299
Telephone: 404-760-4300
Facsimile: 404-233-1267

Counsel for Defendant,
PAG, LTD

## <u>TABLE OF CONTENTS</u>

Table Of Authorities .................................................................................................iv

List Of Defendant, PAG, LTD's, Exhibits ...............................................................vi

I.      INTRODUCTION...............................................................................................1

II.     STATEMENT OF FACTS ................................................................................2

       A.     The '204 Patent Is An "Improvement" Patent......................................2

             1.     The "Improved" "Projections" And "Leg Portions" ..................3

       B.     The Problematic Prior Art Battery Pack Connections ...........................5

             1.     The Prior Art '107 Patent...........................................................5

             2.     The Prior Art '968 Patent...........................................................6

       C.     The Specification Of The '204 Patent-In-Suit......................................6

             1.     "Summary Of The Invention" Section Of The '204 Patent.......7

             2.     "Brief Description Of The Drawings" Section Of The '204 Patent...........7

             3.     "Detailed Description" Section Of The '204 Patent ..................8

III.    PAG'S PROPOSED CONSTRUCTIONS AND LEGAL SUPPORT THEREFORE .......9

       A.     Claim Construction Law .......................................................................9

             1.     Intrinsic Evidence.....................................................................9

                 i.     The Claim Language.....................................................10

                 ii.    The Specification ..........................................................11

                      a.     Reading-In Limitations vs. Construing "The Invention" ..................12

                      b.     A Patentee Can Be A Lexicographer ...............................14

                      c.     Distinguishing The Invention From The Prior Art............15

- i -

          d.      Claims Can Be Properly Limited To The Only Disclosed Embodiment ...................................................................15

      iii.    The Prosecution History .....................................................16

B.    The Disputed Claim Term At Issue ...................................................16

    1.    "a plurality of spaced headed *projections* … with *each projection* having head and *leg portions*" ...............................17

    2.    PAG's Proposed Construction Is Correct ................................18

       i.    A Half-Moon Shaped End Portion Is "The Invention" Of The '204 Patent ....................................................................19

          a.      "Summary Of The Invention" Section Of The '204 Patent ...........................................................19

          b.      "Brief Description Of The Drawings" Section Of The '204 Patent ..................................................19

          c.      "Detailed Description" Section Of The '204 Patent .........20

      ii.    The '204 Patent Clearly Distinguishes Between The Projections And Leg Portions Of The '204 Patent And The Prior Art ...................................................................22

          a.      The "Projections" And "Leg Portions" Of The '107 And '968 Patents Differ From The '204 Patent ......................22

      iii.    The Inventor Of The '204 Patent Defined "Projections" And "Leg Portions" As Having An End Portion With A "Half-Moon Shape" ...............................................................25

          a.      Express Definition ............................................26

          b.      Implicit Definition ...........................................26

          c.      Pictorial Definition ..........................................26

      iv.    No Alternative "Projection" Or "Leg Portion" Is Defined Or Disclosed In The Specification ....................................27

      v.    Conclusion: PAG's Proposed Construction Is Contextually Correct And Accurate ...............................................28

3.    Plaintiff's Proposed Construction Is Wrong ............................................28

IV.    CONCLUSION ..........................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**I.    <u>CASE LAW</u>**

<u>Alloc, Inc. v. International Trade Comm'n</u>, 342 F.3d 1361 (Fed. Cir.  2003). ................ 12, 13, 21

<u>Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc.,</u>
262 F.3d 1258 (Fed. Cir. 2001). ........................................................................10, 14, 15, 25, 26

<u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d 1359 (Fed. Cir. 2002)......................................11

<u>Comark Communications v. Harris Corp.</u>, 156 F.3d 1182 (Fed. Cir. 1998)...............................12

<u>Markman v. Westview Instrus., Inc.</u>, 517 U.S. 370 (1996)...........................................................12

<u>Medrad, Inc. v. MRI Devices Corp.</u>, 401 F.3d 1313 (Fed. Cir. 2005)..................................11, 12

<u>Microsoft Corp. v. Multi-Tech Sys., Inc.</u>, 357 F.3d 1340 (Fed. Cir. 2004). .................... 13, 14, 21

<u>Modine Mfg. Co. v. United States Int'l Trade Comm'n</u>, 75 F.3d 1545 (Fed. Cir. 1996). 14, 16, 27

<u>Netword, LLC v. Central Corp.</u>, 242 F.3d 1347 (Fed. Cir 2001). ...............................................11

<u>O.I. Corp. v. Tekmar Co.</u>, 115 F.3d 1576 (Fed. Cir. 1997)...................................................15, 25

<u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005). ......................................9, 10, 11, 16, 19

<u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243 (Fed. Cir. 1998). ...... 9, 12, 18, 28

<u>SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 242 F.3d 1337 (Fed. Cir. 2001). 13

<u>Standard Oil Co. v. American Cyanamid Co.</u>, 774 F.2d 448 (Fed. Cir. 1985). ...........................11

<u>Sunrace Roots Enter. Co., LTD v. SRAM Corp.</u>, 336 F.3d 1298 (Fed. Cir. 2003)......................12

<u>Toro Co. v. White Consolidated Indus., Inc.</u>, 199 F.3d 1295 (Fed. Cir. 1999)............... 15, 16, 27

<u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576 (Fed. Cir. 1996). .............................9, 11, 16

<u>Wang Lab., Inc. v. America Online, Inc.</u>, 197 F.3d 1377 (Fed. Cir. 1999). ................................15

<u>Watts v. XL Sys., Inc.</u>, 232 F.3d 877 (Fed. Cir. 2000). ........................................................13, 21

AT1 30042821.7

**B.**     <u>**STATUTES, RULES, & REGULATIONS**</u>

35 United States Code §112, Fifth Paragraph ...........................................................................17

Code of Federal Regulations § 1.83(a).....................................................................................27

Manual of Patent Examining Procedure § 608.02(d).................................................................28

## <u>LIST OF DEFENDANT, PAG, LTD'S, EXHIBITS</u>

"A"          United States Patent No. 4,810,204

"B"          United States Patent No. 4,218,107

"C"          United States Patent No. 4,550,968

"D"          Plaintiff Anton/Bauer's Claim Constructions

"E"          Defendant, PAG, Ltd's Disputed Claim Term Constructions

## I.    __INTRODUCTION__

Defendant, PAG, LTD ("PAG"), hereby submits its proposed construction of the disputed claim terms.[1]  More specifically, PAG focuses this Memorandum on the single phrase "a plurality of spaced headed projections… with each projection having head and leg portions." Based on the law and facts of this case, the phrase "a plurality of spaced headed projections… with each projection having head and leg portions" should be construed as:

> *The parts on the male plate that protrude from the surface of the male plate, each of which has a large circular head and an integral narrow leg portion.  The leg portion of each projection terminates in a circular end portion, which is cut linearly along a top edge to provide a substantial half-moon shape.*

PAG believes that its proposed construction should be adopted by the Court as its construction demonstrates how a person of ordinary skill in the art would construe the disputed claim term after having read the patent-in-suit, U.S. Patent No. 4,810,204 (the "'204 patent"), and having understood what the inventor of the '204 patent truly invented.  Indeed, after reading the entire '204 patent and its specification, the "inescapable conclusion" is that PAG's construction is correct for at least the following four reasons:

(i)    the inventor of the '204 patent defined and described "the invention" as having "projections" and "leg portions" that have a "half-moon shaped" end portion;

(ii)    the inventor of the '204 patent defined his invention as a new and improved design as compared to the designs of U.S. Patent No. 4,218,107 (the "'107 patent") and U.S. Patent No. 4,550,968 (the "'968 patent"), and the

---

[1]  In accordance with the Court's Order, the parties exchanged their respective proposed definitions for all potentially disputed claim terms on December 8, 2005.  Attached as DX "E" is PAG's constructions for each one of the disputed claim terms.

"projections" and "leg portions" of the prior art designs described in the '107 and '968 patents have symmetrical end portions without a "half-moon shape;"

(iii)    the inventor of the '204 patent, acting as a lexicographer, defined and specified that "each" "projection" and "leg portion" must have a "half-moon shaped" end portion; and

(iv)    the inventor of the '204 patent did not disclose or suggest any embodiment other than "projections" and "leg portions" with "half-moon shaped" end portions.

As set forth below, the precedent of the Court of Appeals for the Federal Circuit ("Federal Circuit") holds that any _one_ of the above-listed four reasons dictates that PAG's proposed construction is correct. Here, however, _four_ independent reasons previously adopted and followed by the Federal Circuit show that PAG's proposed construction is correct.

## II.    STATEMENT OF FACTS

### A.    The '204 Patent Is An "Improvement" Patent

The invention disclosed in the '204 patent is an "improvement" over prior art designs. As stated by the inventor of the '204 patent, "_the present invention_ [of the '204 patent] is direct[ed] to further _improving_ several features of the battery pack connection." DX "A," '204 Patent at Col. 3, Lines 13-15.[2] [3] The "further improve[ments]" described in the '204 patent are

---

[2] The notation "DX" is shorthand for "Defendant's Exhibit." Defendant's Exhibits "A" through "E" are filed herewith.
[3] The "Column" numbers of a U.S. Patent refer to the numbers at the top of each column of the specification of a patent. The '204 patent has Columns "1" through "6." The "Line" numbers refer to the numbers that are found down the middle of each page of the specification of a patent, in between the two columns of text on each page of the specification of the patent.

based on the predecessor designs of a battery pack connection shown in Plaintiff's U.S. Patent No. 4,218,107 (the "'107 patent") and U.S. Patent No. 4,550,968 (the "'968 patent").[4]

Although the inventor of the '204 patent believed that the inventions of the '107 and '968 patents "generally proved satisfactory in use," the invention of the '204 patent was specifically described as directed to a handful of "improvements" over the '107 and '968 patented designs. DX "A," '204 Patent at Col. 3, Lines 15-47.

In particular, and with respect to the disputed claim term, the inventor of the '204 patent intended to "improve" over the designs of the '107 patent and the '968 patent with an "improved securement means:"

> While the foregoing generally proved satisfactory in use, *the present invention* is direct[ed] to further improving several features of the battery connections…. with *improved securement means for the headed projections on the surface of the male plate to prevent loss thereof*.

DX "A," '204 Patent at Col. 3, Lines 13-15 and Lines 42-47 (emphasis added).

## 1. The "Improved" "Projections" And "Leg Portions"

The inventor of the '204 patent intended to provide his "improved securement means" by virtue of "improved" headed "projections" and "leg portions." In fact, the inventor of the '204 patent stated that "in accordance with *the present invention*," his new, "improved" headed projections were "improved" by virtue of having "half-moon shaped" end portions or back plates:

> The headed *projections* on the male plate have *a **half-moon shaped** back plate* seated in a complementally shaped slot on the wall of the male plate *to preclude inadvertent turning and loosening* of the screwthreaded mounting of the headed projection *with concomitant loss of the projection* from the plate if its mounting completely comes apart.

---

[4] The inventor of the '204 patent, Mr. Anton Wilson, is also the sole inventor of the '107 patent. All three patents, the '204 patent, the '107 patent, and the '968 patent, are owned by Plaintiff, Anton/Bauer, Inc.

DX "A," '204 Patent at Col. 4, Lines 43-49 (emphasis added).

The inventor of the '204 patent confirmed that his "present invention" was the "half-moon shaped" "projections" and "leg portions" in Figure 5 of the '204 patent:



DX "A," '204 Patent at Figure 5.  Reference number "56" of Figure 5 clearly shows a person having ordinary skill in the art how the inventor of the '204 patent "improved" the headed projection of the '204 patent by adding a "half-moon shaped" end portion or back plate, as compared to the symmetrical headed projections of the '107 and '968 patents.

The inventor of the '204 patent even explained that Figure 5, with its "half-moon shaped" "projections" and "leg portions," depicts the "present invention:"

> FIG. 5 is an exploded perspective view of *the headed projection* of the battery pack connection *of the present invention* and further illustrates its *manner of securement* to the male plate of the battery pack connection.

DX "A," '204 Patent at Col. 5, Lines 35-38 (emphasis added).

4

B.     **The Problematic Prior Art Battery Pack Connections**

1.     **The Prior Art '107 Patent**

Contrary to the "projections" described and defined in the '204 patent-in-suit, which have "half-moon shaped" end portions, the "projections" in the '107 patent merely have symmetrical end portions:

> a plurality of projections 26, _each of which has_ a large head 27 and an integral narrow leg portion 28. Each projection may be secured to the male plate by being formed with an axial threaded hole into which a screw 29 from the backside of the male plate is threadable."

DX "B," '107 Patent at Col. 3, Lines 5-10. In other words, the legs of the projections in the '107 patent have symmetrical, non-half-moon shaped, end portions; they do not have "a circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial half-moon shape." See DX "A," '204 Patent at Col. 7, Lines 3-7; DX "C," '107 Patent. Consistent with this "symmetrical" end portion definition, Figures 3 and 4 of the prior art '107 patent also define projections with "symmetrical" end portions that do not have a half-moon shape. See DX "C," '107 Patent at Figures 3 and 4.[5]

As the projections of the '107 patent do not have a "a circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial half-moon shape," the projections of the '107 patent are, according to the '204 patent-in-suit, subject to "inadvertent turning and loosening" along "with concomitant loss of the projection from the plate 12." See DX "A," '204 Patent at Col. 7, Lines 3-7 and Lines 13-15. Thus, the projections of the '107 patent fail to provide an "improved securement means for the headed projections on the surface of the male plate to prevent loss thereof." See DX "A," '204 Patent at Col. 3, Lines 45-47; DX "B," '107 Patent.

---

[5] Figure 4 of the '107 Patent is reproduced at page 24 of this Memorandum.

### 2.    The Prior Art '968 Patent

As with the '107 patent, the "projections" of the '968 patent also have symmetrical end portions – not "half-moon shaped" end portions:

> a plurality of projections 26, *each of which has* a large head 27 and an integral narrow leg portion 28. Each projection may be secured to the male plate by being formed with an axial threaded hole into which a screw 29 from the backside of the male plate is threadable."

DX "C," '968 Patent at Col. 4, Lines 23-28. Consistent with this "symmetrical" end portion definition, Figures 3 and 4 of the prior art '968 patent also define projections that have "symmetrical" end portions without a half-moon shape. See DX "C," '968 Patent at Figures 3 and 4.[6]

As the projections of the '968 patent do not have a "a circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial half-moon shape," the projections of the '968 patent, according to the '204 patent-in-suit, also are subject to "inadvertent turning and loosening" along "with concomitant loss of the projection from the plate 12." See DX "A," '204 Patent at Col. 7, Lines 3-7 and Lines 13-15. Thus, the projections of the '968 patent fail to provide an "improved securement means for the headed projections on the surface of the male plate to prevent loss thereof." See DX "A," '204 Patent at Col. 3, Lines 45-47; DX "C," '968 Patent.

### C.    The Specification Of The '204 Patent-In-Suit

Throughout the specification of the '204 patent – in each and every instance – the inventor of the '204 patent only describes, and therefore defines, a "projection" as having a "leg portion" with a "half-moon shaped" end portion. In fact, no other embodiment is ever disclosed or even suggested anywhere in the '204 patent.

---

[6] Figure 4 of the '968 Patent is reproduced at page 24 of this Memorandum.

### 1.     "Summary Of The Invention" Section Of The '204 Patent

In the "Summary Of The Invention" section of the '204 patent, the inventor defined the "improved securement means for the headed projections" (see DX "A," '204 Patent at Background Of The Invention, Col. 3, Lines 13-15 and Lines 45-47) as having "projections" with "a half-moon shaped back plate:"

> In accordance with *the present invention*.... *The headed projections on the male plate have a half-moon shaped back plate* seated in a complementarily shaped slot on the wall of the male plate *to preclude inadvertent turning and loosening* of the screwthreaded mounting of the headed projection with *concomitant loss of the projection from the plate* if its mounting completely comes apart."

DX "A," '204 Patent at Col. 3, line 50 and Col. 4, lines 35-36 and lines 43-49 (emphasis added). No other "improved securement means" or "projection" is described in the "Summary Of The Invention" section, or anywhere else in the '204 patent. DX "A," '204 Patent.

### 2.     "Brief Description Of The Drawings" Section Of The '204 Patent

In the "Brief Description Of The Drawings" section of the '204 patent, the inventor again reiterated that his "invention" includes not just any "projection," but only a "projection" with a "half-moon shaped end portion:"

> "Further objects and advantages of *the invention* will become apparent from the following description and claims, and from the accompanying drawings, wherein:

> FIG. 5 is an exploded perspective view of *the headed projection* of the battery pack connection *of the present invention* and further illustrates its manner of securement to the male plate of the battery pack connection."

DX "A," '204 Patent at Col. 5, Lines 18-20 and lines 35-38 (emphasis added). Reference number "56" of Figure 5 clearly shows "projections" and "leg portions" with "half-moon shaped" end portions:



DX "A," '204 Patent at Figure 5.  No other "improved securement means" or "projection" is shown in the "Brief Description Of The Drawings" section of the '204 patent, or any other section of the '204 patent.  DX "A," '204 Patent.

### 3.     <u>"Detailed Description" Section Of The '204 Patent</u>

Finally, in the "Detailed Description Of The Preferred Embodiment" section of the '204 patent, the inventor reiterates for the fifth time that his "invention" is a "projection" with a "leg portion" that has a "half-moon shaped" end portion:

> Referring now to the drawings in detail… the battery pack of *the present invention* is generally indicated by reference numeral 10 in FIG. 13 and includes a female plate 11 and a male plate 12.
>
> The male plate 12 is formed with *a plurality of projections 26*, *each of which has* a large circular head 27 and *an integral narrow leg portion 28 terminating in a circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial half-moon shape*….  The *half-moon shaped end portion* 54 is seated in a complementarily shaped slot 60 on the front wall of the male plate 12 *to preclude inadvertent turning and loosening of the threaded projection 26, with concommitant loss of the projection* from the plate 12 if its mounting completely comes apart.

DX "A," '204 Patent at Col. 6, Lines 17-22 and Col. 7, Lines 3-16 (emphasis added).

Based on the inventor's description of his "invention" in the "Background Of The Invention" section, the "Summary Of The Invention" section, the "Brief Description Of The Drawings" section, the Figures, and the "Detailed Description Of The Preferred Embodiment"

section of the '204 patent, the inventor of the '204 patent staked-out his invention as covering not just any "projection," but only a "projection" with a "leg portion" that has a "half-moon shaped" end portion.

## III.    PAG'S PROPOSED CONSTRUCTIONS AND LEGAL SUPPORT THEREFOR

### A.    Claim Construction Law

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history…. Such intrinsic evidence is the most significant source of the legally operative meaning of the disputed claim language." <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).   The intrinsic record of this case leads to the "inescapable conclusion" that the "projection" and "leg portion" terms of claims 9 and 11 of the '204 patent must be construed as having "half-moon shaped" end portions.

### 1.    Intrinsic Evidence

When the Court considers the intrinsic evidence, it must do so through the eyes of a person having ordinary skill in the art.  The person of ordinary skill in the art does not construe the words of a claim in a vacuum, but rather only after having read the entire intrinsic record, in particular, the specification of the patent at issue.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

The specification of the patent-in-suit must be studied in order to determine what the inventor truly invented because "[t]he patent system is based on the proposition that claims cover <u>*only*</u> the invented subject matter."  <u>Phillips</u>, 415 F.3d at 1321 (emphasis added); <u>Renishaw PLC</u>

v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of _what the inventors actually invented_ and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (emphasis added).

In the present case, based on the inventor's own words and own description of his "invention," the "invention" of the '204 patent, in relevant part, is "projections" and "leg portions" that have a "half-moon shaped" end portion. Claims 9 and 11 of the '204 patent should be construed consistent with this "invention." Phillips, 415 F.3d at 1321 ("[t]he patent system is based on the proposition that claims cover _only_ the invented subject matter.") (emphasis added).

### i.     The Claim Language

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" Phillips, 415 F.3d at 1312. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e. as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312; Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001) ("As a starting point, we give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art.").

The ordinary meaning of a disputed claim term, however, can only be determined _after_ reading the _entire_ patent. Phillips, 415 F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."); Phillips, 415 F.3d at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the

claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

### ii.    The Specification

The specification of a patent is the most important source for claim interpretation because it shows what the inventor truly invented and claimed as his/her invention.[7] Vitronics, 90 F.3d at 1582 (the specification "is always highly relevant to the claim construction analysis.  Usually, it is _dispositive_; it is the _single best guide_ to the meaning of a disputed term.") (emphasis added); Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985) ("[t]he descriptive part of the specification aids in ascertaining the scope and meaning of the claims in as much as the words of the claims must be based on the description.  The specification is, thus, the _primary basis_ for construing the claims.") (emphasis added); Phillips, 415 F.3d at 1317 ("It is therefore entirely appropriate for a court, when conducting claim construction, to _rely heavily_ on the written description for guidance as to the meaning of the claims.") (emphasis added).

The specification is the most important claim construction tool because it provides the context in which the disputed claim terms appear, and in which they must be interpreted. Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313,1319 (Fed. Cir. 2005) ("we must look at the ordinary meaning in the context of the written description and the prosecution history."); Netword, LLC v. Central Corp., 242 F.3d 1347, 1352 (Fed. Cir 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose."); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359,

---

[7] The "specification" of the '204 patent is the written description set-forth in the patent at Column 1, Line 1 through Column 11, Line 26.  The "specification" of the '204 patent also includes Figures 1 through 19.

1366 (Fed. Cir. 2002) (the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess).

The meaning of the disputed claim terms cannot be construed in a vacuum. Medrad, 401 F.3d at 1319 ("We cannot look at the ordinary meaning of the term… in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); Markman v. Westview Instrus., Inc., 517 U.S. 370, 389 (1996) ("[A claim] term can be defined only in a way that comports with the instrument as a whole.") Renishaw, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (emphasis added).

### a.    Reading-In Limitations vs. Construing "The Invention"

Although the specification of a patent is critical to proper claim construction, limitations that appear in the specification of a patent, but not the claims, generally are not read into the claims. Comark Communications v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998). There is, however, a delicate balance between properly using the specification for claim construction purposes and improperly using the specification to read limitations into a claim. This balance turns on how the specification characterizes the claimed "invention." Sunrace Roots Enter. Co., LTD v. SRAM Corp., 336 F.3d 1298, 1305 (Fed. Cir. 2003) ("That balance turns on how the specification characterizes the claimed invention.").

To determine the tip of the balance, the Court must look to whether the specification refers to a limitation only as a part of less than all possible embodiments, or whether the specification, read as a whole, suggests that the very character of the invention requires the limitation be a part of every embodiment. Alloc, Inc. v. International Trade Comm'n, 342 F.3d

12

1361, 1370 (Fed. Cir. 2003). Where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is _entirely permissible and proper_ to limit the claims to what is described in the specification. SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1345 (Fed. Cir. 2001).

Certainly, where the inventor of a patent makes general statements such as "the present invention is," those statements must be viewed as limiting the scope of the claimed invention consistent with the inventor's characterization of "the present invention." Alloc, 342 F.3d at 1368-69 ("A patent applicant may consistently and clearly use a term in a manner either more or less expansive than its general usage in the relevant art, thereby expanding or limiting the scope of the term in the context of the patent claims.") (The "specification describes 'the invention' under the heading 'Technical Problems and Objects of the Invention,' as… where a play exists…. Thus, the specification teaches that _the invention as a whole_, not merely a preferred embodiment, provides for play in the positioning of floor panels.") (emphasis added); Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1347-48 (Fed. Cir. 2004) ("When the specification 'makes clear that _the invention_ does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.") ("In light of those clear statements in the specification that _the invention_ ('the present system') is directed to communications 'over a standard telephone line,' we cannot read the claims… to encompass data transmission over a packet-switched network such as the Internet. Instead, the specification shared by all three patents leads to the 'inescapable conclusion' that the communications between the local and remote sites of the claimed inventions must occur directly over a telephone line.") (emphasis added); Watts v. XL

Sys., Inc., 232 F.3d 877, 883 (Fed. Cir. 2000) ("the specification actually limits the invention to structures that utilize misaligned taper angles, stating that the '*present invention* utilizes [the varying taper angle] feature."); Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("When the preferred embodiment is described in the specification as *the invention* itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

This is particularly true when the inventor makes statements of what "the invention" is in the "Summary of the Invention" section of the specification, or any other section of a patent prior to the "Detailed Description" section of the patent.  Microsoft, 357 F.3d at 1348 ("Those statements, some of which are found in the 'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents."); Bell Atlantic, 262 F.3d at 1270 (description of "the invention" was set forth in the Summary of the Invention section of the patent "before we even reach the Detailed Description of the Preferred Embodiments").

In the present case, the inventor of the '204 patent described his "invention" as having "half-moon shaped" end portions in the "Background Of The Invention" section, the "Summary Of The Invention" section, the "Brief Description Of The Drawings" section, and the Figures of the '204 patent, all of which sections precede the "Detailed Description Of The Preferred Embodiment" section of the '204 patent.

### b.     A Patentee Can Be A Lexicographer

A patentee may act as a lexicographer and define words in the specification either expressly or by implication.  Bell Atlantic, 262 F.3d at 1269 ("the patentee may act as his own lexicographer by using the specification to define terms either expressly or 'by implication.'").

A patentee defines a term by implication when the patentee uses the term consistently throughout the specification and no other definition or embodiment is suggested for that term.  Bell Atlantic, 262 F.3d at 1271 ("when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'").

In the present case, the inventor of the '204 patent expressly, implicitly, and pictorially defined "*each*" "projection" and "leg portion" as having a "half-moon shaped" end portion.

### c.    Distinguishing The Invention From The Prior Art

The invention, and corresponding claim terms, can also be defined by statements made in the specification in an effort to distinguish the patented invention from the prior art.  O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1581 (Fed. Cir. 1997) (limiting claims because the specification described only non-smooth or conical passages and distinguished over the prior art based on these characteristics).

The inventor of the patent in this case clearly distinguished the "projections" and "leg portions" of the '204 patent as being different from the "projections" and "leg portions" of the prior art '107 and '968 patents because of the "half-moon shaped" end portions.

### d.    Claims Can Be Properly Limited To The Only Disclosed Embodiment

When the specification of a patent only discloses one embodiment, the claims can be properly limited to the sole embodiment.  Toro Co. v. White Consolidated Indus., Inc., 199 F.3d 1295, 1301-02 (Fed. Cir. 1999) ("the specification describes the advantages of the unitary structure as important to the invention…. This is not simply the preferred embodiment; it is the only embodiment.") ("This is not a case of limiting the claims to a 'preferred embodiment' of an invention that has been more broadly disclosed…. No such broader invention is here described."); Wang Lab., Inc. v. America Online, Inc., 197 F.3d 1377, 1382-83 (Fed. Cir. 1999)

15

(limiting claims to the only embodiment described, a character-based protocol, and specifically not encompassing a bit-mapped protocol); Modine, 75 F.3d at 1551 ("When the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

As in Toro, Wang, and Modine, the '204 patent only discloses one embodiment of a "projection" and "leg portion," and that sole embodiment has a "half-moon shaped" end portion.

### iii.    The Prosecution History

If it is in evidence, the prosecution history must also be considered by the Court. Vitronics, 90 F.3d at 1582. The prosecution history, however, often is not helpful. Phillips, 415 F.3d at 1317 (the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

PAG does not presently believe that the prosecution history of the '204 patent is helpful to the claims construction analysis in this case.

### B.    The Disputed Claim Term At Issue

Plaintiff alleges that PAG infringes claims 9 and 11 of the '204 patent. Claim 9 provides:

9.    A releasable connections for a battery pack or the like comprising a relatively flat male plate and a relatively flat female plate,

said plates being adapted to be releasably locked together in connected position;

said female plate including a plurality of depending slots, and at least one elongate terminal, said terminal and slots being elongate in the same direction;

said male plate including a plurality of spaced headed **_projections_** with there being one for each slot and with _each projection_ having head and **_leg portions_**, and at least one elongated mating terminal;

said male plate being positioned abutting the female plate with the legs of the projections being located in associated slots and with the one terminal within the mating terminal;

releasable locking means on said female plate for engaging at least one of the headed projections in one of said slots to lock said plates in connected position by preventing relative movement between said plates in the direction of said slots by maintaining the engagement of said locking means with said headed projection until said locking means is released; and said releasable locking means includes

at least one rotatable member on the backside of the female plate;

a pin on said rotatable member between said member and the backside of said female plate; and

means urging the member to a closed condition with said pin disposed in the path of movement of said headed projection inserted in said slot.

DX "A," '204 Patent at Col. 12, Lines 31-62 (emphasis added).

Claim 11, which depends from claim 9, provides:[8]

11.    The invention *as defined in claim 9* wherein said urging means is a torsion spring disposed between the bottom of said rotatable member and a fixed support on the backside of said female plate.

DX "A," '204 Patent at Col. 12, Line 67 through Col. 13, Line 2 (emphasis added).

PAG respectfully requests the Court to construe the claim term "a plurality of spaced headed *projections*… with each projection having head and *leg portions*…."

## 1.    **"a plurality of spaced headed *projections* … with *each projection having head and leg portions*"**

The phrase "a plurality of spaced headed projections… with each projection having head and leg portions" should be construed as:

*The parts on the male plate that protrude from the surface of the male plate, each of which has a large circular head and an integral narrow leg portion. The leg portion of each projection terminates in a circular end portion, which is cut linearly along a top edge to provide a substantial half-moon shape.*

---

[8] "Dependent" claims include all of the terms of the claim from which they depend. In other words, claim 11 of the '204 patent includes all of the terms of claim 9, including the "projections" and "leg portions" claim terms. See 35 U.S.C. §112, paragraph 5 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

### 2.    PAG's Proposed Construction Is Correct

PAG's construction should be adopted by the Court as it is wholly consistent with the intrinsic record of the '204 patent. Renishaw, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (emphasis added). Indeed, after reading the entire '204 patent and its specification, the "inescapable conclusion" is that PAG's construction is correct.

The claim construction evidence compels PAG's proposed claim construction for at least the following four reasons:

(i)    "the invention" is defined as having projections and leg portions that have an end portion with a half-moon shape;

(ii)    the invention is distinguished over the prior art as a new and improved design as compared to the '107 and '968 patents, and the "projections" and "leg portions" of the '107 and '968 patents have symmetrical end portions without a "half-moon shape;"

(iii)    the inventor of the '204 patent, acting as a lexicographer, defined "projections" and "leg portions" as having end portions with a "half-moon shape;" and

(iv)    no other embodiment of the "projections" or "leg portions" are disclosed in the '204 patent other than "projections" and "leg portions" with "half-moon shaped" end portions.

Any one of these four reasons, standing alone, mandates that PAG's construction is correct.

### i.    A Half-Moon Shaped End Portion Is "The Invention" Of The '204 Patent

The Court should construe "projection" and/or "leg portion" as having a "half-moon shaped" end portion because that is how the inventor of the '204 patent consistently – and solely – defined his "invention." <u>Phillips</u>, 415 F.3d at 1321 ("[t]he patent system is based on the proposition that claims cover <u>*only*</u> the invented subject matter.") (emphasis added).

Throughout the specification of the '204 patent, the inventor of the '204 patent consistently proclaimed that his "invention," in relevant part, is "projections" and "leg portions" with "half-moon shaped" end portions.

### a.    "Summary Of The Invention" Section Of The '204 Patent

In the "Summary Of The Invention" section of the '204 patent, the inventor stated that his "invention" included "half-moon shaped" end portions or back plates:

> In accordance with ***the present invention***…. *The headed projections on the male plate have a **half-moon shaped** back plate* seated in a complementally shaped slot on the wall of the male plate *to preclude inadvertent turning and loosening* of the screwthreaded mounting of the headed projection with *concommitant loss of the projection from the plate* if its mounting completely comes apart."

DX "A," '204 Patent at Col. 3, line 50 and Col. 4, lines 35-36 and lines 43-49 (emphasis added).

### b.    "Brief Description Of The Drawings" Section Of The '204 Patent

In the "Brief Description Of The Drawings" section of the '204 patent, the inventor again reiterated that his "invention" does not encompass just any "projection," but only a "projection" with a "half-moon shaped" end portion:

> "Further objects and advantages of ***the invention*** will become apparent from the following description and claims, and from the accompanying drawings, wherein:

FIG. 5 is an exploded perspective view of *the headed projection* of the battery pack connection *of the present invention* and further illustrates its manner of securement to the male plate of the battery pack connection."

DX "A," '204 Patent at Col. 5, Lines 18-20 and lines 35-38 (emphasis added).  Figure 5 shows:



DX "A," '204 Patent at Figure 5.

### c. "Detailed Description" Section Of The '204 Patent

Finally, in the "Detailed Description Of The Preferred Embodiment" section of the '204 patent, the inventor once again consistently declared that his "invention" is a "projection" with a "leg portion" having a "half-moon shaped" end portion:

Referring now to the drawings in detail… the battery pack of ***the present invention*** is generally indicated by reference numeral 10 in FIG. 13 and includes a female plate 11 and a male plate 12.

The male plate 12 is formed with *a plurality of projections 26*, *each of which has* a large circular head 27 and *an integral narrow leg portion 28 terminating in a circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial **half-moon shape**….  The **half-moon shaped end portion** 54 is seated in a complementarily shaped slot 60 on the front wall of the male plate 12 *to preclude inadvertent turning and loosening of the threaded projection 26, with concommitant loss of the projection* from the plate 12 if its mounting completely comes apart.

DX "A," '204 Patent at Col. 6, Lines 17-22 and Col. 7, Lines 3-16 (emphasis added).

Where, as here, the inventor of a patent makes general statements such as "the present invention is," those statements must be viewed as limiting the scope of the claimed invention consistent with the inventor's characterization of "the present invention." <u>Alloc</u>, 342 F.3d at 1368-69 ("A patent applicant may consistently and clearly use a term in a manner either more or less expansive than its general usage in the relevant art, thereby expanding or limiting the scope of the term in the context of the patent claims.") (The "specification describes 'the invention' under the heading 'Technical Problems and Objects of the Invention,' as … where a play exists…. Thus, the specification teaches that the invention as a whole, not merely a preferred embodiment, provides for play in the positioning of floor panels."); <u>Microsoft Corp.</u>, 357 F.3d at 1347-48 ("When the specification 'makes clear that <u>*the invention*</u> does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.") ("In light of those clear statements in the specification that <u>*the invention*</u> ('the present system') is directed to communications 'over a standard telephone line,' we cannot read the claims… to encompass data transmission over a packet-switched network such as the Internet.  Instead, the specification shared by all three patents leads to the 'inescapable conclusion' that the communications between the local and remote sites of the claimed inventions must occur directly over a telephone line.") (emphasis added); <u>Watts</u>, 232 F.3d at 883 ("the specification actually limits the invention to structures that utilize misaligned taper angles, stating that the '<u>*present invention*</u> utilizes [the varying taper angle] feature.").

Thus, in light of the inventor's persistent description of his "invention" throughout the specification of the '204 patent, one of ordinary skill in the art would inescapably conclude that

"the invention" of the '204 patent, in relevant part, is the "projections" and "leg portions" that have a "half-moon shaped" end portion.  As such, the "projections" and "leg portions" of claims 9 and 11 of the '204 patent should be construed as having "half-moon shaped" end portions. Phillips, 415 F.3d at 1321 ("[t]he patent system is based on the proposition that claims cover *only* the invented subject matter.") (emphasis added).

**ii.     The '204 Patent Clearly Distinguishes Between The Projections And Leg Portions Of The '204 Patent And The Prior Art**

The second reason that the Court should construe "projections" and "leg portions" as having "half-moon shaped" end portions is because the inventor of the '204 patent clearly intended to invent "projections" and "leg portions" that are *different* than the "projections" and "leg portions" disclosed in the prior art '107 and '968 patents.  Indeed, in the '204 patent, the inventor stated that "the present invention is direct[ed] to further improving several features of the [foregoing prior art] battery pack connection[s]."  DX "A," '204 Patent at Col. 3, Lines 13-15.

**a.     The "Projections" And "Leg Portions" Of The '107 And '968 Patents Differ From The '204 Patent**

Contrary to the "projections" and "leg portions" described and defined in the '204 patent-in-suit, which have "half-moon shaped" end portions, the "projections" and "leg portions" of the prior art '107 and '968 patents do not have "half-moon shaped" end portions.  Instead, the "projections" and "leg portions" of the '107 and '968 patents merely have symmetrical end portions.

The following comparison chart clearly shows the differences between the "projections" and "leg portions" of the '204 patent as compared to the "projections" and "leg portions" of the '107 and '968 patents.

22

| '107 Patent: "Projections" | '968 Patent: "Projections" | '204 Patent: "Projections" |
|---|---|---|
| The male plate 12 is formed with a plurality of projections 26, *each of which has* a large head 27 and an integral narrow leg portion 28. Each projection may be secured to the male plate by being formed with an axial threaded hole into which a screw 29 from the backside of the male plate is threadable.<br><br>DX "B," '107 Patent at Col.<br><br>3, Lines 5-10. | The male plate 12 is formed with a plurality of projections 26, *each of which has* a large head 27 and an integral narrow leg portion 28. Each projection may be secured to the male plate by being formed with an axial threaded hole into which a screw 29 from the backside of the male plate is threadable.<br><br>DX "C," '968 Patent at Col. 4, Lines 23-28. | The male plate 12 is formed with a plurality of projections 26, *each of which has* a large circular head 27 and an integral narrow leg portion 28 terminating in a *circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial* **half-moon shape**. Each projection 26 may be secured to the male plate 12 by being formed with an axial threaded hole 58 into which a screw 29 from the backside of the male plate is threadable. *The* **half-moon shaped end portion** *54* is seated in a complementally shaped slot 60 on the front wall of the male plate 12 to *preclude inadvertent turning and loosening of the threaded projection 26*, with *concommitant loss of the projection from the plate 12* if its mounting completely comes apart.<br><br>DX "A," '204 Patent at Col. 7, Lines 3-16. |

    Moreover, the Figures showing the respective "projections" and "leg portions" of the '204, '107, and '968 patents also clearly show that the "projections" and "leg portions" of the '204 patent are noticeably different than the "projections" and "leg portions" of the '107 and '968 patents:

AT1 30042821.7



**'204 Patent, Figure 5**          **'107 Patent, Figure 4**          **'968 Patent, Figure 4**

DX "A," '204 Patent at Figure 5; DX "B," '107 Patent at Figure 4; DX "C," '968 Patent at Figure 4.

      As the projections of the '107 patent and the '968 patent do not have a "a circular end portion 54 which is cut linearly along a top edge 56 to provide a substantial half-moon shape," the "projections" and "leg portions" of the '107 and '968 patents are subject to "inadvertent turning and loosening" along "with concomitant loss of the projection from the plate 12." <u>See</u> DX "A," '204 Patent at Col. 7, Lines 3-7 and Lines 13-15. The projections of the '107 and '968 patents also fail to provide an "improved securement means for the headed projections on the surface of the male plate to prevent loss thereof." <u>See</u> DX "A," '204 Patent at Col. 3, Lines 45-47; DX "B," '107 Patent; DX "C," '968 Patent.

As the improved "securement means" requires "projections" and "leg portions" with a "half-moon shape," the "projections" and "leg portions" of the '204 patent must be construed consistent with this improvement over the prior art '107 and '968 patents.   DX "A," Col. 4, Lines 43-44.  Stated another way, the "projections" and "leg portions" terms of claims 9 and 11 of the '204 patent cannot be construed to encompass "projections" and "leg portions" that have symmetrical, non-half-moon shaped end portions because "projections" and "leg portions" with symmetrical, non-half-moon shaped end portions are disclosed in the prior art '107 and '968 patents and are expressly distinguished in the '204 patent.  O.I. Corp., 115 F.3d at 1581 (limiting claims because the specification described only non-smooth or conical passages and distinguished over the prior art based on these characteristics).

### iii.   The Inventor Of The '204 Patent Defined "Projections" And "Leg Portions" As Having An End Portion With A "Half-Moon Shape"

The third independent reason as to why the Court should construe "projections" and/or "leg portions" as having a "half-moon shape" is because the inventor of the '204 patent, acting as a lexicographer, clearly defined the terms "projections" and "leg portions" as having an end portion with a "half-moon shape."  Bell Atlantic, 262 F.3d at 1269 ("the patentee may act as his own lexicographer by using the specification to define terms either expressly or 'by implication.'"); at 1271 ("when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'").

The inventor of the '204 patent defined "projections" and "leg portions" as having end portions with a "half-moon shape" in at least three ways.

### a.     Express Definition

First, the inventor of the '204 patent expressly defined that "*each*" "projection" "has a large circular head 27 and an integral narrow leg portion 28 terminating in a circular *end portion* 54 which is cut linearly along a top edge 56 to provide a substantial *half-moon shape*." DX "A," '204 patent at Col. 7, Lines 3-7 (emphasis added). By this express definition, the inventor of the '204 patent requires "each" and every projection of the '204 patent to have "a circular end portion" with "a substantial half-moon shape."

### b.     Implicit Definition

Second, the inventor of the '204 patent also defined the "projections" and "leg portions" of the '204 patent by implication. As set-forth above, throughout the specification of the '204 patent, the inventor of the '204 patent always and only described the "projections" and "leg portions" as having "half moon shaped" end portions.

### c.     Pictorial Definition

Third, the inventor of the '204 patent defined the "projections" and "leg portions" of the '204 patent pictorially. Figure 5 of the '204 patent, which the inventor described as showing "the headed projection… of the present invention," clearly depicts the "projections" and "leg portions" as having a "half-moon shaped end portion."

Thus, the inventor of the '204 patent, acting as a lexicographer, expressly, implicitly, and pictorially, defined the "projections" and "leg portions" of the '204 patent as having "half-moon shaped" end portions. As such, the inventor's (and PAG's) definition should be adopted by the Court. Bell Atlantic, 262 F.3d at 1269 ("the patentee may act as his own lexicographer by using the specification to define terms either expressly or 'by implication.'"); at 1271 ("when a

patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'").

### iv.     No Alternative "Projection" Or "Leg Portion" Is Defined Or Disclosed In The Specification

The fourth independent reason why the Court should construe "projections" and/or "leg portions" as having "half-moon shaped" end portions is because no other definition or embodiment of "projections" or "leg portions" is disclosed in the specification of the '204 patent. Toro, 199 F.3d at 1301-02 ("the specification describes the advantages of the unitary structure as important to the invention…. This is not simply the preferred embodiment; it is the only embodiment.") ("This is not a case of limiting the claims to a 'preferred embodiment' of an invention that has been more broadly disclosed…. No such broader invention is here described."); Wang, 197 F.3d 1377, 1382-83 (limiting claims to the only embodiment described, a character-based protocol, and specifically not encompassing a bit-mapped protocol); Modine, 75 F.3d at 1551 ("When the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

As no alternative "projection" or "leg portion" is set-forth in the specification of the '204 patent, or depicted in a Figure, the claims of the '204 patent must be construed as requiring "projections" and "leg portions" that have a "half-moon shaped" end portion.  See Toro, 199 F.3d at 1301 ("Nowhere in the specification, including its twenty-one drawings, is the cover shown without the restriction ring attached to it.  Nor is the restriction ring shown other than attached to the cover.  The specification states that the restricting ring is automatically inserted and removed by the cover to which it is attached, and illustrates only this structure in the drawings.").  See also 37 C.F.R. § 1.83(a) ("The drawing in a nonprovisional application _must_

27

show *every feature* of the invention specified in the claims.") (emphasis added); Manual For

Patent Examining Procedure § 608.02(d) (Complete Illustration in Drawings).

### v.      Conclusion: PAG's Proposed Construction Is Contextually Correct And Accurate

PAG's construction should be adopted by the Court because it is contextually accurate

and correct. <u>Renishaw</u>, 158 F.3d at 1250 ("Ultimately, the interpretation to be given a term can

only be determined and confirmed with a full understanding of *what the inventors actually*

*invented* and intended to envelop with the claim. The construction that stays true to the claim

language and most naturally aligns with the patent's description of the invention will be, in the

end, the correct construction.") (emphasis added).

In light of the inventor's description of his invention in the "Background Of The

Invention" section, the "Summary Of The Invention" section, the "Brief Description Of The

Drawings" section, the Figures, and the "Detailed Description Of The Preferred Embodiment"

section, the only plausible definition of "projections" and "leg portions" is that they have "half-

moon shaped" end portions.

### 3.      Plaintiff's Proposed Construction Is Wrong

Plaintiff's proposed "construction" of "headed projections" is wrong.   Plaintiff's

proposed definition:

"More than one headed projection set apart from one another,"

cannot be right because its definition uses the word that is being defined, namely "projection."

DX "D," Plaintiff Anton/Bauer's Claim Constructions at 4.  Moreover, the specification of the

'204 patent does not expressly, implicitly, or pictorially support Plaintiff's proposed definition.

Plaintiff's definition of "each projection having head and leg portions" is equally non-

illuminating.  Plaintiff's arbitrary definition:

"Extending elements or features have an enlarged uppermost part relative to a lower, narrower portion, making them headed projections,"

is also without support or basis in the specification of the '204 patent.   DX "D," Plaintiff Anton/Bauer's Claim Constructions at 4.

In fact, the only definition of "projections" and "leg portions" set forth in the intrinsic record, is the definition proffered by PAG.  See DX "A," '204 Patent at Column 4, Lines 43-49; Column 7, Lines 3-7; and Figure 5.  Thus, Plaintiff's construction should be rejected.

## IV.    **CONCLUSION**

For the above-stated reasons, PAG respectfully submits that its claim constructions should be adopted by the Court.

This 20th day of January, 2006.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

s/Stephen R. Risley_____
Stephen R. Risley (ct22652)
J. Scott Culpepper (ct22653)
2600 One Atlanta Plaza
950 East Paces Ferry Road, NE
Atlanta, Georgia 30326
Telephone: 404-760-4300
Facsimile: 404-233-1267
Email: srrisley@rkmc.com
Email: jsculpepper@rkmc.com


Jason M. Kuselias (ct20293)
ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: 860-275-8200
Facsimile: 860-275-8299
Email: jkuselias@rc.com

Counsel for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTON/BAUER, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:01-CV-577-CFD |
| | ) | |
| PAG, LTD. | ) | |
|     Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANTON/BAUER, INC. and | ) | |
| ALEX DESORBO, | ) | |
|     Counterclaim and Third | ) | |
|     Party Defendants | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 20th day of January, 2006, a true and correct copy of the above and foregoing "DEFENDANT, PAG LTD'S, OPENING CLAIM CONSTRUCTION ("MARKMAN") MEMORANDUM" was served on the following counsel of record:

James T. Shearin
**PULLMAN & COMLEY, LLC**
50 Main Street
Bridgeport, CT 06604

Allen D. Brufsky
**CHRISTOPHER & WEISBERG, P.A.**
200 E. Las Olas Boulevard, Suite 2040
Ft. Lauderdale, FL 33301

by electronic mail and also by depositing a copy of the same in the United States mail, in a properly addressed envelope with sufficient first class postage affixed thereto.

s/Stephen R. Risley
Stephen R. Risley  (ct22652)
J. Scott Culpepper  (ct22653)
Attorneys for Defendant
PAG, LTD

AT1 30042821.7