UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTON/BAUER, INC. | ) |
| | ) |
|       Plaintiff | ) CIVIL ACTION NO. 3:01-CV-577 (CFD) |
| vs. | ) |
| | ) |
| | ) |
| PAG, LTD. | ) |
|       Defendant | ) |
| vs. | ) |
| | ) |
| | ) |
| ANTON/BAUER, INC. AND | ) |
| ALEX DESORBO | ) |
| | ) |
|       Defendant | JANUARY 20, 2006 |

## PLAINTIFF, ANTON/BAUER, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION OF PATENT NO. 4,810,204

## I.    INTRODUCTION:

Plaintiff, Anton/Bauer, Inc. ("Plaintiff" or "Anton/Bauer"), submits this brief in support of its proposed claim construction of U.S. Patent No. 4,810,204 (the "204 Patent" or "Patent").  Anton/Bauer's proposed claim constructions dated December 8, 2005 are attached hereto as Exhibit 1[1]; PAG, Ltd. ("Defendant" or "PAG's") proposed claim constructions dated December 8, 2005 are attached hereto as Exhibit 2. A copy of the '204 Patent is attached hereto as Exhibit 3.  For ease of reference, Anton/Bauer has reproduced the parties' respective construction in the text of this memorandum.

Simply put, the Patent discloses and claims a battery pack connection comprised of female and male plates that releasably lock together to form a

---

[1]    Pursuant to the Court's Order of November 9, 2005, the parties previously exchanged with one another their respective constructions of the claim terms in issue.

mechanical and electrical connection. The connection is used to power electric devices, such as movie cameras. '204 Patent at Col. 1, Lines 18-22. The connection permits the battery pack to be "quickly and efficiently replaced upon discharge of the batteries." Id. at Lines 14-15. The connection is used to power electric devices, such as movie cameras.

Plaintiff has accused PAG of violating claims 9 and 11 of the '204 Patent. Claim 9 of the Patent read as follows:

A releasable connection for a battery pack or the like comprising a relatively flat male plate and a relatively flat female plate,
said plates being adapted to be releasably locked together in connected position ;
said female plate including a plurality of depending slots, and at least one elongate terminal, said terminal and slots being elongate in the same direction;
said male plate including a plurality of spaced headed; projections with there being one for each slot and with each projection having head and leg portions, and at least one elongated mating terminal;
said male plate being positioned abutting the female plate with the legs of the projections being located in associated slots and with the one terminal within the mating terminal;
releasable locking means on said female plate for engaging at least one of the headed projections in one of said slots to lock said plates in connected position by preventing relative movement between said plates in the direction of said slots by maintaining the engagement of said locking means with said headed projection until said locking means is released; and said releasable locking means includes
at least one rotatable member on the backside of the female plate;
a pin on said rotatable member between said member and the backside of said female plate; and
means urging the member to a closed condition with said pin disposed in the path of movement of said headed projection inserted in said slot.

Claim 11 reads as follows:

The invention as defined in claim 9 wherein said urging means is a torsion spring disposed between the bottom of said rotatable member and a fixed support on the backside of said female plate.

2

As becomes readily apparent from a review of PAG's proposed constructions, PAG has violated the fundamental principles of claim interpretation clearly laid out by the Federal Circuit. PAG's tortured constructions are made solely to avoid an infringement determination of the accused devices or, in many instances, to capture within the scope of the claims the non-infringing alternatives Anton/Bauer pointed out in its Motion for Summary Judgment, dated May 25, 2004. More importantly, PAG ignores the established principles of Patent claim construction that require that the specification is the single best guide to the meaning of a disputed term and that rejects the transmutation of specification language into the claim limitations.

II.     **CLAIM CONSTRUCTION PRINCIPLES**

    A.     **The Purpose of Claim Construction.**

Patent claims are like a deed to property. They define the metes and bounds of an invention much like a deed displays where the boundaries of real property are. *See*, *Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1998). It is the claims that define the invention. *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc*. 52 F.3d 967, 970-71 (Fed Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). The goal of claim construction is to determine the ordinary and customary means of a claim to a person of ordinary skill in the art in question. *Phillips v. AWH Corp*., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). To determine this meaning, the court looks to "those sources available to the public that show" what such a person would understand the disputed claims to mean. Id.

Importantly, courts do not and cannot construe claims to redefine them, or to provide greater precision to the meaning of a claim than the patentee used. *See*, *PPG Industries, Inc. v. Guardian Industries Corp*., 156 F.3d 1351, 1354-55 (Fed. Cir. 1998). "'The construction of claims is simply a way of elaborating the normally terse claim language [ ] in order to understand and explain, but not to change, the scope of the claims.'" *Union Oil Company of California v. Atlantic Richfield Company*, 208 F.3d 989, 995 (Fed. Cir. 2000), *quoting*, *Scripps Clinic v. Genetech, Inc*., 927 F.2d 1565, 1580 (Fed. Cir. 1991).

**B.    The Standards of Claims Construction.**

Since *Markman* was first decided, the Federal Circuit has wrestled with balancing the use of intrinsic evidence and extrinsic evidence in arbitrating disputes involving claim construction.   Intrinsic evidence includes the claims themselves, the specification of the Patent, and the file history of the Patent. Extrinsic evidence is all evidence external to the Patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. The recent decision in *Phillips v. AWH Corp*., 415 F.3d at 1303, clarified the rules, holding that the most important sources concerning the meaning of a Patent claim term are those which constitute the intrinsic record. *Phillips*, 415 F.3d at 1312-1313.

**1.    The Claims**

The *Phillips* decision reaffirmed that the "bedrock principle of Patent law that the claims of a Patent define the invention to which the patentee is entitled the right to exclude." Id. at 1312 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, l582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the

4

scope of the patented invention").  The Federal Circuit emphasized the "primary importance" of the claims in determining "precisely what it is that is patented." Id. at 1312 (citing *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)).  "Because the patentee is required to define precisely what his invention is," the Court explained, "it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." Id. at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop")).  "[T]he claims define the scope of the right to exclude; the claims construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Freosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  After all, it is the claim "language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).

The Court went on to reaffirm the principle that "the words of a claim are generally given their ordinary and customary meaning," i.e., "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313 (citations omitted).  In this regard, the Court said that a person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire Patent, including the other claims and the specification. Id. at 1313.  The Court continued:

> Other claims of the Patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the Patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

Id. at 1314 (citations omitted).

## 2.    The Specification

After stressing the "primary importance" of the claims themselves, *Phillips* added that "[t]he claims, of course, do not stand alone"; rather they "must be read in view of the specification, of which they are a part." Id. at 1315 (citations omitted). Underscoring the importance of the specification, the Court declared: "'Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. at 1315, citing *Vitonics*, 90 F.3d at 1582. Stated another way, the "construction that stays true to the claim language and most naturally aligned with the Patent's description of the invention will be, in the end, the correct construction." Id. at 1316.

The Court noted that its cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive. *Phillips*, 415 F.3d at 1315 (citations omitted). Either way, the

6

specification was, as viewed by the Federal Circuit, the best guide for interpreting the claims. [2]

### 3.    The Scope Of The Claim Cannot Be Limited By the Specification.

It is important to distinguish the role of the specification in claim interpretation from any role in limiting the claims.    "Because the patentee is required to define precisely what his invention is, it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id.* at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop")). "[T]he claims define the scope of the right to exclude; the claims construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Freosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

---

[2]    *Phillips* also said that while prosecution history can often inform the meaning of the claim language, it should not be relied upon too heavily "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. at 1317.    Likewise, *Phillips* establishes that the claim interpretation process must avoid excessive reliance on the extrinsic record, which "consists of all evidence external to the Patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Id. at 1317.    As the Court explained, "while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." Id. (citations omitted).    In particular, the Court highlighted the dangers inherent in placing too much emphasis on dictionaries and treatises to construe claim terms:

The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the Patent.    Properly viewed, the "'ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire Patent.    Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification. Id. at 1321.

The *Phillips* court also explains that the scope of a claim is not based solely on the basis of the claim language, "but upon giving claims their broadest reasonable construction 'in light of the specification as it would be interpreted by one of ordinary skill in the art.'" *Phillips*, 415 F.3d at 1316, quoting *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). Importantly for the present case, *Phillips* clearly lays out the rule forbidding the importation of limitations from the specification into a claim. *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). While the Court acknowledged that "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice," id. at 1323, it emphasized that the distinction must be made.

> [T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a Patent describes only a single embodiment, the claims of the Patent must be construed as being limited to that embodiment.

Id. (citations omitted).

The Court observed that, "[m]uch of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specifications to be strictly coextensive." Id. (citations omitted). The Court added, "[t]he manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent." Id.

(citing *Snow v. Lake Shore & M.S. Ry. Co.*, 121 U.S. 617, 630 (1887) (it was clear from the specification that there was "nothing in the context to indicate that the patentee contemplated any alternative" embodiment to the one presented).

Thus, PAG's proposed claim constructions which import specification language to the claims as limitations are utterly unsupportable at law. Such gamesmanship with the specification language unfairly limits the scope of a Patent, runs counter to the Federal Circuit directive, and should not be condoned.

**III.    DISCUSSION:**

Anton/Bauer has based its proposed claim interpretations upon the most reliable intrinsic evidence, namely the claim terms themselves, the specification, and the plain meaning of the English language.  As shown above, this evidence is the single best guide to the meaning of a disputed term, and is usually dispositive by itself. Contrarily, PAG's proposed constructions are mostly distorted and unsupportable and are offered for two strategic reasons.  First, in several instances, PAG's construction is offered to eliminate certain of the non-infringing alternatives that Anton/Bauer has cited in its Motion for Summary Judgment.  For instance, PAG goes out of its way in several of its proposed constructions to argue, illogically and unreasonably, that the Patent does not teach an electrical connection.  Second, PAG attempts to narrow the claims by improperly importing language from the specification (or sometimes from no reference at all) so as to avoid a finding of infringement.  Given the direction on claim interpretation by *Phillips*, Anton/Bauer's proposed construction should be adopted, and PAG's proposed construction should be rejected.

9

Plaintiff has set forth below each of the terms at issue, the parties respective constructions, and an explanation as to why Anton/Bauer's construction should be accepted and PAG's construction should be rejected.

### 1.    A Releasable Connection For A Battery Pack Or The Like

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **releasable connection** is a separable attachment. '204 Patent at Col. 8, Line 65 to Col. 9, Line 53. | A **releasable connection** should be construed as a mechanical engagement that can be locked to hold two structures together, and that also can be unlocked so that the two structures can be separated. It does not refer to an electrical engagement. |
| A **battery pack** is a group of two or more cells connected together to furnish electric current. '204 Patent at Col. 6, Lines 25-27. | A **battery pack** is two or more electrochemical cells electrically interconnected in an appropriate series/parallel arrangement to provide the required operating voltage and levels. |
| **Or the like** means a similar functional structure to a battery pack, i.e., to furnish electric current. | **Or the like** is so indefinite and ambiguous that it cannot be construed. |

This first element of claim 9 is a **releasable connection**[3] for a **battery pack or the like**, which is comprised of a relatively flat male plate and a relatively flat female plate. Claim 9 in its entirety and the element at issue are straight-forward.

As Anton/Bauer has posited, and as the language of the specification makes clear, the term **releasable connection** speaks to a separable attachment. The two plates are attached together to form their connection and separated to break the connection. '204 Patent at Col. 8, Line 65 to Col. 9, Line 53.

---

[3] Claim terms are referenced in bold print.

10

The attachment is for a battery pack or the like.  A **battery pack** is a group of two or more cells connected together to furnish an electric current.  Id. at Col. 6, Lines 25-27.  This construction is consistent with the commonly accepted definition of this well-known term.

"**Or the like**" means a structure similar in function to a battery pack, i.e., a structure that furnishes power or other electronic controls.  The specification describes some of these similar structures. Id. at Col. 11, Lines 20-25 (e.g. AC power supplies; power taps).

PAG argues that a **releasable connection** is "a mechanical engagement that can be locked to hold two structures together, and that can also be unlocked so that the two structures can be separated."  Obviously, PAG has gone out of its way to embellish a construction of this term that is both inconsistent with the plain and ordinary meaning of the words.  The claim does not discuss merely a "mechanical" engagement, but rather an attachment of two components.  PAG improperly attempts to import the loaded term "mechanical" into the claim language to preclude an electrical engagement.  It even goes so far as to say that the connection is not an electrical engagement.  The intrinsic evidence does not describe such an unfair construction nor does *Phillips* permit this limitation.

The term **releasable connection** can only mean that which is compelled by the words that are used – a connection that can be released or an attachment that can be separated.  The term is not limited to mean that only one type of connection exists (i.e. mechanical), or that there is only one type of releasable connection, (i.e., mechanical or electrical.)  No such limitation can reasonably be read into this claim term.

11

The court should be mindful of the continuing theme that runs though PAG's attempts to have the court misconstrue the Patent.  PAG desperately seeks to avoid the finding that the connection taught by the Patent is both electrical as well as mechanical, because it wants this Court to disregard certain of the non-infringing alternatives that form a mechanical connection to the female plate but not electrical connection.  See Anton/Bauers' Memorandum of Law in Support of Motion for Summary Judgment, dated May 25, 2004, at 16-20, a true and accurate copy of which (without exhibits) is attached hereto at Exhibit 4.  By limiting the Patent to a mechanical connection, these devices may arguably become infringing and thus potentially violate the first prong of the implied license defense – i.e., the Patentee sells an article (the female plate) that has no non-infringing uses. *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003).  Try as it might, however, PAG cannot read an electrical connection out of the claims or ignore the specification.  This very first claim element talks about a connection for a battery pack or its equivalent which both logically, under the terms of the Patent, and consistent with the English language, can only speak to an electrical and mechanical connection insofar as it refers to an electrical power source (i.e. a battery pack) and a device to be powered (i.e. that which the battery pack is being connected to) as a result of the mating of the two plates.

Furthermore, PAG also errs in attempting to construe a "**releasable connection**" as one "which can be locked."  The two functionalities of releasably connecting the plate and locking them are dealt with separately in the claim.  Compare '204 Patent, Col. 12, Line 31 with Lines 34-35, and Lines 45-64.  If PAG's construction

were appropriate, the balance of the claim that describes the plates as being releasably locked together would be superfluous. The term "**releasable**" simply means that the battery pack may be detached.

PAG also submits that a **battery pack** is two or more electro-chemical cells electrically interconnected[4] in an appropriate series/parallel arrangement to provide the required operating voltage and levels. The parties seemingly agree that a **battery pack** is a group of two or more electro-chemical cells that are interconnected. PAG, however, improperly suggests that the cells have to be somehow arranged in an "appropriate series/parallel arrangement to provide the required operating voltage and levels." This "appropriate" arrangement is not mentioned in the claims or anywhere in the intrinsic evidence.

PAG lastly says that "**or the like**" is so indefinite and ambiguous that it cannot be construed. Nothing could be further from the truth. "Or the like" is modified by the phrase "battery pack." Simply put, "or the like" refers to a structure similar in nature and purpose to a battery pack. There is nothing confusing or ambiguous about this language.

---

[4] Once again, PAG goes out of its way to contort the nature of the connections involved with the Patent. The only way two or more electro-chemical cells can be electrically interconnected is if they are mechanically connected. You cannot have one without the other.

2. **Releasably Locked Together In A Connected Position**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| The term releasably **locked together in a connected position** means two plates which are held or fastened together, in a manner which can be released, which connection provides for a linking and continuity of the mating functional elements of the two plates. '204 Patent, Col. 7, Line 55 to Col 8, Line 9; Col. 8, Lines 22-33; 65 to Col. 9, Line 53; Col. 8, Lines 10-30; Col. 9, Lines 19-33; 34-53, | The term **releasably locked together in a connected position** refers to a mechanical engagement that can be locked to hold two structures together, and that also can be unlocked so that the structures can be separated. The phrase does not refer to an electrical engagement. |

This portion of Claim 9 follows upon the introduction of the male plate and female plate into the claim language. The plates are adapted (i.e. configured) to be "**releasably locked together in a connected position**." The term "**releasably locked together**" means that the two plates are held or fastened together in a manner which can be released. This meaning is obvious from the language used, and consistent with the specification. The specification explains the locking mechanism and locking process, '204 Patent, Col. 7, Line 55 to Col 8, Line 9; Col. 8, Lines 22-33; 65 to Col. 9, Line 33, as well as the releasing process, Col. 8, Lines 10-33; Col. 9, Lines 34-53.

Importantly, the claim language goes on to say that the plates releasably locked together must be in a "**connected position**." In order to give this language meaning, the Court must construe the claim language so that when the two plates are releasably locked together, they are fastened directly to provide a link and continuity of the mating

functional elements of the two plates (i.e. they are connected or joined together). It is not sufficient that the two plates be locked together; they must be "connected."

This linking of the functional elements is described in the specification. '204 Patent, Col. 8, Line 65 to Col. 9, Line 53. The construction of the female plate and the way in which the female plate forms an electrical connection to the device is described at Col. 6, Line 34 to Col. 7, Line 2. Likewise, the male plate and the way in which it is electrically connected to the associated battery pack is described at Col. 7, Lines 3-54. When the plates are attached together, they physically mate such that the female terminals receive the male terminals to form the electrical connection. Col. 8, Line 65 to Col. 9, Line 54. When the attachment is separated, the electrical connection is broken. Col. 8, Lines 24-25.

PAG's proposed construction again seeks to limit the connection to a mechanical one only. In so doing, PAG tries to insert meaning into the claim that is belied by the terminology used. The terms "**locked together**" in a "**connected position**" with the male and female plate "**abutting**" one another bespeaks a direct connection, not simply some amorphous mechanical engagement. This "connection" must be understood to be one that creates the union of the functional elements, both mechanical and electrical, of the two plates.

3.    **The Female Plate, Including A Plurality Of Depending Slots And At Least One Elongated Terminal**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **relatively flat female plate** is one of two mating elements of the releasable connection that is, for the most part, constructed on one functional plane which contains one or more holes used for mating or connecting to a male counterpart.  '204 Patent, Col. 6, Line 33 to Col. 7, Line 3; Figures 6, 7 and 8. | A **female plate** should be construed as an object that interconnects an electrical device or a support or a recharging unit to the male plate. |
| A **depending slot** is a narrow opening extended from a larger opening in the direction of the mating engagement.  Figure 6, item 17; Col. 8, Line 68 to Col. 9, Line 9; Col. 9, Lines 3-14, 26-34. | A **depending slot** is the symmetrical portion of the keyhole openings cut in the front surface of the female plate that have parallel side walls and that are separate and distinct from the ovoid or elliptical portion of the keyhole opening.  Depending slots does not include the ovoid or elliptical of the keyhole opening. |
| At least one **elongated terminal** means one or more devices attached to the end of an electrical apparatus for making an electrical connection, which are long in proportion to width.  Figures 6 and 8 at item 19; Col. 6, Lines 42-54; Col. 8, Lines 25-28; Col. 9, Lines 24-33. | An **elongated terminal** means an electrical connector that has (i) an expandable tip; and (ii) a threaded shank. |

The **female plate** is one of the two plates that mates or interconnects with its male counterpart to form the releasable connection.  It contains one or more holes used for mating with its male counterpart.  '204 Patent, at Col. 6, Line 33 to Col. 7, Line 3; Figures 6, 7 and 8.

16

According to PAG, the claim should be further construed to require that the female plate must be used to interconnect an "electrical device,[5] or a support, or a recharging unit to the male plate." Again, PAG improperly tries to import limitations into the claim from the specification ('204 Patent at Col. 6, Lines 24-25) that does not exist. The male plate is attached to the battery pack or the like through which electric current is passed to the female plate and, in turn, to the device to be powered. Certainly, in the Abstract and Background sections of the Patent, the Patent reveals that the use of the releasable connection was to power electrical devices with the female plate (which makes clear that the connection is an electrical one) attached to the electrical device. See Abstract; Col. 1, Lines 18-22. But, there is no claim language which limits to what the female plate may be attached. *Phillips* precludes the use of the specification to limit the claim terms. *Phillips*, 415 F.3d at 1323.

The female plate has a **plurality of depending slots**. As the Patent makes clear, this term refers to more than one narrow opening extended from a larger opening in the direction of the mating engagement, the mating engagement being the projections contained on the male plates. The depending slots are shown in Figure 6 at item 17; see also Col. 8, Line 68 to Col. 9, Line 9; Col. 9, Lines 26-34. Notably, the parties do not disagree that the slots are the lower portions of the keyhole openings cut in the front surface of the female plate. But, contrary to PAG's suggestion, the claim language does not require symmetry or separation from the ovoid or elliptical portion of the keyhole. Rather, PAG attempts, for some reason, to include phantom

_____

[5] Even PAG cannot help but trip over itself with its inconsistent use of the words electrical, mechanical and connection. If the female plate is used to interconnect an electrical device such as a recharger to the male plate, it must, of logical consequence, form an electrical connection.

restrictions in its proposed construction.    Indeed, as the reference to the term "keyhole" makes clear, and as the specification supports, the slots are simply the lower and narrower portions of the keyhole openings.  Col. 9, Lines 3-14, 26-34.

The female plate also has at least one **elongated terminal** in the claim.  An elongated terminal is a device attached to the end of an electrical apparatus for making an electrical connection, which is long in proportion to width.   One such terminal is depicted in Figures 6 and 8 at item 19.  The **elongated terminal(s)**, when wired, provide for the electrical connection of the female plate to the device, Col. 6, Lines 42-54, and subsequently to the male plate and the battery or the like, Col. 8, Lines 25-28; Col. 9, Lines 24-33.  PAG, ironically, does not differ with this construction from the standpoint of the elongated terminal being the means by which the electrical connection is accomplished (thus undermining its argument elsewhere that there is no electrical connection).  Where PAG goes wrong this time is that it seeks to define a specific type of terminal, that which has an expandable tip and threaded shank – the terminal specifically depicted in Figure 6.   While this is the preferred embodiment taught by the Patent, the claim is not so limited.  The claim speaks to any and all terminals of whatever configuration or nature, so long as they are elongated.  In claim construction, the specification can help define the claim, but it does not limit the claim. *Phillips* at 1323.  The binding precedent has "expressly rejected the contention that if a Patent describes only a single embodiment, the claims of the Patent must be construed as being limited to that embodiment." *Id*. Nonetheless, that is the essence of PAG's proposed claim construction.

4.  **A Male Plate, Including A Plurality Of Spaced Headed Projections, With There Being One For Each Slot And With Each Projection Having Head And Leg Projections, And At Least One Elongated Mating Terminal**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **relatively flat male plate** is one of two mating elements of the releaseable connection that is, for the most part, constructed on one functional plane which contains one or more projections used for mating or connecting to a female counterpart.  204 ' Patent, Col. 7, Lines 3-55; Figures 1 & 2, and which is connected to a battery pack or the like.  Col. 6, Lines 24-28; Col. 8, Lines 65-66. | The **male plate** is one side of a closed container that has a half-moon shaped slot in its front wall and which contains rechargeable batteries. |
| The **plurality of spaced headed projections** means more than one headed projection set apart from one another.   The headed projections are extending elements or features that have an enlarged uppermost part relative to a lower, narrower portion, making them headed projections.   Figure 5, item 27; Col. 7, Lines 3-7. | The **plurality of spaced headed projections** means three parts of the male plate that protrude from the surface of the male plate, each of which must have: (i) a large circular head; (ii) an integral narrow leg portion; and (iii) a half-moon shaped end portion or back plate. |
| One **spaced headed projection for each slot** means a one-to-one correspondence between the number of depending slots and the number of spaced headed projections. | One **spaced headed projection for each slot** means a one-to-one correspondence between the number of depending slots and the number of spaced headed projections. |

| | |
|---|---|
| At least **one elongated mating terminal** is one or more devices attached to the end of an electrical apparatus for making an electrical connection which are long in proportion to width and which joins or fit together with its/their counterpart(s). Col. 9, Lines 23-33. | At least **one elongated mating terminal** is a removable or adjustable housing on the male plate that must include: (i) a U-shaped opening; (ii) a stationary post that is surrounded by the U-shaped opening; (iii) at least four shoulders; (iv) a groove; (v) a space; and (vi) female contacts. |

The **male plate** is defined in relationship to its female counterpart. It is the second of the two plates that are interconnected to form a **releasable connection**. '204 Patent, Col. 7, Lines 3-55; Figures 1 and 2, and which is connected to the battery pack or the like. Col. 6, Lines 24-28; Col. 8, Lines 65-66.

According to PAG, the **male plate** should be "one side of a closed container that has a half moon slot in its front wall". There is no claim language requiring the male plate to have a half moon shape slot in its front wall. Rather, PAG seeks to impose those limitations by misconstruing the Patent and by importing language from the specifications at Col. 7, Lines 3-17. The patentee knew how to define what he wanted his plate to have, e.g. headed projections. He did not say it had to have a half-moon slot in its front wall. He dealt with that in Claim 8 which is not in issue in this claim. Col. 12, Lines 28-30.

The male plate has a **plurality of space headed projections**, which simply means that it has more than one feature that protrudes from the surface of the male plate, each of which has a larger head in relation to a narrower leg portion, and which are set apart from one another. These projections are depicted in the specifications. Figure 5, item 27; Col. 7, Lines 3-7.

20

Contrary to the construction offered by PAG, there is no requirement in the claim language that there be only three projections nor that they have a half-moon shaped end portion or back plate. While the preferred embodiment depicts three projections with a half-moon shaped end portions, see Figure 1 at item 26, 5, and 6; Col. 7, Lines 11-16, for the reasons stated above, the limitations of specification cannot be imported into the claim. *Phillips* 415 F.3d at 1323. The number of headed projections is defined by the number of defending slots on the female plate. Col. 12, Lines 40-42. The claim is for plurality of projections which means one for each of the depending slots. PAG's attempt to define the number of projections as three is utterly unsupported. Further, there is no requirement that there be a half-moon shaped end position. The specification explains that the purpose of this configuration is to prevent inadvertent turning and loosening of the projections. Col. 7, Lines 11-16. While that is certainly one way to perform that function, it is not the only way and the Patent cannot be so limited.

The **male plate** must also have at least one "**elongated mating terminal**."[6] This "mating" element complements the terminal on the female plate or, more specifically, one or more devices attached to the end of an electrical apparatus for making an electrical connection which are long in proportion to width. It is when those two terminals are connected, Col. 12, Lines 46-47, that the electrical connection is formed. Col. 9, 23-33.

---

[6] The terminal on the male plate has a female contact terminal block in the housing for "receiving the companion female contact terminal." '204 Patent, Col. 7, Lines 21-22. These female contact terminals, in turn, are connected by wires to the battery. Id., Lines 30-35. Once the block is joined with the male plate, the "male terminals received in the female contact terminals in holes will self-align and make appropriate contact." Id. at 37-39.

PAG offers a wholly improper construction of "elongated mating terminal," arguing that it must include "a removable and adjustable housing on the male plate that must be expanded to include: (i) a U-shaped opening; (ii) a stationary post that is surrounded by the U-shaped opening; (iii) at least four shoulders; (iv) a groove; (v) a space; and (vi) female contacts." In this regard, PAG cannot help but stumble over itself from trying to define the claim as a verbatim recitation of the specification. Col. 7, Lines 18-44. PAG's construction is without foundation, and its absurd attempt to add six additional elements to a single claim term, a clear violation of claim construction principles. *Phillips*, 415 F.3d at 1323. Those skilled in an art understand that an elongated mating terminal is one part of the coupling in an electrical connection. That mating terminal may be many things, any type of terminal that forms the coupling. The Patent cannot be limited to the embodiment described in the specification.[7]

--------

[7] PAG's reason for defining the Patent this way should not escape the court. Plain and simple, PAG seeks to argue that because the terminal on its infringing device does not literally satisfy each of these six components it cannot infringe. It cannot so readily avoid its unfair conduct.

**5.    Said Male Plate Being Positioned Abutting The Female Plate With The Leg Of The Projections Being Located In Associated Slots And With The One Terminal Within The Mating Terminal**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
| --- | --- |
| The phrase **being positioned with the one terminal within the mating terminal** should be construed to be the nexus or linking of the two or more electrical terminals of the two plates by the insertion of one into another.  The linking of these two terminals is what forms the electrical connection between the two plates.  Col. 8, Line 68 to Col. 9, Line 30. | The phrase **being positioned with one terminal within the mating terminal** means provided to assure proper alignment and entry of the male contact terminals into the female contact terminals upon assembly of the male and female plates, which means necessarily include the one elongated terminal on the female plate (as defined above) and the at least one elongated terminal on the male plate (as defined above). |

It is here that the claim term – **the male plate being positioned – with the one terminal within the mating terminal** -- speaks to the "nexus or linking of the two or more electrical terminals of the two plates by insertion of one into the other."  Col. 8, Line 68 to Col. 9, Line 30.  The linking of these terminals is what forms the electrical connection between the two plates, just as the release of these two terminals breaks the electrical connection.  Col. 8, Lines 22-25.  PAG's definition is complicated, vague and ignores the functionality that results from the mating of the terminals.

6.    **Releasable Locking Means On Said Female Plate For Engaging At Least One Of The Headed Projections Which Means Include At Least One Rotable Member On The Backside Of The Female Plate**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| The **releasable locking means** is the mechanics on the female plate which permit the separable binding and unbinding of the plates relative to one another, Figures 8-11, 16-19; Col. 7, Line 55 to Col. 8., Line 64; Col. 9, Lines 15-24, 34-54; Col. 10, Line 20 to Col. 11, Line 16, by the interaction with one or more of the headed projections on the male plate, as shown and described in the specification.  Col. 7, Line 55 to Col. 8, Line 47; Col. 9, Lines 15-24, 34-54; Figures 8-11 and 16-19. | This claim term should not be construed as a "means-plus function."  The term **releasable locking means** should be construed to mean a mechanical engagement that can be locked to hold two or more structures together, and that also can be unlocked so that the two or more structures can be separated. |

This claim term is a means-plus function term. The construction of a means-plus-function limitation includes two steps. First, the court determines the claimed function. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003). Second, it identifies the corresponding structure in the written description that performs that function. *Id*. The scope of the claim includes the structure in the specification and its equivalents.  See *Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999)*.

The female plate has a **releasable locking means for engaging at least one of the headed projections**.  This term refers to mechanics which permit the separable binding and unbinding of the plates relative to one another in interaction of

24

one or more of the headed projections of the male plate to slots in the female plate. Col. 7, Line 55 to Col. 8, Line 64; Col. 9, Lines 34-54; Col. 10, Line 20 to Col. 11, Line 16.  See Figures 8-11 and 16-19.  The structure consists of a rotable member on the backside of the female plate, Col. 12, Lines 56-57; a pin on said rotable member between said member and the backside of the female plate, id. at lines 58-60; and a means for urging the member to a closed condition with the pin disposed in the path of movement of the headed projection inserted in the slots; id. at 60-63.  This structure is described in the specifications are set forth at Col. 7, Line 55 to Col. 8, Line 46; Col. 9, Lines 15-24, 34-54 and Figures 8-11 and 16-19.  The Patent covers this structure and all its equivalents.

PAG's proposed construction is inaccurate and incomplete because it does not define the releasable locking means as a) being part of the female plate, b) as means to engage at least one of the headed projections on the male plate with a releasable component that includes at least one rotable member of the backside of the female plate and c) "'a means for urging the member to a closed condition with said pin disposed in the path of movement.'"  In fact, the inadequacy of PAG's construction is obvious when one simply compares their definition of the terms **releasably locked together** and **releasable locking means;** they are virtually identical.   "When construing the functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim." *Generation II Orthotics, Inc. v. Med. Tech., Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001).

7.    **Means Urging The Member To A Closed Condition With Said Pin Disposed In The Path Of Movement**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| The term means **urging the member to a closed condition with said pin disposed in the path of movement** refers to mechanics by which force is applied to the rotatable element so as to bias it, with some force, to the extent of its ability to travel in a direction, such that the pin blocks the change of position of the headed projection within the slot, as shown and described in the specification, Col. 8, lines 10-46; Figuress 9-11; Col. 9, Lines 15-19; 45-48; Col. 10, Line 10 to Col. 11, Line 16; Figures 9-11; 14-19. | The term means **urging the member to a closed condition with said pin disposed in the path of movement.** This should be construed as a "means-plus-function" term. The claimed function is: "urging the member to a closed condition." The corresponding structure in the Patent is either: (1) a "leaf spring 72" comprising a generally linear metallic member spanning between a "V-notch 77 on the bottom of body portion 73" and a "block 78;" or (2) a "torsion spring" comprising a coiled metallic spring with one end secured to a hole in "the bottom of body portion 73'" and another end "rotatably mounted in a lateral opening in a fixes [sic] block 78." |

This claim is also a means-plus-function claim that requires the *Omega* two-step analysis performed above.

Claim 9 provides that the **releasable locking means urges a rotatable member to a closed condition with said pin disposed in the path of movement.** The parties agree that the function is to urge the rotable member to a closed condition. This is accomplished by force applied to the rotatable member so as to bias it, with some force, to the extent of its ability to travel in the direction, such that the pin blocks the change of position of the headed projection within the slot.

The corresponding structures described in the specification for accomplishing the urging of the member consists of a leaf spring assembly (Figures 9-11); Col. 8,

Line 10-46; Col. 9, Lines 15-19, 45-48 or a torsion spring assembly (Figures 14-19; Col. 10, Line 10 to Col. 11, Line 16).   But, the Patent cannot be limited, as PAG suggests, to either of these precise embodiments.   A means plus term incorporates the structure and its equivalents, not the embodiment of the specification.   *Omega Eng'g*, 334 F.3d 1321.

### 8.    Torsion Spring

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **torsion spring** is an elastic body, twisted and formed or constructed in a manner as to exert force on one end in one longitudinal direction about an axis while the other end is forced in an opposing direction.<br><br>Col. 10, Lines 36-38, 52-56 and 63-66 to Col. 11, Line 3; Figure 16 at item 72. | A **torsion spring** is a coil that reacts against a twisting motion to move or return a part or component. |

A **torsion spring** is an elastic body, twisted and formed and constructed in a manner as to exhibit force on one end in a longitudinal direction about an axis while the other end is forced in an opposing direction.  Col. 10, Lines 36-38, 52-56, and 63-68 to Col. 11, Line 3; Fig. 16 at item 72'; Fig. 18, item at 72'.  PAG's definition does not describe what a spring truly accomplishes, which is to exert force on the two opposing ends while the spring is depressed, as opposed to only one of the ends.

### 9.    Fixed Support On The Back Side Of The Female Plate

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A stationary anchor point, for the spring element, constructed on the opposite side of the female plate from the female plate's planar nexus to the male plate.<br><br>Col. 10, Lines 34-40. | An immovable block attached to the backside of the female plate that holds and supports the torsion spring. |

This claim term – **fixed support on the back side of the female** plate – appears in claim 11, which is dependent upon claim 9. It speaks to a particular urging means by use of a torsion spring disposed between the bottom of the rotatable member as defined in claim 11 and a fixed support on the back side of the female plate. The **fixed support** is simply a stationary anchor for the spring element, constructed on the opposite side of the female plate from the portion of the female plate that is next to the male plate. Col. 10, Lines 34-40.

### IV.    CONCLUSION:

Anton Bauer has proposed claim construction that is supported by the specification as directed by the Federal Circuit in *Phillips*. Proper citations to the specification for construing the claims have been provided for the court's convenience in the proposed claim construction chart. Under *Phillips*, the Federal Circuit mandates 1) that the specification be the primary source for interpreting the claims, and 2) that the claims may not be narrowed by the importation of specification terms into the language of the claims. PAG's proposed language blatantly fails to follow the

mandates, and PAG's baseless proposal of claim construction should not be condoned.

PLAINTIFF
ANTON/BAUER, INC.


By:   /s/ James T. Shearin
    James T. Shearin, Esq. – ct 01326
    Brian C. Roche, Esq. – ct 17975
    Pullman & Comley, LLC
    850 Main Street, P.O. Box 7006
    Bridgeport, CT  06601-7006
    Phone:  (203) 330-200
    Facsimile:  (203) 576-8888

    Allen D. Brufsky, Esq. – ct 04490
    Christopher & Weisberg,P.A.
    200 E. Las Olas Blvd
    Suite2040
    Ft. Lauderdale, FL 33301
    Phone: (954) 828-1488
    Facsimile: (954) 828-9022

## <u>CERTIFICATION</u>

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on the date hereon to all counsel and pro se parties of record:

Stephen R. Risley, Esq.
J. Scott Culpepper, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
950 East Paces Ferry Road NE
2600 One Atlanta Plaza
Atlanta, Georgia 30326

Jason M. Kuselias
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

    /s/ James T. Shearin
James T. Shearin –  ct 01326
Brian C. Roche    – ct 17975

Bridgeport/57052.2/JTS/585732v2