UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTON/BAUER, INC. | ) |
| | ) |
| Plaintiff | ) CIVIL ACTION NO. 3:01-CV-577 (CFD) |
| vs. | ) |
| | ) |
| PAG, LTD. | ) |
| | ) |
| Defendant | ) |
| | ) |
| vs. | ) |
| | ) |
| ANTON/BAUER, INC. AND | ) |
| ALEX DESORBO | ) |
| Defendant | ) FEBRUARY 17, 2006 |

_____

**MEMORANDUM IN RESPONSE TO DEFENDANT PAG, LTD.'S OPENING
CLAIM CONSTRUCTION ("MARKMAN") MEMORANDUM**

**I.    INTRODUCTION**

Pursuant to the parties' agreement, and subsequently this Court's Order, the parties exchanged on December 1st a list of the claim terms they asserted should be construed by the Court.  A copy of the submission made by Anton/Bauer, Inc. ("Anton/Bauer") in this regard is attached as Exhibit A to this memorandum and a copy of the submission made by PAG, Ltd. ("PAG") is attached as Exhibit B.  On December 8th, the parties filed what they believed to be the proper construction of those respective terms.  Those constructions are attached as Exhibits D and E to PAG's Opening Claim

Construction ("Markman") Memorandum filed on January 20, 2006 ("PAG's Memorandum").

On January 20, 2006, the parties were ordered to submit their briefs supporting their respective constructions.  Both did so, although PAG decided to focus solely on the single phrase in Claim 9 of US Patent No. 4,810,204 (the "'204 Patent") to wit:

> Said male plate including a plurality of spaced *headed projections* with there being one for each slot and with each projection having head and leg portions, and at least one elongated mating terminal.

For the reasons that follow, Anton/Bauer submits that this Court should reject PAG's convoluted construction of this disputed claim term and not read into the claim term language from the specification that was excluded by the inventor, to wit, that the leg of the projection must terminate in a half-moon shape.  Frankly, the construction urged upon this Court by PAG is reprehensible in that it both runs afoul of Federal Circuit precedent directly on point and pure common sense.  PAG is doing nothing less than attempting to rewrite the '204 Patent to avoid infringement.

Further, given that PAG has not offered any support for the construction of the remaining terms, apparently opting instead to put all of its "proverbial eggs in one basket", the Court should adopt all the constructions offered by Anton/Bauer in its Memorandum of Law in Support of its Proposed Claims Construction of Patent No. 4,810,204, filed on January 20, 2006 ("Anton/Bauer's Memorandum").

## II.     <u>FACTS AND PROCEDURAL HISTORY</u>

The '204 Patent is a combination patent.  It teaches the union of a female and male plate for the purposes of forming an electrical and mechanical connection, most often used, for example, to attach a battery pack to an electrical device.  See '204 Patent at Column 1, Lines 10-33.   This is the third generation of the underlying technology created by employees of and later assigned to Anton/Bauer.  <u>See also</u> U. S. Patent Numbers 4,218,107 (the "'107 Patent") and 4,550,968 (the "'968 Patent"), attached to PAG's Memorandum as Exhibits B & C.  The earlier patents similarly taught a releasable connection for a battery pack or the like but did so in different ways.  As this court held in its Ruling on Motion for Preliminary Injunction, attached hereto as Exhibit C, at 4, ¶15, and as the parties stipulated to, the '107 Patent "discloses all aspects of the male-female battery pack connection claimed in the '204 Patent except for the components of the 'releasable locking mechanism on said female plate' specified in Claims 9 and 11 of the '204 Patent."

Summarily stated, the '107 Patent disclosed the combination of the two plates, <u>see</u> '107 Patent at Column 4, Lines 43-62, and relied upon a tensioned flexible strip to engage the head of the projection inserted into the keyhole to maintain the connection. <u>Id</u>. at Column 4, Line 62 to Column 5, Line 6; <u>see also</u>, '204 Patent  at Column 1, Line 66 to Column 2, Line 2.  To remove the plates, the user simply bent the strip from its normal position.  <u>Id</u>. at Column 2, Lines 3-4.

The '968 Patent modified the core '107 Patent invention by improving the efficiency and speed of the connection, and facilitated use of the flexible locking strip by employing a latch activator.  '968 Patent, Column 6 at Lines 16-23; Column 7, Lines 11-21; and Column 8, Lines 31-35; see also '204 Patent, Column 2, Lines 35 to Column 3, Line 13.

The '204 Patent was the third iteration of the releasable connection in a new combination.  The '204 Patent discloses several new and different features to the engagement of the two plates in the combination - -- a locking mechanism, safety latch, newly designed keyhole slots to facilitate alignment, and means to ensure proper alignment of the male and female terminals. "…[A]long with" the foregoing is an improved securement means for the headed projections on the male plate.  See '204 Patent at Column 3, Lines 16-47; see also e.g. Column 11, Line 47 to Column 2, Line 3; Column 12, Line 48 to Column 13, Line 12.[1]

In relevant part, the claim term in issue relates to the male plate and, more particularly, to the *headed projections* that are affixed to the male plate and used to align and attach the male plate to the female plate.  The *headed projections* on the male

---

[1] Because of the evolutionary nature of the '204 Patent, PAG has labeled the '204 Patent an "Improvement" patent.  This Court should note from the outset that no such label attaches for purposes of claims construction.  Rather, the same principles that apply to the construction of the earlier patent, or for that matter any patent, apply here.  This Court should also note that PAG is being fairly disingenuous with the Court.  Its quote on Page 3 of its Memorandum exalts the improved securement means as though it was some principal feature of the patent.  Its ellipses, however, skips over 28 lines of text and ignores the fact that the improved securement means for the headed projections was designed "along with" the novel means for alignment locking engagement of the plates.

plate "extend into and beyond the larger expanded openings in the keyholes" in the female plate. '204 Patent at Column 9, Lines 2-8.

PAG's proposed construction focuses not on the portion of the *headed projection* that engages with the keyholes nor, for that matter, even the leg portions that slide down the keyhole slot upon engagement, but rather on the base of the *headed projection* where it is seated to the male plate itself. PAG argues that Claim 9, and all claims, of the patent should be read to require that the all *headed projections* require a base which abuts the male plate that are half-moon shaped and are received in a corresponding half-moon recesses.

PAG has not offered a construction of any of the other claims terms either that it put into issue by virtue of its submission, Exhibit B, or in response to Anton/Bauer's submissions, Exhibit A. PAG has also not offered any argument in support of or explanation for the constructions it offered in its submissions. Notably, the parties' agreement, as adopted and ordered by the Court, required claims constructions to be exchanged on December 8 and supporting memoranda to be filed on or before January 20, 2006.

## III.    **CONTROLLING LAW**

Anton/Bauer does not take issue with the fact that the preferred embodiment of the '204 Patent describes, in part, *headed projections* terminating in a half-moon shape. It also does not take issue with the fact that this half-moon shape design was not

5

expressly recited in the specifications or claims of the '107 and '968 Patents. Where Anton/Bauer does disagree with PAG is on the import and relevance of these two facts in defining the terminology of the claim. The reason is that PAG ignores well settled Federal Circuit law by arguing that a reference, however minor, in the specification to a half-moon shaped projection must apply to and thus limit all claims. That is most emphatically not the case.

The Federal Circuit has recently articulated its view of claims construction in Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). There, the court emphasized that the role of the specification in interpreting a claim must be distinguished from the role of the specification in limiting a claim. A patent claim cannot be interpreted differently from its terms, in order to mirror that which is described in the specification. It is the claim terminology that "defines the scope of a right to exclude; the claims construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." Teleflex Inc. v. Ficosa, N. Am. Corp., 299 F.3 1313, 1324 (Fed. Cir. 2002). In this regard, the claim terms must be given their "broadest reasonable 'construction in light of the specification as it would be interpreted by one of ordinary skill and art.'" Philips, 415 F.3d at 1316 quoting In re Am. Acad. of Sci. Tech. Ctr., 367 F.3d, 1359, 1364 (Fed. Cir. 2004).

The Phillips court noted that:

> the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill and the art would understand the claim terms.  For instance, although the specification often describes the very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.  In particular, we have expressly rejected the contention that if the patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.

Id. at 1323 (citations omitted).  The court went on to observe that "[m]uch of the time, upon reading the specification in [the context of it is presenting the best mode for practicing the invention], it will be clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiment in the specifications to be strictly co-extensive."  Id.  The court added "the manner in which the patent uses a term within the specification and claim usually will make the distinction apparent."  Id. (citing Snow v. Lake Shore M. S. Ry. Co., 121 U.S. 617, 630 (1887).

Consistent with this teaching, the Federal Circuit has repeatedly cautioned courts not to use the specification to construe the claims in a manner inconsistent with their plain language.  As the court explained in *Innova*:

> Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express.  The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim;

> but not for the purpose of changing it, and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms. This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further.

Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1117 (Fed. Cir. 2004) (quoting, White v. Dunbar, 119 U.S. 47, 51-52 (1886)); see also Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1333-44 (Fed. Cir. 2001) (reversing various claim constructions of district court for importing limitations from specification into patent claims); Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("we do not permit courts to redraft claims"); Markman v. Westview Instruments, Inc. 52 F.3d 1967, 980 (Fed. Cir. 1995) (en banc). ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.") Indeed, this has been the law for more than one hundred years. See, e.g., McCarty v. Lehigh Valley R.R. Co., 160 U.S. 110, 116 (1995) ("We know of no principle of law which would authorize us to read into a claim an element which is not present… The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim…, we should never know where to stop.")

The Federal Circuit has also repeatedly admonished against any claim construction exercise that attempts to limit the scope of the claims by the number of embodiments described in the specification.  As the court explained in Teleflex, Inc.:

> In sum, the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms.  As we explained in CCS Fitness, an accused infringer cannot overcome the "heavy presumption" that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history.  We hold that claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

Teleflex, Inc., 299 F.3d at 1327; see also Nazomi Communications, Inc.. v. ARM Holdings, PLC, 403 F.3d 1364, (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"); Innova, 381 F.3d at 1117 ("even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, at 1366 (Fed. Cir. 2002) (accused infringer may not narrow claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or

prosecution history"); <u>Lampi Corp. v. Am. Power Prods., Inc.</u>, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("[i]t is a familiar principle of patent law that a claim need not be limited to a preferred embodiment").

This Court has embraced this well-settled principle.  In <u>Tyco Healthcare Group, LP v. Ethicon Endo-Surgery, Inc.</u>, Civil Action No. 3:04cv1702 (JBA), (Ruling attached hereto as Exhibit D) Judge Arterton construed a claim that an "ultrasonic instrument according to Claim 7, wherein the cutting surface of the cutting jaw is curved along the longitudinal axis of the instrument."  Defendant urged a construction that required the curve to be outward and downward in the distal direction.  The defendant pointed to the specification language as supporting its argument.  The plaintiff responded that the fact that the inventor knew how to use the words "outward" and downward" and chose not to use those words in his claim, suggested knowledge of both courses.  Relying upon <u>Phillips</u>, the Court concluded that while the intrinsic evidence (the specification) did describe a cutting surface that is curved outwardly and downwardly, there was nothing in the intrinsic evidence to require that cutting surface be so curved.  It noted that the patentee knew how to use different terminology, and could have so limited its claims if it chose to.[2]  <u>Id</u>. at 23-26.

_____

[2]    PAG relies on <u>Toro Company v. Light Consolidated Industries, Inc.</u>, 199 F.3d 1295, 1301-02 (Fed. Cir. 1999) as suggesting that a specification describes only one embodiment must mean the claim is limited to that embodiment.  <u>Toro</u> so concluded because the specification did not permit any other

In yet another recent case, Judge Hall rejected the approach urged upon this court by PAG.  See Pfizer, Inc. v. Ajix, Inc. 2005 U.S. Dist. Lexis 15984 (D. Conn. July 29, 2005) (attached hereto as Exhibit E).  There, the accused infringer urged a narrow construction of the term "engageable" based upon the lack of support in the specifications for a broader definition.  Emphasizing the plain language of the Court, Judge Hall said that to accept such a narrow reading would be "to ignore the plain language of the claim itself and to allow Pfizer to read the specification into the claim." Id. at 15.

Phillips does just more than just recite controlling claims construction law because Philips, itself, dealt with a case in which the Court was reviewing a trial court's claims construction.  More specifically, the Court had to construe the use of the term "baffles" in the patent-in-suit.  The Court noted that in certain of the claims, the particular function to be served by the baffles was recited.  In so noting, the Court concluded that such a specific limitation on the term in one portion of the claim "makes it likely that the patentee did not contemplate that the term "baffles" alone already contained a limitation" when the function language was not recited in other claims.  415 F.3d at 1324.  The Court cited with authority its earlier precedent in Dow Chem. Co. v.

---

construction.  See Teleflex, Inc.; 299 F.3d at 1326-1327 (discussing Toro).  That is not true here. Philips, and its progeny make clear that an embodiment reciting only one structure does not so limit the claim unless the specification expressly states that limitation.  Phillips, 415 F.3d at 1323.

United States, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000), concluding that an independent claim should be given broader scope than a dependent claim to avoid rendering the dependent claim (having more limiting language) redundant.

This doctrine, known as the doctrine of claim differentiation, is a canon of claim construction that holds a broader scope should be given to a claim that uses a more general term than a dependent claim using a more specific term; otherwise, such a dependent claim would be superfluous.  See generally, Mycogen Plant Science, Inc. v. Monsanto Co., 243 F.3d 1316, 1329 (Fed. Cir. 2001); Dow Chem. Co., 226 F.3d at 1341-42.  Phillips said it this way:

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.  For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

415 F.3d at 1314-15 (citations omitted).

Stated succinctly, a claim term cannot be deemed to be limited to a specific purpose or have a specific design, if the inventor set forth that specific purpose or design in another claim.  Id.  If that were the case, then the more limited claim term

would be redundant.  Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d at 1324; Specialty Composites v. Cabot Corp., 845 F.2d 981, 987-988 (Fed. Cir. 1988) (The fact that patent contained examples showing external plasticizers did not mean that the word plasticizer in the claim should be read to exclude internal plasticizers, particularly where there was narrower dependent claims that included external plasticizers as a limitation.  That limitation could not be read into the broader, independent claims.)

The Phillips Court also dealt with an invention that purports to be an advantage over prior art in terms of corresponding claims.  The Court rejected the notion that the term "baffles" should be limited to the functionality that the patent itself indicated was the means by which the prior art was improved.  Rather, the Court concluded that the claim could not be read to cover only one functionality.  Phillips, 415 F.3d at 1327. Again, the Court relied upon its own precedent in saying that "the fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be constructed as limited to structures that are capable of achieving all of the objectives." Id., quoting Liebel-Flarsheim, 358 F. 3d at 908.  See also Resonate, Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1367 (Fed. 2003) (rejecting notion that every claim in a patent must be read to achieve all of the objectives set forth in the patent).

The fundamental principle underlying all these cases should be clear.  If everything in the specification were to be read into the claims, then there would be no necessity for the claims themselves.  Rather, the patent would be limited to solely the

embodiment set forth in the specification, thus eliminating a notion that it was a preferred embodiment or best mode in making it the one and only patented invention.

## IV.   DISCUSSION

Anton/Bauer submits and urges this Court to hold as follows in response to PAG's memorandum.  First, the Court should adopt in their entirety the submissions made by Anton/Bauer as to the meanings to the claim terms in issue.  PAG had every opportunity to brief these constructions but chose instead, and for reasons which are probably apparent to the Court, to offer no support or explanation for the constructions it submitted on December 8, 2005.[3]  The law is clear that the failure of a party to provide an analysis for or cite support for its argument can be construed as an abandonment of that position.  State Street Bank and Trust Company v. Inversiones Errazuriz Limitada, et al, 374 F.3d 158, 172 (2d Cir. 2004); Tolbert v. Queens College, 242 F.3d 58, 75-76 (2d Cir. 2001).   Such is true here.  PAG has opted to focus solely on one claim term devoting the entirety of its 29-page brief to that single issue.  It should not be permitted the additional opportunity to advance arguments it has heretofore seen fit to not brief, thus further delaying this already lengthy litigation.

---

[3]    PAG presumably believes that because its infringing devices purportedly have no *headed projections* ending in a half-moon shape, that it will escape infringement under the '204 Patent.  PAG's construction speaks to the very ill the Federal Circuit has taught against, construing terms of a patent to fit the infringement analysis rather than to construe the patent in terms of how one schooled in the art would read it.

Second, PAG's effort to construe the claim term to identify a specific way in which the leg portions of the headed projections terminate and are seated in the male plate should be categorically rejected by the Court. It violates every precept of controlling Federal Circuit law and it is inconsistent with the way the inventor structured his own claims. PAG may have a selfish interest in the construction it offers; but that's not the construction that this Court should adopt.

PAG purports to offer four separate reasons for limiting the construction of the term *headed projections* to those having a leg portion terminating in a half-moon shape.

1.      That the inventor, Anton Wilson, referenced the *headed projections* as having leg portions with a half-moon shaped end.

2.      That the '204 Patent was a new and improved design over the prior inventions described in the '107 and '968 Patents, both of which have *headed projections* with leg portions that ended in a symmetrical shape.

3.      That Mr. Wilson acted as his own lexicographer defining the *headed projections* as having leg portions that terminated in a half-moon shape.

4.      That no other embodiment was suggested in the specification.[4]

---

[4] Points one and four are ostensibly the same argument and will be treated as such in this Memorandum.

PAG Memorandum at 18.

Each of its arguments is fundamentally flawed.

**A.     The Prior Patents Do Not Support PAG's Claim Limitation**

PAG argues that the '204 Patent is an "improvement patent" and should be limited to cover only those items designated as improvements in the "Background" Section of the Patent.  PAG Memorandum at 22-25.

There is no dispute that the inventors discussed and claimed new designs and features which improved upon the '107 invention in the '968 and '204 Patents.[5] In the '204 Patent, the same inventor who invented the '107 technology noted that while the '968 Patent improved the '107 design, there was still a need for further change, including improving the locking mechanism, adding a safety latch, redesigning the keyhole slots, and improving the means for aligning the plates along with an improved securement means for the headed projections.  '204 Patent at Column 3, Lines 16-47. "An improved securement means" is later described as the *headed projections* on the male plate having a "half-moon shaped backplate seated in a complementally-shaped

_____

[5]The inventor of the '968 Patent, John Corrigan, noted that the necessity of having proper prealignment of the *headed projections* into the keyholes taught by the '107 Patent impeded the overall speed and efficiency of the connection and release of the two plates.  That problem was addressed in the '968 Patent by changing the configuration of the keyhole slots.  The locking strip on the '107 Patent was also improved with a latch actuator, having a cam for contact with the flexible strip so that the flexible strip could be moved away from its normally biased position, enabling the headed projections to be removed from the keyhole slot.  '968 Patent, Column 6 at Lines 16-23; Column 7, Lines 11-21; and Column 8, Lines 31-35; see also, '204 Patent, Column 2, Lines 35 to Column 3, Line 13.

slot on the wall of the male plate to preclude inadvertent turning and loosening of the screw-threaded mounting of the *headed projection* with concomitant loss of projection from the plate if it's mounting completely comes apart," id. at Column 4 at lines 43-49. The half-moon shape based headed projections are then described in the specifications at Column 7, lines 3-8.  This is the entirety of the language PAG relies upon for its argument that Wilson distinguished the '204 Patent from the headed projections that supposedly ended in a symetrical shape in the prior art.

The problem with PAG's superficial analysis is that it is belied by the record. Contrary to PAG's statement, the '107 and '968 Patents do not describe the leg portions of the *headed projections* as terminating in a symmetrical shape.  Indeed, the claim chart PAG reproduces on Page 23 of its memorandum reveals that the inventors did not describe the *headed projections* as terminating in any particular shape.  These prior claims only said the *headed projections* have to be anchored to the male plate.  See e.g. '107 Patent at Column 3, Lines 5-10.  The '107 Patent describes a projection having head and leg portions, which could be anchored to the male plate with a screw. Id.  The '968 Patent describes the *headed projection* in exactly the same way.  '968 Patent at Column 4, Lines 23-29.  Neither patent discussed the shape of the end of the leg portion of the *headed projection* – only that it could be screwed onto the male plate.

The '204 Patent describes the *headed projection* identically to the way it is described in the '107 and '968 Patents.  '204 Patent at Column 7, Lines 3-5.  After all, it

was written by Wilson only 9 years after he wrote the '107 Patent and 4 years after Corrigan wrote the '968 Patent. The projection has a large circular head and narrow leg portion. And, it may still be affixed to its male plate by a screw. Id. In each of the patents, the head of the projection is inserted into the corresponding keyhole of the female plate and the leg portions slide in the corresponding keyhole slots to form the connection. '204 Patent at Column 9, Lines 1-4; '968 Patent; Column 5, Lines 10-13; '107 Patent at Column 3, Lines 21-23. That functionality of the *headed projections* does not change in any of the patents and, for that reason, the term *headed projections* does not change in any of the patent claims. Indeed, if the Court compares the Abstracts for each of the three patents, it will note the identical reference to the form and functionality of the *headed projections*.

It is for this reason that Wilson drafted each of his independent claims in the '204 Patent to use the same language he and Corrigan had used earlier in his '107 and '968 Patents to refer to the *headed projections*. In Claim 1 of the '204, for example, Wilson claimed a releasable connection for a battery pack or the like describing the projections as having head and leg portions. The patent does not claim what the bottom portion of the projection looks like, nor how it is secured to the plate. It is a projection, an element or feature that extends from the plate that has an enlarged uppermost part (the head) relative to a lower, narrower portion (the leg). Claim 1 goes on to claim a safety latch

18

means - - one of the so-called improvements the inventor set out to address. '204 Patent at Col. 3, Lines 16-29 and Column 11, Lines 54-57.

In fact, when the Court reviews the independent claims of each of the Patents, it will note that the claim language addressing the core features of the mating of the plates is the same in each patent. The '107 Patent claims the basic design. '107 Patent at Column 4, Line 42-61. The '968 Patent recites the same core features of the '107 Patent but provides an additional means for improving the speed and efficiency of the connection and the use of a latch actuator. '968 Patent at Column 6, Lines 1-28. And, the '204 Patent recites the core feature of the '107 Patent but claims a new and different safety latch, '204 Patent, Column 11 at Lines 28-57 and a new and different releasable locking means, id. at Column 13, Lines 31-63, Exhibit C at 4, ¶15. The term *headed projections* does not change because their design and use in the engagement and releasable locking with the female plate in combination does not change. The '204 Patent is directed to new and different features that change the combination as a result of changes primarily to the female plate. The features and functionality of the *headed projections*, or for that matter, the male plate in general, were not changed in the combination. Anton Bauer submits that it is, in fact, this consistent use of the term *headed projections* in each of the three patents by both inventors that compels the conclusion that Wilson was not limiting all claims, and specifically Claim 9, to a *headed projection* that ends in a particular shape.

19

As further proof, <u>and remarkably absent from PAG's analysis</u>, Wilson dealt specifically with projections terminating in a half-moon shape only in Claim 8 of the '204 Patent. In Claim 7 a claim dependent on Claim 1, he added the notion that the projections could be received and mounted in a "complementally-shaped recess" in the male plate. '204 Patent, Column 12, Lines 23-25. In Claim 8, a claim then dependent on Claim 7, he additionally claimed the *headed projections* "include a leg terminating in a substantially half-moon plate received in a complementally-shaped recess" Id. at Col. 12, lines 28-30. The inventor thus knew how to describe these distinctions in this aspect of his invention. He knew how to and did, in fact, provide for recesses in the male plate that would accommodate any shape (Claim 7). He knew how and did, in fact, provide for *headed projections* that would terminate in a half-moon shape (Claim 8) and be seated in a similarly shaped recess. Someone schooled in the art would necessarily know that Claims 7 and 8 are refinements of the invention taught by the independent claim. Stated another way, a reader would know that the dependent claims teach unique aspects of the *headed projections* and their mounting otherwise taught by Claim 1 or as those references are made in any of the other claims.

Federal Circuit law provides that a claim must be construed as a whole. <u>See Phillips</u>, 415 F.3d at 1314-15, and cases cited <u>supra</u> at 12. An inventor's use of multiple constructions indicates his knowledge of and intention to distinguish the difference between them. <u>See Innova</u>, 381 F.3d at 1117 and cases cited <u>supra</u> at pages 8-11.

20

Anton Wilson used the same "*headed projections*" language in each of his independent claims 1, 9, 15, 16 and 18.  He described their head; he described their leg.  But, he did not limit how his projections would terminate or be seated in the male plate in those claims.  Rather, each of those claims recited the same base male plate taught by the '107 Patent (insofar as the projection is concerned); his inventions dealt with changes to the combination as effected by changes to the female plate and the relationship between the plates in combination.  The only instance where that differed is in Claims 7 and 8 and in both claims Wilson used the appropriate language to show what and how he was distinguishing from the prior art and the general description of a *headed projection*.    The development of these three patents supports Anton/Bauer's construction, not PAG's.

**B.      The Preferred Embodiment Of The '204 Patent Does Not Require A Limited Reading Of Claim 9.**

PAG next argues that the Summary, Exhibits, and Preferred Embodiment sections of the '204 Patent expressly and by implication compel the conclusion that the term "*headed projections*" must have a leg portion ending with a half-moon shape.  PAG Memorandum at 6-9 and 19-21.  That is simply not true.

The description of the base of the *headed projection* as being half-moon shaped and situated in a complementally-shaped slot on the front wall of the male plate is discussed in only one paragraph of the '204 Patent, at Column 7, Lines 3-16.

Otherwise, the reference to the term "*headed projections*" and its interrelationship with the female plate keyholes, is not dependent upon, nor does it involve, the way in which the *headed projection* is anchored to the male plate itself.  In fact, the reference to Item No. 56, the pictoral representation of a half-moon shaped base, is referenced at only one point in the entire Preferred Embodiment.  By contrast, the *headed projections* themselves and the interrelationship with the female slot counterparts are mentioned over one hundred times throughout the patent, without any reference to the anchor points to the male plate. This only makes PAG's argument, that the inventor intended in effect  to reduce the essence of all the '204 claims to require *headed projections* with leg portions terminating in a half-moon shape, untenable.

Further, the fact that Claim 7 mentions "complementally-shaped recesses" (into which the base of the *headed projections* are seated) and Claim 8 specifically claims the half-moon shaped base means that the way in which the term *headed projection* is used elsewhere in the '204 Patent is the same as it was used in the two prior patents – '107 and '968.  In other words, except for the specific wording of Claim 7 and 8, the *headed projection* and the termination of the leg portion thereof is unspecified and can take any form.  Claim 7 confirms this fact because it discloses a male plate that can be modified to have complementally-shaped recesses to the shape of the base of the projections to "prevent rotation of said projection in said recess."  '204 Patent, Column 12, Lines 26-27 (Claim 7).  That shape can be a square, a triangle or any other shape

22

that helps prevent the rotation of the object.  Claim 8 tells us the recess can also be a half-moon shape because that claim refers to the "invention of Claim 7" and then discloses *headed projections* which include a leg terminating "in a substantially half-moon plate."  '204 Patent at Column 12, Lines 29-30.  If the recesses referred to in Claim 7 were restricted to half-moon shapes only (as PAG's reading must support) why use the more general terminology of "complementally-shaped?"  Why not just say complementally half-moon shaped recesses?  If the word "projection" alone embodied the half-moon structure as PAG suggests, why is it necessary to add [i.e. "include"] the language in Claim 8?  As the Federal Circuit said, patents should not be interpreted to preclude redundant readings.  See Phillips, 415 F.3d at 1324 and cases cited supra at 11-12.    PAG;s reading violates that fundamental rule.  Anyone reading this patent would know the distinction Wilson was drawing and PAG conveniently choosing to ignore.

To be certain, Wilson may have decided that the preferred embodiment to be used in the specification as a reduction to practice was a half-moon shaped base, but his claims and their terminology do not include it, other than Claim 8, which specifically asserts this technology.  That is because the releasable connection - - the combination - - taught by this Patent, does not involve movement with the bases of the *headed projections*.  The base of the *headed projections* relate solely to the way in which they may be attached to the male plate.  Anton Wilson did not limit the language in the

23

balance of the Patent, nor in the claims, because it was not his intention to limit the way in which base portions of his *headed projections* were shaped or anchored.[6]  And, the law prohibits this court from construing his patent otherwise simply because a broader construction would include symetrically-based *headed projections* that PAG argues would not accomplish Wilson's objective of improving the anchoring of the projections. See Phillips, 415 F.3d at 1327 and cases cited supra at 13.  Wilson's independent claims and their respective dependent prongs teach various inventions configured in various ways.  It was not necessary for him to capture all of his objectives in one claim. Id.

Herein lies the importance of distinguishing between what is referred to as a preferred embodiment and the claim itself.  The preferred embodiment is just that – what the inventor deemed to be the best way to describe his or her patent, in order to describe to one schooled in the art how the invention might work and function in practice.  Patent law, however, protects against infringement of more than just a specific example used by the inventor, but rather all aspects of a particular claim.  C.R. Bard, Inc. and Davol, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 865 (Fed. Cir. 2004); Licbel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 907-08 (Fed. Cir.), cert. denied 543 U.S. 925 (2004).

─────────────────────

[6] Indeed, as noted, a comparison of the way in which the '107, '968 and '204 Patents are written shows that two different inventors used the word *headed projections* the same way.

C.      **Anton Wilson Did Not Define The Term "Projection" Acting As His Own Lexicographer.**

PAG also argues that the inventor, acting as his own lexicographer, defined the term *headed projections* and leg portions as having an end portion with a "half-moon shape."  Again, PAG distorts the record and misconstrues the law.

An inventor acts as his own lexicographer when he gives a special definition to a term "that differs from the meaning it would otherwise possess," Phillips, 415 F.3d at 1316, citing CCS Fitness, Inc., 288 F.3d at 1366, or disclaimed a certain meaning, Phillips, 415 F.3d at 1316, citing SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d at 1337, 1343-44 (Fed. Cir. 2000).

Wilson first used the term "*headed projections*" in his '107 Patent in 1980. Corrigan used the same reference in his '968 Patent in 1985.  And, four years later, Wilson used it again in his '204 Patent.   At no time, in no patent, under any circumstance was the term used in a special manner, different from the meaning it would otherwise possess[7] nor did Wilson ever disclaim any meaning.  Nor should he have as the invention does not require a specific form to the projection (other than having head and leg portions); only that it engage the female plate and the locking

_____

[7] A projection is defined as a "thing or part that extends outward beyond a prevailing line or surface."  The American Heritage College Directory (3d Ed. 1997).  "*Headed*" *projections* simply have an uppermost part that distinguishes it from the leg portion of the projection.

mechanism in the prescribed manner. As noted, the only time the word *headed projection* was defined other than by reference to the word itself, is when Wilson added the half-moon shape language in dependent Claim. 8. He added language to modify the word; he did not redefine the word.

In fact, it is disingenuous for PAG to take the position that the term *headed projection* requires either definition or limitation whatsoever. PAG itself, being schooled in the art, knows exactly the meaning and function of the *headed projection* of the '204 patent and its antecedents. In U.S. Patent No. 6,489,744 ("'744 Patent") attached as Exhibit F, created by a principal of PAG, Paul Lavender, and assigned to PAG, PAG describes a battery charger with a movable battery fitting. That battery described in this patent depicts a (male) plate, identical to that in the '107, '968 and '204 Patents that includes "a plurality of enlarged headed protrusions," '744 Patent at Column 3, Lines 3-4 and Exhibit 4 at Items 42 and 46, that engages with the keyhole slot, or what PAG calls an aperture. Id. at Column 3, Lines 49-58. PAG's "headed protrusions" are Anton/Bauer's *headed projections*. Alan Lavender, another principal of PAG, also invented a configurable female battery connector for fitting multiple (male plate) battery types (not coincidentally, one type is that as would be constructed under the '107, '968 and '204 patents). See U.S. Patent No. 6,638,086, attached as Exhibit G. His connector refers to a connector plate, Exhibit 1 at Item 10, which again, not coincidentally, has the same three projections (he calls them mechanical connectors) as

the Anton/Bauer male plate and which engage corresponding slots in the female plate disclosed.  Id. at Column 2, Lines 12-14, 47-55.

Whether you call them *headed projections*, headed protrusions or connectors, PAG or anyone else schooled in the art knows exactly what they are and how they function in the context of each of the '107, '968 and 'specifically the '204 patents and none would require them as having a particularly configured base except in the most specious of arguments

The inventors of the '107, '968 and '204 Patents used the term projections exactly the same way in each and every one of the claims in all three patents, except in one instance.   And, in that instance, Wilson asserted in Claim 8 the preferred embodiment he had revealed in his patent–projections terminating in a half-moon shape.  That's not the only embodiment, but simply the preferred embodiment.  Wilson knew how to, and indeed intended to, describe the *headed projections* differently and clearly and did so consistently throughout the Patent.  Wilson knew how to reference the half-moon shape he discussed in his specification and did so clearly in Claim 8.  He did not so modify or define the term in any of his other claims because he was addressing *headed projections* that were not defined by how their base portions were configured.  He was not "acting as his own lexicographer", there was no need to.

## V.  CONCLUSION

Whether PAG focuses on the language of the specifications, the pictoral representation, or what it calls implication, it is in each instance taking the specification and doing exactly what the Federal Circuit said can't be done – to limit the claims.  The term *headed projections* is clearly defined by the prior art, by the delineation of claims within the '204 patent and by common understanding and usage. If Anton Wilson intended to define the term *headed projections* differently than it had been used in the '107 and '968 Patents, and differently than it is commonly understood, he would have chosen language different than the words he had in Claim 9.   If he intended to universally incorporate a specific concept of how the *headed projections* should be configured and anchored in the male plate at their base he would have omitted the wording of Claim 7. If he intended to universally incorporate a half-moon limitation on the *headed projection*, he would have added the language of Claim 8 to all his independent claims.   He didn't do that and thus any attempt at such unfounded limitation cannot exist in any reasonable term construction. Respectfully, this Court should not import the "half-moon" language.  Patents and patent claim terms should be read plainly and consistently.  PAG's reading and argument offends that simple rule.

The invention at issue is the combination of the male and female plates, not how the base of the *headed projection* is configured to the male plate; no more than it is about a "leaf spring" or any other dependent claim not at issue in this action. The

*headed projection* in Independent Claim 9 is the same *headed projections* described in the earlier patents, '107 and '968 – an extending element or feature on the male plate that has an enlarged uppermost part (a head) relative to a lower narrower portion (a leg). It is not and cannot be otherwise specified or limited as it pertains to this case.

PLAINTIFF
ANTON/BAUER, INC.
By:_____/s/ James T. Shearin_____
James T. Shearin, Esq. – ct 01326
Brian C. Roche, Esq. – ct 17975
Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT  06601-7006
Phone:  (203) 330-200
Facsimile:  (203) 576-8888

## CERTIFICATION

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on the date hereon to all counsel and pro se parties of record:

Stephen R. Risley, Esq.
J. Scott Culpepper, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
950 East Paces Ferry Road NE
2600 One Atlanta Plaza
Atlanta, Georgia 30326

Jason M. Kuselias
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

_____/s/ James T. Shearin_____
James T. Shearin –  ct 01326
Brian C. Roche    – ct 17975

Bridgeport/57052.2/JTS/588814v1