Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 1 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                  Page 1 of 116

Source: Legal > Cases - U.S. > Federal Court Cases, Combined ⓘ
Terms: public w/3 notice w/25 claim w/3 constru! (Edit Search | Suggest Terms for My Search)
Focus: claim w/ 2 differentiation (Exit FOCUS™)

↵Select for FOCUS™ or Delivery
  ☐

*66 Fed. Cl. 400, \*; 2005 U.S. Claims LEXIS 165, \*\**

HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC.,
Plaintiffs, v.THE UNITED STATES, Defendant, and LOCKHEED MARTIN CORP., Defendant-
Intervenor.

No. 02-1909C

UNITED STATES COURT OF FEDERAL CLAIMS

66 Fed. Cl. 400; 2005 U.S. Claims LEXIS 165

June 14, 2005, Filed

**PRIOR HISTORY: [\*\*1]** Honeywell Int'l v. United States, 65 Fed. Cl. 809, 2005 U.S.
Claims LEXIS 161 (Fed. Cl., Jan. 26, 2005)

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff patentees sued defendant, the federal government, for
infringing on its patent pertaining to a display system for use in association with a night
vision aid. Intervenor contractor moved to intervene in the case because it manufactured
an aircraft that incorporated technology allegedly claimed in the patent. The court
convened a Markman hearing to construe disputed terms in the patent claims at issue.

**OVERVIEW:** In this patent construction case, the court examined numerous claims
disputed by the parties and determined that it was unnecessary to consider extrinsic
evidence to construe the claims at issue in most instances. With its construction, the court
failed to side completely with any one party. Instead, the court gave a mixed ruling with
respect to the disputes. For example, with respect to its interpretation of "notch filter," the
court disagreed with the patentee on whether the notch filter that had
the capacity both to pass and substantially block light (the patentee argued that it did one
or the other, while the court found that it did both), but sided with the patentee to find
that a notch filter could be either a single-notch filter or a multi-notch filter. While the
specification provided no definition of "color band," the court concluded that where "color
bands" was used without the adjectives "predetermined" or "predetermined red," "color
bands" referred to a range of visible wavelengths that could include all colors visible to the
human eye. The court also granted a contractor the right to intervene in this case
pursuant to U.S. Ct. Cl. R. 24(a).

**OUTCOME:** The court determined as a matter of law that the disputed claims should be
construed consistent with its opinion and order. The court also granted the contractor the
right to intervene in the case.

**CORE TERMS:** display, filter, color, band, red, patent, wavelength, local color, night vision,
specification, notch, invention, block, optical, goggle, source of light, blue, post-claim, pre-
claim, cockpit, embodiment, preamble, construe, full color, blocking, extrinsic evidence, skill,

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 2 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 2 of 116

predetermined, green, filtering

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Patent Law > Infringement Actions > Claim Interpretation > Aids 🔊

*HN1* ↓ Intrinsic evidence is the most relevant and reliable to establish the metes and bounds of the property right conveyed by the privilege of the patent grant. Extrinsic evidence has been determined to be useful to identify the academic and industry credentials of one skilled in the art, akin to the reasonable man in the tradition of tort law. If the court must resort to extrinsic evidence to avoid determining that a claim is indefinite, only the most probative and reliable of such evidence should be considered-and, with caution.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > General Overview 🔊

*HN2* ↓ With respect to patent claim construction, the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.  More Like This Headnote

Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview 🔊

Patent Law > Subject Matter > Inventions Related to National Security 🔊

*HN3* ↓ The United States Court of Federal Claims has jurisdiction to adjudicate claims that allege an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same seeking recovery of reasonable and entire compensation for such use and manufacture. 28 U.S.C.S. § 1498(a). The United States Court of Federal Claims also has jurisdiction to adjudicate claims under the Invention Secrecy Act, 35 U.S.C.S. § 181.  More Like This Headnote

Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview 🔊

Patent Law > Subject Matter > Inventions Related to National Security 🔊

*HN4* ↓ See 35 U.S.C.S. § 181.

Patent Law > Subject Matter > Inventions Related to National Security 🔊

*HN5* ↓ An applicant may seek damages caused by the issuance of a Secrecy Order under the Invention Secrecy Act, 35 U.S.C.S. § 181. 35 U.S.C.S. § 183. That is, an applicant whose patent is withheld, shall have the right to apply to the head of any department or agency who caused the order to be issued for compensation for the damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure. If full settlement of the matter is not achieved the head of the department or agency may award and pay to such applicant a sum not exceeding 75 per centum of the sum which the head of the department or agency considers just compensation for the damage and/or use.  More Like This Headnote

Civil Procedure > Justiciability > Standing 🔊

Constitutional Law > The Judiciary > Case or Controversy > Standing 🔊

Case 3:01-cv-00577-CFD     Document 168-9     Filed 03/03/2006     Page 3 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!     Page 3 of 116

HN6⬇ The party invoking federal jurisdiction, has the burden of proof and persuasion to satisfy the constitutional requirements of Article III standing.  More Like This Headnote

Patent Law > Infringement Actions > General Overview 🔳

HN7⬇ 35 U.S.C.S. § 281 provides that a patentee shall have remedy by civil action for infringement of his patent. Pursuant to 35 U.S.C.S. § 100(d), the word "patentee" includes not only the patentee to whom the patent was issued but also the successors in title to the patentee.  More Like This Headnote

Civil Procedure > Joinder of Claims & Parties > Intervention 🔳

HN8⬇ The United States Court of Federal Claims may summon any and all persons with legal capacity to be sued to appear as a party in any suit of any nature whatsoever pending in said court to assert and defend their interests. 41 U.S.C.S. § 114(b); U.S. Ct. Cl. R. 14(b); 24(a); 24(b).  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues 🔳

HN9⬇ The meaning and scope of a patent's claims are issues of law to be determined by a federal trial judge.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids 🔳

HN10⬇ In Markman I, the United States Court of Appeals for the Federal Circuit specified three sources relevant to construe a patent's claim: claim language; the specification; and prosecution history. It is important to recognize, however, that in Markman II the United States Supreme Court did not constrain a federal trial court from adjudicating the terms of a claim by excluding any relevant and reliable evidence, including that of experts. Instead, that decision was entrusted to the considered judgment of the federal trial judge to determine, but following the precedent of the United States Court of Appeals for the Federal Circuit that was established to bring uniformity and doctrinal stability to the decisions of the federal judiciary on all matters concerning patent law.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids 🔳

HN11⬇ A federal trial judge examines claim terms and phrases through the viewing glass of a person skilled in the art. In doing so, a federal trial judge in a patent infringement case must determine, as a threshold matter, whether there is ambiguity in any claim term requiring construction and, if so, to consider intrinsic evidence. First, a federal trial judge must look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. Second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms or by implication. Third, a federal trial judge may consider the prosecution history of the patent, if in evidence. The United States Court of Appeals for the Federal Circuit has decided that intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids 🔳

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 4 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!

Page 4 of 116

*HN12* The specification is often the best tool to ascertain the technological and temporal context of claims. If a patent's claim language is ambiguous, the specification, including the inventors' statutorily-required written description of the invention, is the primary source for determining claim meaning. Of course, the utility of the specification depends on whether the written description of the invention is clear and complete enough to enable those of ordinary skill in the art to make and use it. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN13* A patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning. The written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term. Federal trial judges also have been well advised not to construe a claim to exclude the preferred and only embodiment disclosed in a specification because such an interpretation is rarely, if ever, correct. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences

*HN14* There is a distinction between enablement and best mode requirements. The specification discloses an invention in such a manner as will enable one skilled in the art to make and utilize it. The purpose of the best mode, however, is to restrain inventors from applying for patents and concealing from the public preferred embodiments of their inventions. The governing statute, 35 U.S.C.S. § 112, provides that the specification shall set forth the best mode contemplated by the inventor of carrying out his invention. Section 112 also requires disclosure of specific instrumentalities or techniques that are the best way of carrying out the invention. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN15* Prosecution history is relevant to claim construction because it may contain contemporaneous exchanges between the patent applicant and the Patent and Trade Office about what the claim means. Prosecution history, however, can trump the importance of the specification in certain circumstances. In sum, prosecution history may preclude a patentee from regaining through litigation, coverage of subject matter relinquished during prosecution of the application of the patent. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN16* If analysis of intrinsic evidence resolves ambiguity about the meaning of the patent claim, as a matter of law, it is improper for a federal trial judge to cite to extrinsic evidence, i.e., evidence outside of the patent record, including expert and inventor testimony, dictionaries, learned treatises, and articles. Trial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues, and trial courts have broad discretion in this regard. Furthermore, a trial court is quite correct in hearing and relying on expert testimony on an ultimate claim construction question in cases in which the intrinsic evidence (i.e., the patent and its file history -- the patent record) does not answer the question. What is disapproved of is an attempt to use extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent. More Like This Headnote

Case 3:01-cv-00577-CFD     Document 168-9     Filed 03/03/2006     Page 5 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 5 of 116

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN17* Extrinsic evidence may be particularly useful to determine how one of ordinary skill in the relevant art would interpret the claim language. For example, a federal trial judge should be able to consider extrinsic evidence to learn whether a common term has a special meaning in the relevant field. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN18* Depending on the clarity of a patent claim and specification, prior issued patents may provide a source of relevant evidence to determine how a term or phrase has been used or understood by one skilled in the art. That is true whether or not the prior art was referenced in the specification or the prosecution history. Within the hierarchy of extrinsic evidence, prior art is a more reliable source of evidence as to the meaning of words or phrases in a patent claim than expert testimony. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN19* As with prior art, treatises and technical articles, particularly those of note, wide circulation, or likely to be utilized as standard desk reference material by an ordinary person skilled in the art at the time of the patent's issuance may be consulted in the discretion of the court. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN20* Expert testimony may be helpful in aiding an understanding of the patent, but not for the purpose of varying or contradicting the claims. The United States Court of Appeals for the Federal Circuit, however, has cautioned that expert testimony may be considered, but only insofar as it aids the trial court to understand the claim language, the specification, or the prosecution history. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Aids

*HN21* It is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field. Federal trial judges may turn to expert testimony to: (1) supply a proper technological context to understand the claims (words often have meaning only in context), (2) explain the meaning of claim terms as understood by one of skill in the art (the ultimate standard for claim meaning), and (3) help the trial court understand the patent process itself (complex prosecution histories--not to mention specifications--are not familiar to most trial courts.). More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > General Overview

*HN22* A district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and prosecution history. More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences

Case 3:01-cv-00577-CFD     Document 168-9     Filed 03/03/2006     Page 6 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                                 Page 6 of 116

*HN23* Post-issuance testimony by a patent's inventor as subjective opinion about the meaning of claim terms is entitled to little or no weight.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Claim Differentiation

Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences

*HN24* Where ambiguity remains after reviewing intrinsic evidence in construing patent claims, two doctrines have been employed to preserve the patent's validity. The United States Court of Appeals for the Federal Circuit has advised federal trial judges that claims should be construed to preserve a patent's validity, however, this presumption is applicable only where the proposed claim construction is practicable, based on sound claim construction principles, and does not revise or ignore the explicit language of the claims. Likewise, the doctrine of **claim differentiation** is to be reserved only for those cases where neither intrinsic nor extrinsic evidence leads to a definite definition.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > General Overview

*HN25* Whether a preamble is treated as a limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent. Where the written description consistently uses specific terms to refer to the invention as a whole, the preamble of each claim serves as a convenient label or descriptive name for the invention as a whole. On the other hand, where there is no meaningful distinction to be drawn between the claim preamble and the rest of the claim, for only together do they comprise the claim, the preamble is said to constitute or explain a claim limitation. In addition, where claim language derives an antecedent basis from the preamble, it may be considered as a necessary component of the claimed invention.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Scope

*HN26* When a patent claim uses the word "comprising" as its transitional phrase, it creates a presumption that the body of the claim is open. In the parlance of patent law, use of the transitional phrase "comprising" creates a presumption that the recited elements are only a part of the device, and that the claim does not exclude additional, unrecited elements.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Scope

*HN27* A party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements; without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right.  More Like This Headnote

Patent Law > Infringement Actions > Claim Interpretation > Scope

*HN28* "Substantially" is a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter. The term "substantially" must be interpreted in light of the specification and prosecution history.  More Like This Headnote

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 7 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!

Page 7 of 116

◆ Hide Headnotes / Syllabus

**HEADNOTES:** Claim Construction; Extrinsic Evidence; Intervenor Standing; Intrinsic Evidence; United States Patent No. 6,142,637; United States Patent No. 6,467,914; 28 U.S.C. § 1498(a); 35 U.S.C. § 100(d); 35 U.S.C. § 112; 35 U.S.C. § 181, Invention Secrecy Act; 35 U.S.C. § 183, Secrecy Order; 35 U.S.C. § 281; 41 U.S.C. § 114(b); Fed. R. Evid. 702, 703; RCFC 14(b); RCFC 24(a), (b).

**COUNSEL:** Lawrence J. Gotts, Mark Koehn, and Elizabeth Miller Roesel, Pillsbury Winthrop Shaw Pittman, LLP, McLean, Virginia, counsel for plaintiffs, Honeywell International, Inc. and Honeywell Intellectual Properties, Inc.

John J. Fargo, Christopher L. Crumbley, and Trevor M. Jefferson, Washington, D.C., counsel for defendant, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C.

Thomas J. Madden, Paul A. Debolt, and Justin E. Pierce, Venable, LLP, Washington, D.C., counsel for defendant-intervenor, Lockheed Martin Corp.

**JUDGES:** SUSAN G. BRADEN Judge.

**OPINIONBY:** BRADEN

**OPINION: [\*402] MEMORANDUM OPINION AND ORDER CONSTRUING CERTAIN CLAIMS OF UNITED STATES PATENT NO. 6,467,914**

**BRADEN, *Judge*.**

In the decade following the United States Supreme Court's unanimous affirmance of the landmark *en banc* decision in *Markman v. Westview Instruments, Inc., 52 F.3d 967, 978-79 (Fed. Cir. 1995)* ("*Markman I*"), aff'd, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996) [\*\*2] ("*Markman II*"), the United States Court of Appeals for the Federal Circuit has devoted a great deal of effort to provide federal trial courts with a workable analytical framework to construe the meaning of a patent's claims that is faithful to 35 U.S.C. § 112 and affords the court an opportunity to consider relevant, but reliable, evidence, in a wide range of diverse and increasingly complex applications of mechanical, electrical, chemical, computer, pharmaceutical, bio, and nano technology.

From the court's reading of controlling appellate precedent, [HN1]intrinsic evidence has been endorsed as most relevant and reliable to establish the metes and bounds of the property right conveyed by the privilege of the patent grant. Extrinsic evidence has been determined to be useful to identify the **[\*403]** academic and industry credentials of "one skilled in the art," akin to the "reasonable man" in the tradition of tort law. If the court must resort to extrinsic evidence to avoid determining that a claim is indefinite, only the most probative and reliable of such evidence should be considered-and, with caution.

**[\*\*3]** In this case, the court determined that it was unnecessary to consider extrinsic evidence to construe the language of the patent claims at issue, in most instances. *See Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)* (internal citations omitted) [HN2]("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."). In only one claim, where extrinsic evidence was considered, the court was able to construe the disputed term by referring to prior art and was not dependent on technical treatises, technical dictionaries, nor the parties' experts.

In light of the multitude of issues addressed herein, an outline of this Memorandum Opinion

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!

Page 8 of 116

and glossary of selected acronyms follow:

OUTLINE

I. THE RELEVANT TECHNOLOGY.

A. Night Vision Aids.

    1. The Electromagnetic Spectrum.

    2. Night Vision Goggles.

B. Cockpit Displays.

    1. Cathode Ray Tubes.

    2. Liquid Crystal Displays.

    3. Color.

C. Characteristics And Types Of Optical Filters.

D. The '914 Patent.

II. FACTUAL AND PROCEDURAL BACKGROUND.

III. DISCUSSION. [**4]

A. Jurisdiction.

B. Standing.

    1. Plaintiff.

    2. Intervenor.

C. Controlling Appellate Precedent Concerning Construction Of Patent Claims.

    1. A Federal Trial Judge Must First Attempt To Construe Ambiguous Claim Terms Utilizing Intrinsic Evidence.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 9 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!    Page 9 of 116

a. Claim Language.

b. Specification Explanation And Definition.

c. Prosecution History.

2. Only In Limited Circumstances May A Federal Trial Judge Construe Claim Terms Utilizing Extrinsic Evidence.

a. Prior Art.

b. Technical Treatises And Technical Articles.

c. Expert Testimony.

d. Scientific Or Industry Specific Dictionaries.

e. Inventor Testimony.

3. A Federal Trial Court Should Construe Claims To Preserve A Patent's Validity Only Where All Other Tools Of Claim Construction Are Exhausted.

4. The Import Of *Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed. Cir. 2004).

D. Construction Of Certain Claims Of United States Patent No. 6,467,914.

1. "Display System."

a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

[*404] b. The Government's Proposed Construction.

i. Pre-Claim [**5] Construction Hearing Brief.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 10 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!    Page 10 of 116

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.


c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.


ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.


d. Specific Precedent Governing Construction Of A Patent's Preamble.

e. The Court's Construction Of "A Display System For Use In Association With A Light Amplifying Passive Night Vision Aid And A Local Color Display, Including A Local Source Of Light, Comprising" In This Case.

2. "Local" And "Color Display."


  [*405]  a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

b. The Government's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

  [*406]  iii. Post-Claim Construction Hearing Briefs.

c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Local Color Display" [**6] In This Case.

Case 3:01-cv-00577-CFD     Document 168-9     Filed 03/03/2006     Page 11 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!     Page 11 of 116

i. In The Preambles To Claim 1 And Claim 2.

ii. In Claim 1(a).

iii. In Claim 2(a).


3. "Local" And "Source of Light."


a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

b. The Government's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Brief.

c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Brief.

d. The Court's Construction Of "Local Source Of Light" In This Case.


4. "Optical Filter" And "Filter."

5. "Filters" And "Filtering."

6. "Filters Light From The Local Color Display."


a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 12 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!    Page 12 of 116

iii. Post-Claim Construction Hearing Briefs.

b. The Government's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Briefs.

c. Intervenor **[**7]** Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Filters Light From The Local Color Display" In This Case.


7. "Notch Filter."


a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Briefs.

b. The Government's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Notch Filter" In This Case.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 13 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 13 of 116

8. "Passes."

9. "Color Bands."

    a. Honeywell's Proposed Construction.

    i. Pre-Claim Construction Hearing Brief.

    ii. At The Claim Construction Hearing.

    b. The Government's Proposed Construction.

    i. Pre-Claim Construction Hearing Brief.

    ii. At The Claim Construction Hearing.

    iii. Post-Claim Construction Hearing Briefs.

    c. [**8] Intervenor Lockheed Martin's Proposed Construction.

    i. Pre-Claim Construction Hearing Brief.

    ii. At The Claim Construction Hearing.

    iii. Post-Claim Construction Hearing Briefs.

    d. The Court's Construction Of "Color Bands" In This Case.

10. "Predetermined Color Bands."

11. "Red Color Band."

    a. Honeywell's Proposed Construction.

    i. Pre-Claim Construction Hearing Brief.

    ii. At The Claim Construction Hearing.

    iii. Post-Claim Construction Hearing Briefs.

    b. The Government's Proposed Construction.

    i. Pre-Claim Construction Hearing Brief.

    ii. At The Claim Construction Hearing.

    c. Intervenor Lockheed Martin's Proposed Construction.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 14 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                Page 14 of 116

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Red Color Band" In This Case.

12. "Predetermined Red Color Band."

13. "Substantially Blocks."

a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

b. The Government's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction [**9] Hearing.

iii. Post-Claim Construction Hearing Briefs.

c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Substantially Blocks" In This Case.

14. "First," "Second," "Third," "Fourth," And "Filter."

15. "Blue Color Band."

a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 15 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 15 of 116

iii. Post-Claim Construction Hearing Briefs.

b. The Government's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Blue Color Band" In This Case.


16. "Green Color Band."


a. Honeywell's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

b. The Government's [**10] Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

c. Intervenor Lockheed Martin's Proposed Construction.

i. Pre-Claim Construction Hearing Brief.

ii. At The Claim Construction Hearing.

iii. Post-Claim Construction Hearing Briefs.

d. The Court's Construction Of "Green Color Band" In This Case.

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 16 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                Page 16 of 116

17. "Narrowband Of The Red Color Band."


IV. CONCLUSION.

* * *

GLOSSARY OF SELECTED ACRONYMS

| | |
|---|---|
| AGC | Automatic Gain Control |
| ANVIS | Aviator' Night Vision Imaging System |
| CIE | Commission International l'Eclairage or International Commission on Illumination |
| CRT | Cathode Ray Tube |
| IEEE | Institute of Electrical and Electronics Engineers, Inc. |
| IPL | Instrument Panel Lighting |
| JEDEC | Joint Engineering Display and Electronic Committee |
| LCD | Liquid Crystal Display |
| MCP | Microchannel Plate |
| nm | Nanometer |
| NVG | Night Vision Goggles |
| NVIS | Night Vision Imaging System |
| RGB | Red Green Blue |
| SED | Spectral Energy Distribution |
| s#lsqb&l ambda;rs qb#s | Wavelength or the distance between successive peaks of an electromagnetic wave. |
| nu, s#ls qb&nu;rs qb#s | Frequency or the number of complete cycles of electromagnetic radiation completed each second. |

[**11]


* * *

I. THE RELEVANT TECHNOLOGY.

In 1973, a second-generation of Night Vision Goggles ("NVG") was developed by the United States Army to provide helicopter pilots with a brighter view at night of underlying terrain to allow them to fly at low levels. See January 24, 2005 Technology/Industry Primer ("Jt. Primer") at 3; n1 see also November 22, 2004 Direct Testimony and Expert Report of Dr. Harry Lee Task ("PMX35") P 8 at 4. NVGs, however, were very sensitive to cockpit lighting, warning lights, displays, and particularly to light of longer wavelengths in the visible spectrum and infrared radiation. See Jt. Primer at 6-8; see also PMX 35 P 9 at 4. In particular, [*407] NVGs' sensitivity to red light created numerous problems that were known prior to the October 10, 1985 filing of the patent at issue in this case, including the fact that nearby light sources in a cockpit could overwhelm the sensor elements and interrupt NVG functioning or amplify reflections from the cockpit lights, causing the pilot to see confusing images. Id.

Case 3:01-cv-00577-CFD      Document 168-9      Filed 03/03/2006      Page 17 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                Page 17 of 116

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Although counsel for all parties collaborated in preparing the January 24, 2005
Technology/Industry Primer, the parties agree that it is not evidence nor a stipulation as to
fact or law. *See* Jt. Primer at 2. The court has obtained permission to reproduce the graphics
that are copyrighted by HowStuffWorks.com.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*12]**

Many techniques were developed by the military and private companies to try to solve the
incompatibility between the NVG and aircraft lighting and cockpit displays. *See* PMX 35 PP 8-
12 at 4-6. In the 1980's, the United States Army began to utilize an Aviation Night Vision
Imaging System ("ANVIS") goggles with a third-generation image intensifying tube that was
much more sensitive to light, *i.e.*, ranging from approximately 450 nanometers ("nm") to
930 nm, instead of 400 nm to 700 nm. *See* Jt. Primer at 3; *see also* PMX 35 PP 9-13 at 4-7.
As a result, the visible range below 580 nm could be used for cockpit lighting and display
since light in that range, in large part, was invisible to NVGs and allowed the pilot to see
outside the aircraft. *See* PMX 35 P 13 at 6-7.

A. Night Vision Aids.

1. The Electromagnetic Spectrum.

The electromagnetic spectrum ("spectrum") describes the range of electromagnetic waves
that transports energy, both in electric and magnetic fields. *See* Jt. Primer at 3. Energy from
cosmic rays have the shortest wavelengths; electrical oscillations have the longest
wavelengths. *Id.* "Visible spectrum" or light is the portion of the spectrum **[\*\*13]** located
between the ultraviolet light region and the infrared region, as depicted below:

[SEE ILLUSTRATION IN ORIGINAL]

*Id.* at 4.

Light is characterized by wavelength and frequency. *Id.* Wavelength, referred to by the
symbol lambda, s#lsqb&lambda;rsqb#s, is the distance between successive peaks of an
electromagnetic wave. *Id.* Frequency referred to by the symbol nu, $v$, is the number of
complete cycles of electromagnetic radiation completed each second. *Id.* Wavelength and
frequency are inversely related, *i.e.*, light with a higher frequency has a shorter wavelength;
light with a shorter frequency has a longer wavelength. *Id.* at 4-5. Wavelength times
frequency equals the speed of light. *Id.* at 5. Light and infrared radiation customarily are
described in terms of wavelength. *Id.*

 **[\*408]** 2. Night Vision Goggles.

NVGs are sensitive to visible light and infrared radiation regions of the electromagnetic
spectrum. *Id.* at 5. An unaided human eye only can see light within the visible region of the
electromagnetic spectrum, which has a narrow range, as shown above. *Id.* The human eye
adapts to different lighting environments and has two distinct sensitivity **[\*\*14]** curves, as
illustrated below:

DAY AND NIGHT SENSITIVITY OF THE HUMAN EYE

[SEE ILLUSTRATION IN ORIGINAL]

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 18 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                Page 18 of 116

*Id.* at 6.

The peak sensitivity of the human eye drifts toward shorter wavelengths of light in extreme darkness, known as scotopic vision, which is rarely used in human activities. *Id.* at 6. Colors are seen by day vision, known as photopic vision. *Id.* Radiant energy, originating from the sun during the day and the stars or moon at night, is the electromagnetic energy that the human eye detects. *Id.* At night, there is less visible light present than during the day, so the human eye has extreme difficulty detecting the radiant energy that remains. *Id.*

Night vision aids enable the user, generally a pilot, to see objects at night by amplifying the very low levels of radiant energy from the visible and infrared spectrum. *Id.* Some night vision aids are capable of amplifying the radiant energy reflected from an object at night in overcast conditions. *Id.*

NVGs utilize a "two-step energy conversion process" to enable the user to observe very low levels of light and infrared radiation and convert the latter into visible light: first, by converting photons **[**15]** into electrons and amplifying the electrons; and second, by converting the amplified electrons back into photons, in visible light for the user. *Id.* at 7-8. A schematic of a typical night vision aid is reproduced below:

SCHEMATIC OF A NIGHT VISION AID

[SEE ILLUSTRATION IN ORIGINAL]

**[*409]** *Id.* at 7.

Low-level radiation first enters the NVG at an objective lens that focuses low levels of light and infrared radiation onto an input window of an intensifier tube. *Id.* The intensifier tube consists of a photocathode and a microchannel plate ("MCP") that amplifies light and infrared radiation. *Id.* The photocathode converts photons into electrons. *Id.* Electrons are then emitted from the cathode and received at the input surface of the MCP, generally constructed of a honeycomb-like plate of many hollow tubes fused together. *Id.* Each electron passing through the tube frees other electrons, creating tens of thousands of electrons that exit the tube for each one that entered the tube. *See* Jt. Primer at 7-8.

Exiting electrons strike a phosphor screen that acts as the reverse of the photocathode and converts the electrons back into photons of visible light at a higher **[**16]** intensity than the input photons. *Id.* at 8. If an observer uses an ocular lens, the light emitted appears as a green image. *Id.* This energy is increased by a factor of 10,000 to 20,000 at maximum sensitivity and is known as "gain" or "image intensification" of the NVGs. *Id.* Although NVGs amplify low level light and infrared radiation by a factor of 10,000 to 20,000, they also amplify normal level and bright lights, such as streetlights or cockpit lights, by the same factor, which can damage the NVGs. *Id.* To prevent this problem, ANVIS goggles were developed that have a feature known as "automatic gain control" to govern image intensification within the MCP. *Id.* This reduction of intensification, however, affects the ANVIS goggles' entire field, thereby preventing the user from seeing dimly illuminated objects when normal level and bright lights are introduced. ANVIS goggles also are sensitive to light from about 540 nm to 910 nm. *See* Jt. Primer at 8. To address this issue, ANVIS goggles utilize a "minus blue" filter that reduces the sensitivity of the goggles to the longer wavelengths. *Id.*

B. Cockpit Displays.

Aircraft use a variety of displays in the **[**17]** cockpit, such as cathode ray tubes ("CRTs") and liquid crystal displays ("LCDs"). *Id.* at 9. Both, however, can generate or reflect light that

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 19 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 19 of 116

interferes with the operation of the NVG. *Id.* at 9-11.

1. Cathode Ray Tubes.

CRTs are "picture tube for television" technology used in a broad range of commercial and military applications, including aircraft displays. *Id.* at 9. CRTs operate by receiving an input that is processed by generating electron beams that strike a screen coated with one or more layers of phosphor, wherein each layer can generate one or more colors in a color display. *Id.* When an electron beam strikes a particular phosphor, a phosphor dot on the screen is excited to emit light of a certain color. *Id.* at 10. Full color CRTs typically have three phosphors that correspond to the three most common primary colors of the display: red, green and blue. *Id.* There are different sets of primary colors, each of which can produce many more colors in the visible spectrum. *Id.* Prior to the advent of flat screen technologies, every computer monitor and television used a CRT, similar to that shown below:

**[\*410]** [SEE ILLUSTRATION IN ORIGINAL]

SCHEMATIC OF A **[\*\*18]** CATHODE RAY TUBE Copyright © 1998-2004 HowStuffWorks, Inc. All rights reserved.

*Id.* at 9.

2. Liquid Crystal Displays.

LCDs are used in many commercial applications, including aircraft cockpit displays. *Id.* In transmissive LCDs, light is generated at the back of the display using a fluorescent tube, known as an LCD backlight. *Id.* This tube has a phosphor coating on the inside that emits light when excited by mercury vapor, which produces color, as determined by the chemical characteristics of the phosphors. *Id.* Color is then passed through an array of liquid crystal picture elements or pixels. *Id.* Each liquid crystal pixel also acts as a "shutter" that either passes or blocks the light to varying degrees. *Id.* at 10-11. A LCD is comprised of two polarizing filters and a cavity containing a liquid crystal compound. *Id.* at 10. When electricity is not applied to a pixel, the backlight is polarized by the first polarizer and is placed to permit light to pass through the second polarizer. *Id.* In a color LCD, each pixel has three subpixels that correspond to the three primary colors of the display. *Id.* at 11. When electricity is applied, the two polarizers **[\*\*19]** act together to block the backlight, as shown below :

**[\*411]** [SEE ILLUSTRATION IN ORIGINAL]

SCHEMATIC OF A LIQUID CRYSTAL DISPLAY

Copyright © 1998-2004 HowStuffWorks, Inc. All rights reserved.

*Id.*

3. Color.

Color is a psychological response to different wavelengths of light based on the human perception. *Id.* at 12. How color is perceived depends upon the amount of energy light has at each wavelength. *Id.* Spectral energy distribution ("SED") shows the relative intensity of light at each wavelength. *Id.* The SED, however, is not useful for identifying specific colors. *Id.* In 1931, the Commission International l'Eclairage or International Commission on Illumination ("CIE") developed a system for identifying specific colors by measuring the chromaticity of light. The CIE system, which uses the diagram reproduced below, is well known and widely accepted. *Id.*

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 20 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                Page 20 of 116

1931 C.I.E. CHROMATICITY DIAGRAM

[*412] [SEE DIAGRAM IN ORIGINAL]

*Id.* at 13.

All existing colors can be represented by a single point on the CIE Diagram, as plotted on chromaticity coordinates (x,y). *Id.* The upside down u-shaped perimeter of the diagram represents the 100% saturated, or pure spectral [**20] colors. *Id.* Colors, however, desaturate or become more and more pastel toward the center, until they are white. *Id.* Every color can be correlated to a dominant wavelength or complimentary dominant wavelength. *Id.*

C. Characteristics And Types Of Optical Filters.

Optical filters are devices that selectively pass or block electromagnetic radiation. *Id.* at 14. Whether radiation is passed or blocked is based upon a transmissive spectrum that shows wavelengths that have high transmittance (passing) and low transmittance (blocking). *Id.* Typically, filters derive their names by the way the transmittance graph looks. *Id.* For example, filters that pass shorter wavelengths and block longer wavelengths are called "low pass filters." *Id.* Filters that pass longer wavelengths and block shorter wavelengths are "high pass filters." *Id.*

A combination of optical filters will create a filter with properties that are cumulative, *i.e.*, the combination of a "highpass filter" that passes light above 500 nm and a "lowpass filter" that passes light below 600 nm will result in light being emitted in the 500-600 nm range. *Id.* The transmittance values of filters are [**21] multiplied, wavelength by wavelength, to calculate the cumulative effect. *Id.*

D. The '914 Patent.

The '914 patent n2 describes the technical problem in 1985 of having "a night vision aid, such as ANVIS goggles, be operable in a cockpit or similar environment in which a full color display is illuminated." '914 patent, col. 2, ll. 2-5.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The '914 patent appears in the record as PMX 1 or DMX 1. 19

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The '914 patent consists of three claims. Claims 1 and 2 are independent claims and [*413] Claim 3 is dependent upon Claim 2. *See* '914 patent, col. 5, l. 30 - col. 6, l. 31.

Claim 1 describes:

A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light, comprising:

(a) a first optical filter that filters light from the local color display, wherein said first optical filter is a notch filter that passes light comprising predetermined color

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 21 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 21 of 116

bands including a predetermined red color band and that substantially blocks **[\*\*22]** light associated with color bands other than said predetermined color bands; and

(b) a second optical filter that filters light at the night vision aid, wherein said second optical filter substantially blocks light of at least said predetermined red color band.


'914 patent, col. 5, l. 30 - col. 6, l. 11.

Claim 2 describes:


A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light having blue, red, and green color bands, comprising:

(a) a plurality of filters at the local color display including (1) a first filter for filtering the blue color band of the local source of light; (2) a second filter for filtering the green color band of the local source of light; and (3) a third filter for filtering the red color band of the local source of light and passing a narrowband of the red color band; and

(b) a fourth filter which filters light at the night vision aid, said fourth filter cooperating with said plurality of filters to substantially block at least said narrowband of the red color band from being admitted to the night vision aid.


**[\*\*23]**


'914 patent, col. 6, ll. 12-28.

Claim 3 describes:


The display system of claim 2 wherein said narrowband of the red color band is substantially five to twenty nanometers wide.


'914 patent, col. 6, ll. 29-31.

II. FACTUAL AND PROCEDURAL BACKGROUND. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n3 The relevant facts and procedural background recited herein largely were derived from:

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 22 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 22 of 116

the United States Patent No. 6,467,914 ("'914 patent"), granted on October 22, 2002 and
issued from United States Patent Application Serial No. 06/786,269 ("'269 application"),
originally filed on October 10, 1985, the prosecution history thereof, and prior art; Plaintiffs'
December 18, 2002 Complaint ("Compl."); the United States ("Gov't" or "Government"); May
23, 2003 Motion To Issue Notice to Third-Party Lockheed Martin Corp. ("Lockheed Martin");
the Government's June 16, 2003 Answer ("Gov't First Answer"); Defendant-Intervenor's
September 3, 2003 Motion to Intervene ("Int. Motion"); Plaintiffs' September 9, 2003
Response thereto ("Pl. Reply to Int. Motion"); Defendant-Intervenor's September 17, 2003
Answer ("Int. Answer"); Plaintiffs' December 23, 2004 Opening Claim Construction Brief
("12/23/04 Honeywell Brief"); Defendants' January 14, 2005 Claim Construction Brief
("1/14/05 Def. Joint Brief"); Plaintiffs' January 21, 2005 Reply Claim Construction Brief
("1/21/05 Honeywell Brief"); Plaintiffs' April 1, 2005 Opening Post-Hearing Brief Regarding
Claim Construction ("4/1/05 Honeywell Brief"); the Government's April 1, 2005 Post-Hearing
Claim Construction Brief ("4/1/05 Gov't Brief"); Defendant-Intervenor's April 1, 2005 Post-
*Markman* Brief ("4/1/05 Int. Brief"); Plaintiffs' Post-Hearing Reply Brief Regarding Claim
Construction ("4/15/05 Honeywell Brief"); Government's Post-Hearing Claim Construction
Reply Brief ("4/15/05 Gov't Brief"); Defendant-Intervenor's April 15, 2005 Reply to
Honeywell's Opening Post-Hearing Brief Regarding Claim Construction ("4/15/05 Int. Brief");
April 15, 2005 Joint Stipulation ("Jt. Stip."); Plaintiffs' May 13, 2005 Amended Complaint
("Am. Compl."); the Government's May 31, 2005 Answer ("Gov't Answer to Am. Compl.");
and Defendant-Intervenor's May 31, 2005 Answer ("Int. Answer to Am. Compl.").


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*24]**

Honeywell Intellectual Properties, Inc. is the owner of the '269 patent application and '914
patent and Honeywell International, Inc. (hereinafter collectively, "Honeywell") is the
exclusive licensee of the '269 patent application and '914 patent. The issuance of the patent,
however, was withheld because of a Secrecy Order, issued on April 2, 1986.

On December 18, 2002, Honeywell filed a Complaint in the United States Court of Federal
Claims asserting essentially three claims against the Government allegedly for violating: (1)
the Invention Secrecy Act of 1951, 35 U.S.C. §§ 181-88, as a result of the Government's
issuance of an April 2, 1986 Secrecy Order concerning Honeywell's '914 **[\*414]** patent and
related '269 application; n4 (2) the Fifth Amendment to the United States Constitution, as a
result of the Government's taking of Honeywell's '914 patent and related '269 application;
and (3) 28 U.S.C. § 1498(a), as a result of the unlicensed, or otherwise unlawful, use of the
'914 patent by or on behalf of the Government. *See* Compl. at PP 53-75. The case was
assigned to the Honorable Emily C. Hewitt.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n4 Initially, Honeywell asserted that the Government infringed U.S. Patent Application Serial
No. 06/786,268 ("'268 application") and U.S. Patent No. 6,142,637 ("'637 patent").
Honeywell, however, relinquished claims in the '268 application and '637 patent. *See*
12/23/04 Honeywell Brief at 1, n.1; *see also* 5/13/05 Honeywell Motion.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*25]**

On May 23, 2003, the Government filed a Motion to Issue a Notice to Third Party Lockheed
Martin, pursuant to 41 U.S.C. § 114(b) and RCFC 14(b). On June 5, 2003, the court granted
the Government's Motion. On June 16, 2003, the Government filed a First Answer.

* * *

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 23 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!    Page 23 of 116

On August 15, 2003, this case was assigned to the undersigned judge. On September 3, 2003, Lockheed Martin filed an Unopposed Motion to Intervene, insofar as Honeywell alleged that the C-130J Hercules aircraft, which is manufactured by Lockheed Martin, incorporated technology claimed in the '914 patent. *See* Int. Motion at 1. On September 9, 2003, Honeywell filed a Response to Lockheed Martin's Motion to Intervene. On September 12, 2003, both Lockheed Martin and the Government filed a Reply to Honeywell's Response. On September 17, 2003, the court issued a revised Order granting Lockheed Martin's Motion to Intervene with respect to only Counts III and IV of the Complaint. On September 17, 2003, the court entered an Order setting discovery and pre-trial deadlines agreed to by the parties. On that date, Lockheed Martin also filed an Answer in response to the December 18, 2002 Complaint.

On February 10, 2004, the **[**26]** Government filed an Unopposed Motion for Entry of a Stipulated Protective Order. On February 20, 2004, the court granted the Unopposed Motion and entered a Stipulated Protective Order. On April 30, 2004, the court entered an Order setting the date of a claim construction hearing for December 6-10, 2004, which subsequently was rescheduled to November 29, 2004-December 3, 2004 by a May 14, 2004 Order. On July 9, 2004, the court also issued an Order granting Honeywell's Unopposed Motion for Extension of Time of Certain Discovery Deadlines. On July 16, 2004, the court convened a telephone status conference to discuss discovery matters and questions concerning the claim construction hearing. At the invitation of the court, on July 23, 2004 and July 29, 2004, Lockheed Martin and Honeywell forwarded the court letters expressing suggestions about that hearing. On July 23 and 30, 2004, and August 5 and 17, 2004, the court convened additional telephone status conferences to discuss pending discovery matters. On August 25, 2004, the court vacated the September 17, 2003 and May 14, 2004 Orders and established a revised Scheduling Order setting a new date for the claim construction hearing for **[**27]** January 27, 2005, later re-set for January 31, 2005. In addition, on August 25, 2004, the court issued a Claim Construction Procedures Order proposed by the parties. On August 26, 2004, the court convened another telephone status conference to discuss discovery matters. On August 27, 2004, Lockheed Martin filed a Motion to Compel Honeywell's responses to Interrogatories 3 and 4. On August 30, 2004, Lockheed Martin filed a Motion to Compel Honeywell's response to Interrogatory 17.

On September 13 and 23, 2004, the court convened additional telephone status conferences to discuss discovery matters. On October 4, 2004, Lockheed Martin filed a Motion to Compel Honeywell to respond to requests for admission. On October 5, 2004, the court convened a telephone status conference with the parties. On October 6, 2004, the court issued an Amended Claim Construction Procedures Order and an Amended Scheduling Order setting another telephone status conference with the parties for October 12, 2004.

On October 15, 2004, Honeywell filed an Infringement Claim Chart. On October 18, 2004, Honeywell requested entry of a First **[*415]** Amended Protective Order and opposed Lockheed Martin's requests for admission. **[**28]** On October 27, 2004, Lockheed Martin filed a Reply. At the November 1, 2004 telephone status conference, the court was advised that the dispute regarding requests for admission had been resolved to the satisfaction of the parties. Accordingly, on November 2, 2004, the court entered an Order to that effect.

On November 10, 2004, defendants filed a Joint Response Chart that asserted Claims 1, 2, and 3 of the '914 patent were invalid, due to:

> (1) the existence of documentary and nondocumentary evidence that rendered Honeywell's claims obvious; (2) the insufficiency of the description of the invention to show Honeywell's possession of it; (3) a failure by Honeywell to

disclose the best mode for practicing the claimed invention; (4) Honeywell's derivation of the invention from others; (5) the introduction of impermissible new matter in Honeywell's June 24, 2002 amendment; (6) the misjoinder of inventorship, which led to the granting of the '914 patent (the Government did not join in this defense); (7) the violation of Honeywell's duty to disclose to the second patent examiner the existence of prior art that was material to the PTO granting the **[\*\*29]** '914 patent (the Government did not join in this defense).

On November 15, 2004, Honeywell submitted a Proposed Claim Construction Statement that set forth: (1) Honeywell's proposed claim constructions, including any special or uncommon meanings of words or phrases used in the '914 patent; (2) references from the specification that support, describe, or explain each of the claim elements and/or Honeywell's proposed construction; (3) material in the prosecution history that describes or explains each of the elements of the claim; and (4) extrinsic evidence, where necessary.

On November 16, 2004, the court entered a First Amended Protective Order reflecting the changes negotiated by the parties. On November 16, 2004, defendants filed a Motion to Amend the Defendants' Joint Response Chart. On November 22, 2004, defendants filed a Joint Proposed Claim Construction Statement, together with a November 22, 2004 Expert Report of Dr. Harry Lee Task.

On December 3, 2004, the court entered an Order setting a status conference on December 17, 2004 and amending the due date for the Joint Claim Construction Statement to December 14, 2004. On December 16, 2004, the court entered an Order granting **[\*\*30]** Lockheed Martin's Motion to Amend Defendants' November 8, 2004 Joint Response Chart. Following the December 17, 2004 status conference, the court entered a Second Amended Protective Order. On December 21, 2004, the parties filed a Joint Claim Construction Statement.

On December 23, 2004, Honeywell filed an Opening Claim Construction Brief seeking the court's construction of certain claims in the '914 patent, together with a four volume appendix - -Exhibits 1-39 (PA1-PA514). On January 14, 2005, the Government and Lockheed Martin filed Defendants' Claim Construction Brief, together with five volumes of Exhibits 1-35 (DE1-DE1036). n5 On January **[\*416]** 21, 2005, Honeywell filed a Reply Claim Construction Brief, together with a Supplemental Appendix Ex. 40-49 (PA515-558). On January 27, 2005, the parties filed a Supplement to the Joint Claim Construction agreeing to the construction of the following terms: "optical filter" and "filter," when used as nouns; "filter" and "filtering," when used as verbs; and "passes," when used as a verb.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 On January 12, 2005, without requesting leave, the Government and Lockheed Martin filed a joint brief prior to the claim construction hearing that clearly was produced and authored in large part by Lockheed Martin's counsel. See 1/14/05 Def. Joint Brief; see also TR at 10-16. On January 26, 2005, the court issued a Memorandum Opinion and Order addressing jurisdictional and procedural issues raised by this unilateral action:

The public interest in having transparent judicial proceedings is particularly ill-served where a private party is in fact conducting and funding the Government's

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 25 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                Page 25 of 116

defense of a patent infringement case without the Government's public recognition and specific authorization of such. Therefore, if the Government, in fact, has decided to allow Lockheed Martin to "assume and undertake the conduct and control" of this case, [pursuant to Contract No. F33657-00-C0018 page one and an unidentified one page attachment, *see* May 23, 2003 Motion for Notice to Third-Party, pursuant to RCFC(14)(b) (Exhibit 2 at 2(i)(3))], then the Government should advise the court and parties . . . . On the other hand, if the Government, in fact, intends to continue to defend this case, the court expects each party to proceed independently, representing the best interests of each party's respective clients.

*Honeywell Int'l, Inc. v. United States,* 65 Fed. Cl. 809, 2005 U.S. Claims LEXIS 161, No. 02-1909C, slip op. at 4-5 (Fed. Cl. Jan. 26, 2005, amended and reissued on June 14, 2005) (Memorandum Opinion and Order).

Thereafter, the Government reaffirmed that it would conduct a separate defense, particularly since "Lockheed's interest in the infringement issue are not co-extensive [with the Government]." TR at 5.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**31]**

The court held a claim construction hearing from January 31, 2005-February 3, 2005 ("TR 1-1138"). n6 In addition to argument of the parties, the court considered the reports of the parties' experts as direct testimony and heard cross examination and re-direct.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The following Honeywell exhibits were admitted into evidence: PMX 1-57, 100-105, 110-112. The following Government and Lockheed Martin exhibits were admitted into evidence: DMX 1-38, DX 50-56.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The court has determined that Honeywell's expert, Lawrence E. Tannas, Jr., and his testimony, met the qualifications of Fed. R. Evid. 702-03. *See* PMX 34 (Nov. 15, 2004 Initial Expert Report of Lawrence E. Tannas, Jr.); PMX 36 (Dec. 1, 2004 Rebuttal Expert Report); PMX 37 (Dec. 7, 2004 Supplement to Expert Reports); *see also* TR at 772-958; 1128-1135. Mr. Tannas has a B.S. and M.S. degree in Engineering from the University of California. *See* PMX 37 at Ex. 1. Mr. Tannas has had more than 25 years of "hands-on" experience with avionic cockpit displays, **[**32]** including research and development, manufacturing, testing, and human factor analysis. *See* PMX 34P 1 at 2. In addition, Mr. Tannas worked for Honeywell in the early 1960's during which time he invented the backup reentry guidance display for the Apollo Reentry Vehicle, which was used in the Apollo 13 mission. *Id.* P 3 at 2. Subsequently, Mr. Tannas was employed at Martin Marietta Corp. where he developed a cockpit for the SV5 Manned Space Vehicle. *Id.* Prior to starting his own firm in 1999, Mr. Tannas also was employed by Rockwell International where he developed the engineering prototype of a liquid crystal display for the world's first full-scale LCD production. *Id.* Mr. Tannas currently is President of Tannas Electronics, an entity involved in consulting, lecturing, and research. *Id.* P 5 at 3. In addition, he is President of Tannas Electronic Displays, Inc., which is involved in research, development, and licensing of intellectual property for preparing LCDs for avionics. *Id.*

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 26 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!    Page 26 of 116

Mr. Tannas has served as a consultant or lecturer for Fortune 500 companies, several universities, and federal agencies, including the Federal Aviation Administration, National Aeronautics **[\*\*33]** and Space Administration, United States Air Force, United States Navy, National Science Foundation, Defense Advanced Research Projects Agency, and the Central Intelligence Agency. *Id.* P 2 at 2. Mr. Tannas also is an inventor or co-inventor of eight patents issued by the USPTO. *Id.* P 3. He has authored or co-authored numerous publications, including serving as author/editor of *Flat-Panel Displays and CRTs* (Van Nostrand Reinhold Co., 1985) and *Flat-Panel Display Technologies, Japan, Russia, Ukraine, and Belarus* (Noyes Publications, 1995). *Id.* P 4. In addition, Mr. Tannas has been a coordinator and lecturer on flat-panel displays, human factor analysis, and advance cockpit displays at University of California at Los Angeles and other universities. *Id.* P 4 at 2-3.

Mr. Tannas was retained by Honeywell to provide an opinion as to the meaning of the following words or phrases in the '914 patent: "color display," *id.* P 12 at 5; "source of light," *id.* P 13; "local" with "color display," *id.* P 14; "local" with "source of light," *id.* P 14 at 5-6; "optical filter," *id.* P 15 at 6; "notch filter," *id.* P 16; "color band," *id.* P **[\*\*34]** 17 at 6-7; "predetermined color band," *id.* P 18 at 7; "substantially blocks," *id.* P 19; "filter," *id.* P 20; "narrow band of the red color band," *id.* P 21 at 7-8.

In addition to testifying about proposed construction of the above-referenced terms, Mr. Tannas advised the court that he intended to testify about the "background of the patented [' 914] invention, including providing **[\*417]** relevant information concerning the technologies and industry to which the ['914] patent relates, the prior art, and the problems solved by the invention." *Id.* P 22 at 8.

The court also has determined that the Government's expert, Dr. Harry Lee Task met the qualifications of Fed. R. Evid. 702-03. *See* PMX 35 (Nov. 22, 2004 Expert Report of Harry Lee Task, Ph.D.); *see also* TR at 968-1127. Dr. Task has had more than 27 years of "hands-on" experience with research and development in helmet mounted displays, display image quality, vision assessment in space, night vision goggles, night vision goggle compatible lighting, and vision through aircraft transparencies. *See* PMX 35 P 3 at 2. Dr. Task has a B.S. degree in Physics from Ohio University, a M.S. in Physics from Purdue University, **[\*\*35]** a M.S. and Ph.D. in Optical Sciences from the University of Arizona Optical Sciences Center, and a M.S. in Management of Technology from the Massachusetts Institute of Technology Sloan School of Management. *Id.* P 2 at 1-2.

In 1971, Dr. Task was hired by the United States Air Force Aerospace Medical Research Laboratory("AMRL") a sanoptical physicist to work on helmet mounted displays and display image quality. *Id.* P 3 at 2. In 1989, Dr. Task became the Chief Scientist for AMRL and served in that capacity until 1991. *Id.* In 1997, Dr. Task became the Senior Scientist for Human Systems Interface for the United States Air Force Research Laboratory, a position equivalent to a one-star General. *Id.* In June 2001, Dr. Task retired from the United States Air Force, but has continued technical work as a consultant. Since his retirement in June 2001, Dr. Task has been an independent consultant and President and Treasurer for Opto-Metrix, Inc., a Subchapter "S" corporation that makes and sells optical protractors. *Id.* P 1 at 1.

Dr. Task also is the inventor or co-inventor of approximately 45 patents issued by the USPTO, author or co-author of over 100 technical-research publications, **[\*\*36]** a member of relevant professional associations, including the Society for Information Display, and a Fellow of the American Society for Testing and Materials. *See* PMX 35 P 4 at 2-3. He has been retained as an expert in vision and visibility in approximately a dozen cases involving vehicle accidents at night or dusk, however, none concerned NVGs or NVG compatible lighting. *Id.* P 5 at 3.

Dr. Task was retained to provide an opinion as to the meaning of the following words or

Case 3:01-cv-00577-CFD    Document 168-9    Filed 03/03/2006    Page 27 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 27 of 116

phrases in the '914 patent: "display system," *id.* P 15 at 8; "local" with respect only to "passive night vision aid," *id.* at PP 17-18 at 8; "display," *id.* PP 19-20 at 4-5; "color display," *id.* P 21 at 9; "local source of light," *id.* PP 22-23 at 9; "notch filter," *id.* PP 24-25 at 9; "narrowband," *id.* P 26 at 10; "color band," *id.* PP 27-29 at 10-11; "red color band," *id.* PP 30-31 at 11-12; "predetermined red color band," *id.* PP 32-34 at 12; "blue color band," *id.* P 35 at 13; "green color band," *id.* P 36 at 13; and "substantially blocks," *id.* PP 37-42 at 13-15.

In addition, Dr. Task testified about the background associated with the technical areas of the **[**37]** '914 patent, including the United States Army's 1973 adoption of a second-generation NVG and designation of the AN/PVS-5A as an "interim" pilot's aid for helicopter flying at night. *See* PMX 35 P 8 at 4. Dr. Task admitted that NVGs were limited because of their incompatibility with aircraft lighting and displays. *Id.* Dr. Task explained that the problem was too much light in the cockpit, to which the NVGs were "sensitive." *Id.* P 9 at 4. In addition, pilots trying to look outside the helicopter would see only reflections of the inside of the cockpit, as opposed to the view outside the helicopter. *Id.* On a more technical basis, the wavelengths that the NVGs were sensitive to (and amplified) included the entire visible spectrum (*i.e.*, 400-700 nm) and a small portion of the near infrared wavelengths, *i.e.*, 700-900 nm. *Id.* P 9 at 4.

Dr. Task advised the court that most cockpit lighting and displays utilize incandescent light bulbs that emit a considerable amount of infrared energy compared to energy to which the human eye is sensitive. *Id.* P 10 at 5. This created an issue since most incandescent lights in the cockpit emitted far more "bad" light than "good" **[**38]** light, to which the eye is sensitive. *Id.* Even when the NVGs were sensitive, "the filters typically did their **[*418]** job with respect to producing the desired color, but they also passed the invisible-to-the-eye infrared light that was incompatible with the NVG operation." *Id.* Therefore, in order to create a display with phosphors compatible with NVGs, longer wavelength side bands needed to be blocked by a filter. *Id.* P 11 at 5-6. To accomplish making a display with a phosphor compatible with NVGs several techniques were developed, including: placing filters over displays to block objectionable infrared and red wavelengths, but pass blue and green wavelengths; incandescent lights in the cockpit were turned off and the instrument panel utilized sources of light that did not emit objectionable light; and a filter passing only shorter wavelengths were put over white phosphor displays to block those wavelengths. *Id.* P 12 at 6. The United States Army also developed an Aviation Night Vision Imaging System ("ANVIS") night vision goggles in the early 1980s that used an image intensified tube that was sensitive in the 450-930 nm range, rather than a full visible spectrum. **[**39]** *Id.* P 13 at 6. When a "long pass" filter was used on the lens in front of the NVG to reduce the sensitivity of the ANVIS to shorter visible wavelengths, the NVG became sensitive to wavelengths of 580-930 nm. *Id.* P 13 at 7. As a result, the visible range of below approximately 530 nm was used for cockpit lighting and display since light in this range was invisible to the NVGs allowing visibility outside the cockpit. *Id.* P 14 at 7. Figure 1, the preferred embodiment of the '914 patent, teaches a significant overlap between the wavelengths (including yellow, orange, and red wavelength bands) sensitive to the human eye and the ANVIS, *i.e.*, approximately 580-700 nm. *Id.* This was the state of the NVG technology in 1985, at the time the '914 patent was filed. *Id.* P 15 at 7 (quoting '914 patent specification describing the problem in 1985 that the '914 patent addressed) ("It is . . . desired that a night vision aid such as ANVIS goggles be operable while a full color display is illuminated. It is therefore desired to prevent light which originates at the full color display from overwhelming the night vision aid.").

Following the claim construction hearing, on February 28, 2005 and **[**40]** March 3, 2005, the court convened telephone status conferences, pursuant to which the court issued a March 11, 2005 Scheduling Order regarding post-hearing briefs and discovery deadlines regarding the August 1-12, 2005 trial.

Case 3:01-cv-00577-CFD   Document 168-9   Filed 03/03/2006   Page 28 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 28 of 116

On March 30, 2005, Lockheed Martin filed a Motion to Supplement the Record with three contracts between Lockheed Martin and the Government to support Lockheed Martin's intervention as a matter of right.

On April 1, 2005, Honeywell filed an Opening Post-Hearing Brief Regarding Claim Construction; the Government filed a Post-Hearing Claim Construction Brief; and Lockheed Martin filed a Post-*Markman* Hearing Brief. On April 7, 2005, the court granted Lockheed Martin's March 30, 2005 Motion to Supplement the Record.

On April 15, 2005, Honeywell filed a Post-Hearing Reply Brief Regarding Claim Construction; the Government filed a Post-Hearing Claim Construction Reply Brief; and Lockheed Martin filed a Reply to Honeywell's Opening Post-Hearing Brief Regarding Claim Construction. In addition, on April 15, 2005, the parties filed a Stipulation agreeing to the meaning of six of the contested claims, which are set forth herein.

On April 20, 2005, Honeywell filed **[**41]** a Motion for Leave to Supplement the Record Regarding Claim Construction of the term "red color band" ("4/20/05 Honeywell Brief"), together with an April 18, 2004 Declaration of Mark Koehn, Esquire and April 19, 2004 Declaration of Lawrence E. Tannas, Jr. and Exhibits 1-13 (PE1-155). n7 Honeywell's Motion requested that the record include the *Draft Standard for Color Active Matrix Liquid Crystal Displays* in U.S. Military Aircraft, WL-TR-93-1177, Darrel Hopper June **[**419]** 1994 (Koehn Ex. 1) and Dr. Hopper's deposition testimony related thereto. On May 4, 2005, the Government filed a Brief in Response to Honeywell's Motion to Supplement, together with three volumes of supporting Exhibits ("Gov't Supp. Resp."). The Government did not object to Honeywell's request to supplement the record, but requested counter-designations.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 On February 25, 2005, Honeywell filed a Motion to file a corrected version of the December 23, 2004 Opening Claim Construction Brief. On March 14, 2005, Defendants opposed Honeywell's request to file a corrected brief. On March 17, 2005, Honeywell filed a reply together with Exhibits A-G. On March 24, 2005, the court entered an Order denying Honeywell's February 25, 2005 Motion, but granted Honeywell leave to discuss any corrections in the post-hearing brief to be filed on April 1, 2005.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**42]**

On May 4, 2005, Honeywell also filed a letter to bring the recent decision of the United States Court of Appeals for the Federal Circuit in *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367 (Fed. Cir. 2005) to the attention of the court. On May 5, 2005, Honeywell filed a Supplement to the October 15, 2004 Claim Chart ("5/5/05 Honeywell Supp. to Claim Chart") to amend: Section II of the Claim Chart to clarify that "Honeywell no longer asserts that LED displays are a type of display that infringes the '914 patent when used by the Government" (5/5/05 Honeywell Supp. to Claim Chart at 1, P 2.); Section II of the Claim Chart to clarify that "Honeywell no longer asserts that the Cockpit Engineer Display (CED) made by Smiths Industries for B-52H, the Warning Annunciator Panel (WAP) made by Litton Systems/Northrop Grumman for the C-17A, or the Engine/Caution Panel made by Litton Systems for the C-17A are covered by the '914 patent when used by the Government in connection with NVIS" (*Id.* at 2, P 3.); and Section III of the Claim Chart to remove "the statement at page 9 referencing 'Attachment B: claim chart showing how, on information and belief, **[**43]** '914 claim 1 reads on full color, NVIS compatible, Light-Emitting Diode (LED) displays, when used with NVIS'" (*Id.* at P 4.). Honeywell appears to have withdrawn Attachment B to the Claim Chart. *Id.* On May 6, 2005, the Government filed a Motion for Leave to File the Declaration of Dr. Darrel G. Hopper ("5/5/05 Hooper Decl.").

Case 3:01-cv-00577-CFD     Document 168-9     Filed 03/03/2006     Page 29 of 29

FOCUS - 12 Results - public w/3 notice w/25 claim w/3 constru!                    Page 29 of 116

On May 6, 2005, Honeywell filed a Reply in support of the April 20, 2005 Unopposed Motion to Supplement the Record Regarding Claim Construction. On May 9, 2005, the court granted the Government's May 6, 2005 Unopposed Motion to File an Original Declaration of Dr. Darrel Hopper.

On May 13, 2005, the court granted Honeywell's May 13, 2005 Unopposed Amended Complaint dismissing Counts I, II, III, and IV as they relate to U.S. Patent No. 6,142,637.

On May 13, 2005, Honeywell filed a Motion to Preclude the Government "from making offensive use of certain documents belatedly produced in violation of the Court's [First Amended Protective Order and Second Amended Protective Order]," together with the May 11, 2005 Affidavit of Mark Koehn and Exhibits 1-19 (PE1-PE159). On May 25, 2005, the Government filed a Brief in Opposition. On May 26, 2005, the court denied [**44] Honeywell's May 13, 2005 Motion to Preclude. On May 31, 2005, Honeywell filed a Motion for Reconsideration.

On May 31, 2005, both the Government and Lockheed Martin filed an Answer to Honeywell's Amended Complaint.

III. DISCUSSION.

A. Jurisdiction.

HN3⁂The United States Court of Federal Claims has jurisdiction to adjudicate claims that allege "an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same . . . [seeking] recovery of . . . reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a).

The United States Court of Federal Claims also has jurisdiction to adjudicate claims under the Invention Secrecy Act. See 35 U.S.C. § 181. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n8 HN4⁂The Invention Secrecy Act provides that "whenever publication or disclosure by the publication of an application or by the grant of a patent on an invention in which the Government has a property interest might, in the opinion of the head of the interested Government agency, be detrimental to the national security, the Commissioner of Patents upon being so notified shall order that the invention be kept secret and shall withhold the publication of the application or the grant of a patent therefor under the conditions set forth hereinafter. Whenever the publication or disclosure of an invention by the publication of an application or by the granting of a patent, in which the Government does not have a property interest, might, in the opinion of the Commissioner of Patents, be detrimental to the national security, he shall make the application for patent in which such invention is disclosed available for inspection to . . . the Secretary of Defense, and the chief officer of any other department or agency of the Government designated by the President as a defense agency of the United States. . . . If, in the opinion of . . . the Secretary of a Defense Department, or the chief officer of another department or agency so designated, the publication or disclosure of the invention by the publication of an application or by the granting of a patent therefor would be detrimental to the national security, . . . the Secretary of a Defense Department, or such other chief officer shall notify the Commissioner of Patents and the Commissioner of Patents shall order that the invention be kept secret and shall withhold the publication of the application or the grant of a patent for such period as the national interest requires, and notify the applicant thereof." 35 U.S.C. § 181.