**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANTON/BAUER, INC. | ) |
| | ) CIVIL ACTION NO. 3:01-CV-577 (CFD) |
| Plaintiff | ) |
| vs. | ) |
| | ) |
| PAG, LTD. | ) |
| Defendant | ) |
| vs. | ) |
| | ) |
| ANTON/BAUER, INC. AND | ) |
| ALEX DESORBO | ) |
| | ) AUGUST 16, 2006 |
| Defendant | |

**PROPOSED ORDER FOR CLAIMS CONSTRUCTION**
**FILED BY ANTON/BAUER, INC.**

**I.      FACTS AND PROCEDURAL HISTORY**

This action was commenced by a complaint filed on April 10, 2001.  Plaintiff, Anton/Bauer, Inc ("Plaintiff" or Anton/Bauer") claims that Defendant, PAG, Ltd. ("Defendant" or "PAG") has infringed Claims 9 and 11 of U.S. Patent Number 4,810,204 (the "'204 Patent").   The '204 Patent is entitled, *Battery Pack Connection*, and was issued on March 7, 1989 to Anton Wilson who subsequently assigned it to Anton/Bauer.

On December 8, 2006, the parties exchanged and filed separate constructions with respect to nine separate terms with respect to Claims 9 and 11 of the '204 Patent. Those terms and the parties' respective constructions are set forth as follows:

1.    A Releasable Connection For A Battery Pack Or The Like

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
| --- | --- |
| A **releasable connection** is a separable attachment.<br><br><br>A **battery pack** is a group of two or more cells connected together to furnish electric current.<br><br><br>**Or the like** means a similar functional structure to a battery pack, i.e., to furnish electric current. | A **releasable connection** should be construed as a mechanical engagement that can be locked to hold two structures together, and that also can be unlocked so that the two structures can be separated. It does not refer to an electrical engagement.<br><br>A **battery pack** is two or more electrochemical cells electrically interconnected in an appropriate series/parallel arrangement to provide the required operating voltage and levels.<br><br>**Or the like** is so indefinite and ambiguous that it cannot be construed. |

2.    Releasably Locked Together In A Connected Position

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
| --- | --- |
| The term releasably **locked together in a connected position** means two plates which are held or fastened together, in a manner which can be released, which connection provides for a linking and continuity of the mating functional elements of the two plates. | The term **releasably locked together in a connected position** refers to a mechanical engagement that can be locked to hold two structures together, and that also can be unlocked so that the structures can be separated. The phrase does not refer to an electrical engagement. |

3.    __The Female Plate, Including A Plurality Of Depending Slots And At Least One Elongated Terminal__

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **relatively flat female plate** is one of two mating elements of the releasable connection that is, for the most part, constructed on one functional plane which contains one or more holes used for mating or connecting to a male counterpart. | A **female plate** should be construed as an object that interconnects an electrical device or a support or a recharging unit to the male plate. |
| A **depending slot** is a narrow opening extended from a larger opening in the direction of the mating engagement. | A **depending slot** is the symmetrical portion of the keyhole openings cut in the front surface of the female plate that have parallel side walls and that are separate and distinct from the ovoid or elliptical portion of the keyhole opening.  Depending slots does not include the ovoid or elliptical of the keyhole opening. |
| At least one **elongated terminal** means one or more devices attached to the end of an electrical apparatus for making an electrical connection, which are long in proportion to width. | An **elongated terminal** means an electrical connector that has (i) an expandable tip; and (ii) a threaded shank. |

4.    **A Male Plate, Including A Plurality Of Spaced Headed Projections, With There Being One For Each Slot And With Each Projection Having Head And Leg Projections, And At Least One Elongated Mating Terminal**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **relatively flat male plate** is one of two mating elements of the releaseable connection that is, for the most part, constructed on one functional plane which contains one or more projections used for mating or connecting to a female counterpart. | The **male plate** is one side of a closed container that has a half-moon shaped slot in its front wall and which contains rechargeable batteries. |
| The **plurality of spaced headed projections** means more than one headed projection set apart from one another. The headed projections are extending elements or features that have an enlarged uppermost part relative to a lower, narrower portion, making them headed projections. | The **plurality of spaced headed projections** means three parts of the male plate that protrude from the surface of the male plate, each of which must have: (i) a large circular head; (ii) an integral narrow leg portion; and (iii) a half-moon shaped end portion or back plate. |
| One **spaced headed projection for each slot** means a one-to-one correspondence between the number of depending slots and the number of spaced headed projections. | One **spaced headed projection for each slot** means a one-to-one correspondence between the number of depending slots and the number of spaced headed projections. |
| At least **one elongated mating terminal** is one or more devices attached to the end of an electrical apparatus for making an electrical connection which are long in proportion to width and which joins or fit together with its/their counterpart(s). | At least **one elongated mating terminal** is a removable or adjustable housing on the male plate that must include: (i) a U-shaped opening; (ii) a stationary post that is surrounded by the U-shaped opening; (iii) at least four shoulders; (iv) a groove; (v) a space; and (vi) female contacts. |

5.    **Said Male Plate Being Positioned Abutting The Female Plate With The Leg Of The Projections Being Located In Associated Slots And With The One Terminal Within The Mating Terminal**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
| --- | --- |
| The phrase **being positioned with the one terminal within the mating terminal** should be construed to be the nexus or linking of the two or more electrical terminals of the two plates by the insertion of one into another. The linking of these two terminals is what forms the electrical connection between the two plates. | The phrase **being positioned with one terminal within the mating terminal** means provided to assure proper alignment and entry of the male contact terminals into the female contact terminals upon assembly of the male and female plates, which means necessarily include the one elongated terminal on the female plate (as defined above) and the at least one elongated terminal on the male plate (as defined above). |

6.    **Releasable Locking Means On Said Female Plate For Engaging At Least One Of The Headed Projections Which Means Include At Least One Rotable Member On The Backside Of The Female Plate**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
| --- | --- |
| The **releasable locking means** is the mechanics on the female plate which permit the separable binding and unbinding of the plates relative to one another, by the interaction with one or more of the headed projections on the male plate, as shown and described in the specification. | This claim term should not be construed as a "means-plus function." The term **releasable locking means** should be construed to mean a mechanical engagement that can be locked to hold two or more structures together, and that also can be unlocked so that the two or more structures can be separated. |

7.    **Means Urging The Member To A Closed Condition With Said Pin Disposed In The Path Of Movement**

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
| --- | --- |
| The term means **urging the member to a closed condition with said pin disposed in the path of movement** refers to mechanics by which force is applied to the rotatable element so as to bias it, with some force, to the extent | The term means **urging the member to a closed condition with said pin disposed in the path of movement.** This should be construed as a "means-plus-function" term. The claimed function is: "urging the member to a closed condition." The corresponding structure in the |

5

| of its ability to travel in a direction, such that the pin blocks the change of position of the headed projection within the slot, as shown and described in the specification. | Patent is either: (1) a "leaf spring 72" comprising a generally linear metallic member spanning between a "V-notch 77 on the bottom of body portion 73" and a "block 78;" or (2) a "torsion spring" comprising a coiled metallic spring with one end secured to a hole in "the bottom of body portion 73'" and another end "rotatably mounted in a lateral opening in a fixes [sic] block 78." |
|---|---|

## 8. <u>Torsion Spring</u>

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A **torsion spring** is an elastic body, twisted and formed or constructed in a manner as to exert force on one end in one longitudinal direction about an axis while the other end is forced in an opposing direction. | A **torsion spring** is a coil that reacts against a twisting motion to move or return a part or component. |

## 9. <u>Fixed Support On The Back Side Of The Female Plate</u>

| PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|
| A stationary anchor point, for the spring element, constructed on the opposite side of the female plate from the female plate's planar nexus to the male plate. | An immovable block attached to the backside of the female plate that holds and supports the torsion spring. |

The parties briefed their respective constructions on January 20, 2006, responded to each other's briefs on February 17, 2006, and filed reply memoranda on March 3, 2006. The Court heard oral argument on July 26, 2006.

The parties have previously stipulated and the Court has opined that the '204 Patent is a combination patent of a battery pack connection that includes "(1) a flat female plate having a plurality of keyhole slots and at least one elongated electrical terminal (the female plate is also manufactured by Anton/Bauer and is normally affixed to the camera or electrically operated device, such as a battery charger); and (2) a flat

male plate, including a plurality of shaped headed projections adapted to be received by keyhole slots to releasably lock the female and male plates together, the male plate also including at least one elongated electrical terminal which mates with the electrical terminal on the female plate when the plates are locked together (the male plate is usually a portion of the housing of the pack containing an electrical battery or AC to DC power source, powering the camera through mating terminal connections) and; (3) a releasable locking means on the female plate for engaging at least one of the headed projections for locking and preventing relative movement between the plates once they are assembled in a mating relation."  Stipulated Facts of Plaintiff, Anton/Bauer, Inc. and Defendant, PAG, Ltd., Pleading No. 25 at ¶ 6.  *See also* Ruling on Motion for Preliminary Injunction, Pleading No. 58, at ¶5, *rev'd on other grounds*, 329 F.3d 1343 (Fed. Cir. 2003).  *See also* '204 Patent at Abstract.

This is the third iteration of the underlying technology created by employees of, and later assigned to, Anton/Bauer.  *See also* U.S. Patent Nos. 4,218,107 (the "'107 Patent") and 4,550,968 (the "'968 Patent").  The '107 Patent also disclosed a combination of male and female plates for a battery connection, *see* '107 Patent at Column 4, Lines 43-62, but relied upon a tensioned flexible strip to engage the head of the projection inserted into the keyhole of the female plate to maintain a connection.  *Id*. at Column 4, Line 62 to Column 5, Line 6; *see also* '204 Patent at Column 1, Line 66 to Column 2, Line 2.  To remove the plates, the user simply bent the strip from its normal position. *Id.* at Column 2, Lines 3-4.  The '968 Patent modified the core '107 Patent invention by improving the efficiency and speed of the connection, and facilitated use of the flexible locking strip by employing a latch activator.  *See* '968 Patent, Column 6 at

Lines 16-23; Column 7, Lines 11-21 and Column 8, Lines 31-35; *see also* '204 Patent, Column 2, Line 35, to Column 3, Line 13.

The '204 Patent was invented by the same individual who invented the '107 Patent, Anton Wilson.  It discloses and claims in several iterations new and different improvements over the prior art as to the engagement of the two plates in combination, generally - - 1) a new releasable locking means, 2) a safety latch, 3) newly designed keyhole slots to facilitate the alignment of the two plates, 4) improved means to ensure that the proper alignment of the male and female terminals, and 5) an improved means for securing the projections to the male plate.  *See e.g.,* '204 Patent at Column 3, Lines 16-47; Col. 11, Line 54 to Line 57 (safety latch); Column 12, Lines 48 to 63 (releasable locking means); Col. 13, Lines 30 to 53 (terminal alignment); Column 11, Lines 57 to 63 (keyhole alignment); Col. 12, Lines 22-31 (securement means).  Some of these new features, in turn, include other new inventions.  *See e.g.,* Col. 11, Lines 59-61 (keyhole slots with ovoid openings); Col. 12, Lines 36-37 (slots, not keyholes); Col. 12, Lines 63-65 and 68 (releasable locking means with a bowed leaf spring or torsion spring).

The parties do not dispute that Claim 9 focuses on the new releasable locking means, *see* Column 12, Line 48 to Line 63, and that Claim 11 depends upon Claim 9, particularly insofar as it relates to the releasable locking means.

While PAG initially took issue with respect to the claims construction offered by Anton/Bauer with respect to each of the terms reproduced above, it offered no argument in support of, nor argument with respect to, its proposed construction of those terms. Further, at this Court's hearing on July 26, 2006, PAG conceded that the constructions offered by Anton/Bauer were acceptable.  Given that fact, and having reviewed the

arguments offered by Anton/Bauer, each of the constructions offered by Anton/Bauer is accepted as follows:

  1.    **A Releasable Connection For A Battery Pack Or The Like**

> A **releasable connection** is a separable attachment.
>
> A **battery pack** is a group of two or more cells connected together to furnish electric current.

  2.    **Releasably Locked Together In A Connected Position**

> The term releasably **locked together in a connected position** means two plates which are held or fastened together, in a manner which can be released, which connection provides for a linking and continuity of the mating functional elements of the two plates.

  3.    **The Female Plate, Including A Plurality Of Depending Slots And At Least One Elongated Terminal**

> A **relatively flat female plate** is one of two mating elements of the releasable connection that is, for the most part, constructed on one functional plane which contains one or more holes used for mating or connecting to a male counterpart.
>
> A **depending slot** is a narrow opening extended from a larger opening in the direction of the mating engagement.
>
> At least one **elongated terminal** means one or more devices attached to the end of an electrical apparatus for making an electrical connection, which are long in proportion to width.

  4.    **A Male Plate, Including A Plurality Of Spaced Headed Projections, With There Being One For Each Slot And With Each Projection Having Head And Leg Projections, And At Least One Elongated Mating Terminal**

> A **relatively flat male plate** is one of two mating elements of the releaseable connection that is, for the most part, constructed on one functional plane which contains one or more projections used for mating or connecting to a female counterpart.

9

> One **spaced headed projection for each slot** means a one-to-one correspondence between the number of depending slots and the number of spaced headed projections.

5. **Said Male Plate Being Positioned Abutting The Female Plate With The Leg Of The Projections Being Located In Associated Slots And With The One Terminal Within The Mating Terminal**

> The phrase **being positioned with the one terminal within the mating terminal** should be construed to be the nexus or linking of the two or more electrical terminals of the two plates by the insertion of one into another.  The linking of these two terminals is what forms the electrical connection between the two plates.

6. **Releasable Locking Means On Said Female Plate For Engaging At Least One Of The Headed Projections Which Means Include At Least One Rotable Member On The Backside Of The Female Plate**

> The **releasable locking means** is the mechanics on the female plate which permit the separable binding and unbinding of the plates relative to one another, by the interaction with one or more of the headed projections on the male plate, as shown and described in the specification.

7. **Means Urging The Member To A Closed Condition With Said Pin Disposed In The Path Of Movement**

> The term means **urging the member to a closed condition with said pin disposed in the path of movement** refers to mechanics by which force is applied to the rotatable element so as to bias it, with some force, to the extent of its ability to travel in a direction, such that the pin blocks the change of position of the headed projection within the slot, as shown and described in the specification.

8. **Torsion Spring**

> A torsion spring is an elastic body, twisted and formed or constructed in a manner as to exert force on one end in one longitudinal direction about an axis while the other end is forced in an opposing direction.

9.    **Fixed Support On The Back Side Of The Female Plate**

> A stationary anchor point, for the spring element, constructed on the opposite side of the female plate from the female plate's planar nexus to the male plate.

The focus of the parties' dispute deals with two terms.  The construction of the term "or the like" as it appears in Claim 9 at Column 12, Lines 31-32, and the construction of the term "headed projections" as they are referenced in Column 12, at Line 40.

## II.    CLAIM CONSTRUCTION PRINCIPLES

### A.    THE PURPOSE OF CLAIM CONSTRUCTION.

Patent claims are like a deed to property.  They define the metes and bounds of an invention much like a deed displays where the boundaries of real property are.  *See*, *Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1998). It is the claims that define the invention.  *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc*. 52 F.3d 967, 970-71 (Fed Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  The goal of claim construction is to determine the ordinary and customary means of a claim to a person of ordinary skill in the art in question.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).  To determine this meaning, the court looks to "those sources available to the public that show" what such a person would understand the disputed claims to mean.  *Id*.

Importantly, courts do not and cannot construe claims to redefine them, or to provide greater precision to the meaning of a claim than the patentee used.  *See*, *PPG Industries, Inc. v. Guardian Industries Corp.*, 156 F.3d 1351, 1354-55 (Fed. Cir. 1998).

"The construction of claims is simply a way of elaborating the normally terse claim language [ ] in order to understand and explain, but not to change, the scope of the claims.'" *Union Oil Company of California v. Atlantic Richfield Company*, 208 F.3d 989, 995 (Fed. Cir. 2000), *quoting*, *Scripps Clinic v. Genetech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991).

**B.      THE STANDARDS OF CLAIMS CONSTRUCTION.**

Since *Markman* was first decided, the Federal Circuit has wrestled with balancing the use of intrinsic evidence and extrinsic evidence in arbitrating disputes involving claim construction.  Intrinsic evidence includes the claims themselves, the specification of the Patent, and the file history of the Patent. Extrinsic evidence is all evidence external to the Patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. The recent decision in *Phillips*, 415 F.3d at 1303, clarified the rules, holding that the most important sources concerning the meaning of a Patent claim term are those which constitute the intrinsic record.  *Phillips*, 415 F.3d at 1312-1313.

**1.      The Claims**

The *Phillips* decision reaffirmed that the "bedrock principle of Patent law that the claims of a Patent define the invention to which the patentee is entitled the right to exclude." *Id*. at 1312 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, I582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention").  The Federal Circuit emphasized the "primary importance" of the claims in determining "precisely what it is that is patented." *Id*. at 1312 (citing *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)).  "Because the patentee is required to define precisely what his invention is," the Court explained, "it is unjust to the public, as well as

an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id*. at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop")).  "[T]he claims define the scope of the right to exclude; the claims construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  After all, it is the claim "language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention."  *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).

The Court went on to reaffirm the principle that "the words of a claim are generally given their ordinary and customary meaning," i.e., "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313 (citations omitted).  In this regard, the Court said that a person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire Patent, including the other claims and the specification.  *Id.* at 1313.  The Court continued:

> Other claims of the Patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.  Because claim terms are normally used consistently throughout the Patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.  For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

*Id*. at 1314 (citations omitted).

Simply put, it is the claim terminology that "defines the scope of a right to exclude; the claims construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex Inc.*, 299 F.3d at 1324. In this regard, the claim terms must be given their "broadest reasonable 'construction in light of the specification as it would be interpreted by one of ordinary skill and art.'" *Philips*, 415 F.3d at 1316 quoting *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

## 2.    The Specification

After stressing the "primary importance" of the claims themselves, *Phillips* added that "[t]he claims, of course, do not stand alone"; rather they "must be read in view of the specification, of which they are a part." *Id*. at 1315 (citations omitted). The Court noted that its cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. "In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id*. at 1316 (citations omitted). Either way, the specification is, as viewed by the Federal Circuit, the best guide for interpreting the claims. [1]

---

[1]    *Phillips* also said that while prosecution history can often inform the meaning of the claim language, it should not be relied upon too heavily "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*. at 1317. Likewise, *Phillips* establishes that the claim interpretation process must avoid excessive reliance on the extrinsic record, which "consists of all evidence external to the Patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*. at 1317. As the Court explained, "while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id*. (citations omitted).

(a)     **The Scope Of The Claim Cannot Be Limited By the Specification.**

It is important to distinguish the role of the specification in interpreting the claims from any role in limiting the claims.  "Because the patentee is required to define precisely what his invention is, it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id*. at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop")). "[T]he claims define the scope of the right to exclude; the claims construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex,* 299 F.3d at 1324.

The *Phillips* court also explains that the scope of a claim is not based solely on the basis of the claim language, "but upon giving claims their broadest reasonable construction 'in light of the specification as it would be interpreted by one of ordinary skill in the art.'" *Phillips*, 415 F.3d at 1316, quoting *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). Importantly for the present case, *Phillips* clearly lays out the rule forbidding the importation of limitations from the specification into a claim. *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").  While the Federal Circuit acknowledged that "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice,"  *id*. at 1323, it emphasized that the distinction must be made.

> [T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a Patent describes only a single embodiment, the claims of the Patent must be construed as being limited to that embodiment.

*Id*. (citations omitted).

The *Phillips* Court observed that, "[m]uch of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specifications to be strictly coextensive." *Id*. (citations omitted). The Court added, "[t]he manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent." *Id*. (citing *Snow v. Lake S. & M.S.R. Co.*, 121 U.S. 617, 630 (1887) (it was clear from the specification that there was "nothing in the context to indicate that the patentee contemplated any alternative" embodiment to the one presented).

Consistent with this teaching, the Federal Circuit has repeatedly cautioned courts not to use the specification to construe the claims in a manner inconsistent with their plain language. It has said:

> Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms. This has been so often expressed in

the opinions of this court that it is unnecessary to pursue the
subject further.

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111,

1117 (Fed. Cir. 2004) (*quoting*, *White v. Dunbar*, 119 U.S. 47, 51-52 (1886)); *see also*

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1333-44 (Fed. Cir.

2001) (reversing various claim constructions of district court for importing limitations

from specification into patent claims); *Process Control Corp. v. HydReclaim Corp.*, 190

F.3d 1350, 1357 (Fed. Cir. 1999) ("we do not permit courts to redraft claims").

*Markman*, 52 F.3d at 980.  The Markman Court said it this way, "the written description

part of the specification itself does not delimit the right to exclude.  That is the function

and purpose of claims."   Indeed, this has been the law for more than one hundred

years.  *See, e.g., McCarty*, 160 U.S. at 116 ("We know of no principle of law which

would authorize us to read into a claim an element which is not present . . .  The

difficulty is that if we once begin to include elements not mentioned in the claim in order

to limit such claim . . ., we should never know where to stop.")

Similarly, the Federal Circuit has also repeatedly admonished against any claim

construction exercise that attempts to limit the scope of the claims by the number of

embodiments described in the specification.  As the court explained in *Teleflex, Inc.*

> In sum, the number of embodiments disclosed in the
> specification is not determinative of the meaning of disputed
> claim terms.  As we explained in *CCS Fitness*, an accused
> infringer cannot overcome the "heavy presumption" that a
> claim term takes on its ordinary meaning simply by pointing
> to the preferred embodiment or other structures or steps
> disclosed in the specification or prosecution history.  We
> hold that claim terms take on their ordinary and accustomed
> meanings unless the patentee demonstrated an intent to
> deviate from the ordinary and accustomed meaning of a
> claim term by redefining the term or by characterizing the
> invention in the intrinsic record using words or expressions

of manifest exclusion or restriction, representing a clear
disavowal of claim scope.

*Teleflex, Inc.*, 299 F.3d at 1327; *see also Nazomi Communications, Inc.. v. Arm Holdings, PLC*, 403 F.3d 1364, (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"); *Innova*, 381 F.3d at 1117 ("even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, at 1366 (Fed. Cir. 2002) (accused infringer may not narrow claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"); *Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("[i]t is a familiar principle of patent law that a claim need not be limited to a preferred embodiment").

This District has embraced this well-settled principle.  In *Tyco Healthcare Group, LP v. Ethicon Endo-Surgery, Inc.*, Civil Action No. 3:04cv1702 (JBA), (Ruling on Claims Construction of Disputed Terms in U.S. Patents 6,063,050; 6,280,407; 6,468,286; 6,682,544, Pleading No. 62 (January 23, 2006, Arterton, J.), Judge Arterton was asked to construe a claim that taught an "ultrasonic instrument according to Claim 7, wherein the cutting surface of the cutting jaw is curved along the longitudinal axis of the instrument."  Defendant urged a construction that required the curve to be outward and downward in the distal direction because it was the only configuration described in the specification language and abstract.  The plaintiff responded that the fact that the inventor knew how to use the words "outward" and downward" in his specification and chose not to use those words in his claim, suggested knowledge of both courses and an

intention not to limit his claims accordingly.  Relying upon *Phillips*, the Court concluded that while the intrinsic evidence (the specification) did describe a cutting surface that is curved outwardly and downwardly, there was nothing in the intrinsic evidence to require that cutting surface be so curved.  It noted that the patentee knew how to use different terminology, and could have so limited its claims if he chose to do so.  *Id*. at 23-26.

Judge Arterton recently issued a second ruling in the *Tyco-Healthcare* case on Plaintiff's Motion for Reconsideration.  *Tyco Healthcare Group, LP v. Ethicon Endo-Surgery, Inc.*, Ruling on Plaintiff's Motion for Reconsideration, Pleading No. 89 (July 14, 2006, Arterton, J).  Returning to the issue of the curvature of the cutting blade, Tyco argued that the Court's initial construction that the curve be "up or down" not "side to side" was too limiting.  Ethicon argued that the specifications, prosecution history and inventor testimony all suggest an "up or down" curve by reference to the longitudinal direction, not a side to side curve which would be a latitudinal direction, that no alternative was offered by or depicted in the specification, and that the "up or down" design was how the inventors distinguished the prior art.  The Court concluded that its initial construction was too limiting because it had imported language from the specifications into the claim term.  She noted that the inventors used the word outward and downward in their specifications but did not use them in their claim, suggesting that they were not intended.  Ruling on Motion for Reconsideration, at 3-8.

The Tyco court also reconsidered its initial construction of the term "clamp member" which it required to be "separate and distinct from the tissue contact surface." Tyco sought reconsideration because it believed the Court had imported that limitation from a dependent claim and that the Court's construction makes the use of the same term in related patents inconsistent.  The court sided with Tyco, holding that it had, in

fact, imported language from a dependent claim into an independent claim (even though the independent claim did not describe any specific way in which the claim member related to the cutting surface) and that her initial construction was inconsistent with the way the same term was used in a name patent.  She concluded, "the Court will 'presume, unless otherwise compelled, that the same claim term in the same patent <u>or related patents</u> carries the same construed meaning.'"  *Id*. at 11, *quoting*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 Fed. Cir. 2003 (emphasis in original).  *See also Pfizer, Inc. v. Ajix, Inc.,* 2005 U.S. Dist. Lexis 15984 (D. Conn. July 29, 2005 Hall, J.) (noting this District's adherence to the teachings of *Phillips,* Judge Hall rejected the accused infringer narrow construction of the term "engageable" based upon a purported lack of support in the specifications for a broader definition.)

*Phillips* does just more than just recite controlling claims construction law because *Philips*, itself, dealt with a case in which the Court was reviewing a trial court's construction of the term "baffles" in the patent-in-suit.  The Court noted that in certain of the claims, the particular function to be served by the baffles was recited with additional or modifying language.  In others, just the object was referenced.  The Court concluded that reference to a specific limitation in one term (i.e. language describing functionality) "makes it likely that the patentee did not contemplate that the term (baffles) alone already contained a limitation" when the function language was not recited in other claims.  415 F.3d at 1324.  The Court cited with authority its earlier precedent in *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000), concluding that an independent claim should be given broader scope than a dependent claim to avoid rendering the dependent claim (having more limiting language) redundant.  This was true even though the description of the function of the baffles in the specification was

one way the inventors distinguished the prior art.  The *Phillips* Court relied upon its own precedent in saying that "the fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be constructed as limited to structures that are capable of achieving all of the objectives."  *Id.*, *quoting Liebel-Flarsheim co. v. Medrad, Inc.*, 358 F. 3d 898, 908 (Fed. Cir.), *cert. denied*, 543 U.S. 925 (2004).  *See also Resonate, Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1367 (Fed. 2003) (rejecting notion that every claim in a patent must be read to achieve all of the objectives set forth in the patent).

This doctrine, known as the doctrine of claim differentiation, is a canon of claim construction that recognizes that because "claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Phillips*, 415 F.3d at 1314, *citing*, *Rexnard Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  It is thus axiomatic that differences among claims (i.e. claim differentiation) can also be a useful guide in understanding the meaning of particular claims.  *Phillips,* 415 F.3d at 1314.  So, a broader scope should be given to a claim that uses a more general term than a dependent claim using a more specific term; otherwise, such a dependent claim would be superfluous.  *See generally*, *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001); *Dow Chem. Co.*, 226 F.3d at 1341-42.

Stated succinctly, a claim term cannot be deemed to be limited to a specific purpose or have a specific design, if the inventor set forth that specific purpose or design in another claim.  *Id.*  If that were the case, then the more limited claim term would be redundant.  *Teleflex, Inc.*, 299 F.3d at 1324; *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987-988 (Fed. Cir. 1988) (The fact that patent contained examples

showing <u>external</u> plasticizers did not mean that the word plasticizer in the claim should be read to exclude <u>internal</u> plasticizers, particularly where there was narrower dependent claims that included external plasticizers as a limitation.  That limitation could not be read into the broader, independent claims.)

The fundamental principle underlying all these cases should be clear.  If everything in the specification were to be read into the claims, then there would be no necessity for the claims themselves.  Rather, the patent would be limited to solely the embodiment set forth in the specification, thus eliminating a notion that it was a preferred embodiment or best mode in making it the one and only patented invention.

## III.    DISCUSSION:

### A.    Headed Projections:

PAG argues that the term "headed projection" should be construed as "parts of the male plate that protrude from the surface of the male plate, each of which must have: (1) a large circular head, (2) an integral narrow leg portion, and (3) a half-moon-shaped end portion or back plate.  Anton/Bauer argues that the "headed projections" are extending elements or features that have an enlarged uppermost part relative to a lower, narrower portion, making them "headed projections."  The comparison of these constructions illustrates that the parties do not disagree with the configuration of the "headed projections" as it consists of a head and leg.  In the industry, these projections are sometimes called T-studs or mushroom plugs, because of their similar look and appearance, a projection with a larger head relative to a narrower leg portion.

Where the parties disagree is whether the base of the projection must have a half-moon shape.  PAG says "Yes", Anton/Bauer says "No."  PAG argues that the term "headed projection" in Claim 9 should be limited to those having a half-moon shape

because they are referenced and depicted in the summary and specification portions of the '204 Patent as being so configured; the Patent notes that this configuration was an improvement over the '107 and '968 Patents; that Mr. Wilson defined "headed projections" in this matter, acting as his own lexicographer; and that no alternative for the embodiment of the projections is taught in the specifications. Anton/Bauer responds that it does not take issue with the fact that the preferred embodiment of the '204 Patent described, in part, "headed projections" terminating in a half-moon shape, that this design was referenced in the specification and depicted in the figures, and that it was one of the noted improvements made by Mr. Wilson. Anton/Bauer argues, however, that established Federal Circuit law makes clear that the specification cannot, and should not, be read into the claim, particularly in this instance where Mr. Wilson claimed various aspects of his invention in different claims, specifically addressing the half-moon shape improvement in Claim 8, a dependent claim of Claim 7, itself a dependent claim of Claim 1, with precise language that defined that configuration, choosing not to make the same specific reference in any of his independent claims, and choosing not to make any such specific configuration depend upon Claim 9.

There is no dispute that the '204 Patent references "an improved securement means," which is described in the specification as the "headed projections" on the male plate having a "half-moon shape back plate seated in a complementally-shaped slot on the wall of the male plate to preclude inadvertent turning and loosening of the screw-threaded mounting of the "headed projection" with concomitant loss projection from the plate if its mounting completely comes apart." '204 Patent at Column 4, Lines 43-49. The half-moon shaped projection is described in the specification at Column 7, Lines 3-8, and depicted in the figures at Figure 1, Item 26 and Figure 5, Item 56. But, the

recitation of that specific configuration in the specification does not get read into the Claim unless the inventor so intended. Here, the record suggests otherwise. A review of the '107 (authored by the same inventor, Anton Wilson), the '968 (authored by an employee of Anton/Bauer), and the '204 Patents demonstrates that the term "headed projections" is used identically in each of the independent claims in each of the patents. *See* '107 Patent at Claim 1; '968 Patent at Claims 1, 6 and 10; and, '204 Patent at Claims 1, 9, 15-16 and 18. In each instance, the reference to the male plate and the "headed projection" is identical. In no instance, in fact, do those claims describe the "headed projections" as terminating in any particular shape. Rather, the focus is only in the way in which they engaged with the corresponding keyhole or slot. *Id*. Notably, in each patent they are described as being screwed into the male plate. '107 Patent at Column 3, Lines 5-10; '968 Patent at Column 4, Lines 24-29; '204 Patent at Col. 7, Lines 8-13.

In each of the Patents, the head of the projection is inserted into the corresponding keyholes of the female plate, and the like portions slide into corresponding slots to form the connection. *See* '204 Patent at Column 9, Lines 1-4; '968 Patent at Column 5, Lines 10-13; '107 Patent at Column 3, Lines 21-23. More specifically, in each of the patents the inventors refer only to the head and the leg and the way in which those designs relate to the keyhole or slot. That functionality of the "headed projections" does not change in any of the Patents, and for that reason, the term "headed projections" does not change in any of the Patent Claims. Indeed, the abstracts of the '107, '968 and '204 Patents describe the "headed projections" and their functionality identically, just as they are defined identically in each of the independent claims of the three Patents.

What Wilson did in the '204 Patent is address different aspects of different elements of his invention in different Claims, an approach he was perfectly entitled to take under controlling Federal Circuit law. *Phillips*, 415 F.3d at 1327. In Claim 1, for example, the '204 Patent teaches essentially the same core '107 combination but couples it with a new invention, the safety latch. *See* Column 11, at Lines 54-56. In Claim 9, the second independent claim, the '204 Patent teaches the essentially the same core '107 combination, but coupled with new slots and a new releaseable locking means. *See* Column 12 at Lines 37 and 56-64. A third independent Claim, Claim 15, teaches neither the safety latch, nor the specific newly invented releasable locking means, but instead focuses on an aspect of the mating, the alignment for the electrical terminals with a block construction in the male plate. Claim 16, the fourth independent claim, has no safety latch, no specific releasable locking means and no improved terminal alignment with block construction in the male plate but rather provides for a block construction in the female plate. Claim 18, the last independent claim, has no safety latch and no specific releasable locking means but instead focuses on a removable block mounted to the female plate to hold/align the male electrical contacts. In each of these independent Claims, the term "headed projection" remains the same, because, as with the '107 and '968 Patents, its functionality accomplished through its head and leg does not change, and there is no claim to the way in which it is mounted on the male plate – indeed no discussion of a "base" portion at all. It is this consistent use of the term "headed projections" in each of the three patents and within the '204 Patent that compels the Court to conclude that Anton Wilson was not limiting his Claim 9 to a specific configuration.

This conclusion is further bolstered by the fact that Wilson dealt specifically with projections terminating in a half-moon shape only in Claim 8 of the '204 Patent.  That is, when Wilson wanted to reference the specific embodiment set forth in the specification -- what he determined to be the preferred (not only) embodiment of his invention -- he did so with particular words and in a separate claim.[2]   In fact, in Claim 7, a claim dependent upon Claim 1, Wilson refers to projections that could be received and mounted in a complementally-shaped recess in the male plate.   *See* '204 Patent, Column 12, Lines 23-25.  This is language which he had used in the specification at Column 4, at Lines 43-49.  He goes on in Claim 8 to define a "headed projection" with a half-moon base that is "mounted in [the] complementally-shaped recess" defined in Claim 7.   In doing so, he specifically sets forth in Claim 8 language that references a particular configuration – a half-moon shape.  *Id*. at Column 12, Lines 20-30.  This is the precise language he used in the specification at Column 7, Lines 3-8.  Wilson's use of his chosen language in Claims 7 and 8 indicate his clear understanding of what language was appropriate to describe and claim a more limited invention than that which was being claimed in his independent claims.   Someone schooled in the art, familiar with the '107 and '968 Patents – the prior art to the '204 Patent -- would understand that the consistent use of the word "headed projections" in each of the independent claims was intended to reflect upon the same construction, particularly when the inventor chose different and more narrow language when he intended to describe a different and more narrow configuration.

---

[2]   Wilson did the same thing in dependent Claim 2 when he described the headed projections as having a circular head; otherwise, he does not define (and, therefore, limit) the shape of the head.  As he did when describing the headed projections having half-moon base, when he wanted to particularize his configuration he chose modifying language.

Federal Circuit law provides that a claim must be construed as whole.  *See Phillips*, 415 F.3d at 1314-15 and cases cited earlier in this decision.  An inventor's use of multiple constructions of the same indicates that inventors knowledge of and intention to distinguish the difference between them.  *See Innova,* 381 F. 3d at 1117, and cases cited earlier.  And, the law is well settled that use of the same claim term in related patents is presumed to have the same meaning.  *Omega Eng'g*, 334 F.3d at 1334.  As *Phillips* has stated, as Judge Arterton recently articulated in *Tyco*, and as logic dictates, the concept of claim differentiation is grounds for a simple notion that "each claim in a patent has a different scope" and the use of different words to describe those different claims should not be ignored in the claims construction process.  *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004).

Wilson used the same "headed projections" language in each of his Independent Claims 1, 9, 15, 16 and 18.  He described their head in relation to their leg.  But, he did not limit how his projections would terminate or be seated in the male plate in those Claims.  Rather, each of those Claims recited the same base male plate taught by the '107 Patent (insofar as the projection is concerned).  His invention dealt with changes to the combinations affected by changes to the female plate and the relationship between the plates' combination.  The only one instance where that differed is in Claims 7 and 8, and in both claims, Wilson used specific language to show what and how he was distinguishing from the prior art and the general description of the "headed projection" and the recess.

In other words, except for the specific wording of Claims 7 and 8, the "headed projection" and the termination of the leg portion thereof, is unspecified and can take any form.  Claim 7 confirms this fact because all it discloses is a male plate that can be

modified to have complementally-shaped recesses to the shape of the base of the projections to "prevent rotation of said projections and said recess." '204 Patent, Column 12, Lines 26-27 (Claim 7). That can be a square, a triangle or any other shape that helps prevent the rotation of the object. Claim 8 tells one involved in the art that the recess can also be a half-moon shape because that claim refers to the "invention of Claim 7", and then discloses "headed projections," which include a leg terminating "in a substantially half-moon plate." '204 Patent at Column 12, Lines 29-30. If the recesses referred to in Claim 7 were restricted to half-moon shapes only (as PAG's reading must support), there would be no reason for the more general terminology of "complementally-shaped". Rather, the inventor would have simply said, complementally half-moon shaped recesses. Similarly, if the word "projection" alone embodied the half-moon shaped structure as PAG suggests, it would be unnecessary to add (*i.e.*, "include") the "half-moon shaped" language in Claim 8. The Federal Circuit has said that claim should not be interpreted to preclude to permit redundant readings. *See Phillips*, 415 F.3d at 1335. PAG's reading violates this rule.

While Wilson may have described the preferred embodiment of his invention with a "headed projection" having a half-moon shaped base, his claims and their terminology do not include it, other than in Claim 8, which specifically asserts this technology. Rather, the base of the "headed projection" relate solely to the way in which the "headed projections" may be attached to the male plate. Wilson did not limit the language in the balance of the Patent, nor in the Claims, because it was not his intention to limit the way in which the base portions of the "headed projections" were sized or shaped or anchored to the male plate. The law does not require that Wilson accomplish each of his improvements in each of his Claims. *See Phillips*, F.3d at 1327.

28

Wilson's independent claims and their respective dependent prongs teach various inventions configured in various ways. It was not necessary for him to capture all of his objections in one claim, and he did not do so in Claim 9. Were it necessary to do so all patents would be a single claim.[3]

Herein lies the importance of distinguishing between what is referred to in this preferred embodiment and the claim itself. The preferred embodiment is just that – what the inventor deemed to be the best way to describe his or her patent, in order to describe to one schooled in the art, how the invention might work and function in practice. Patent law, however, protects against infringement of more than just a specific example used by the inventor, but rather all aspects of a particular claim. *See* C.*R. Bard, Inc., v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004); *Liebel-Flarsheim Co.*, 358 F.3d at 907-08.

PAG's argument that Wilson acted as his own lexicographer is also without merit. An inventor acts as his own lexicographer when he gives a special definition to a term "that differs from the meaning it would otherwise possess," *Phillips*, 415, F.3d at 1316, *citing CCS Fitness, Inc.*, 288 F.3d at 1366, or disclaims a certain meaning, *Phillips*, 415, F.3d at 1316, *citing SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F. 3d 1337, 1343-44 (Fed. Cir. 2001).

Wilson first used the term "headed projections" in his '107 Patent in 1980. Corrigan used it five years later in the '968 Patent, and Wilson used it four years after that in the '204 Patent. The term was not used in a special manner, different from the meaning it would otherwise possess in any of these three patents. "Projection" is

---

[3]   Wilson did the same thing, with other features of his invention, such as describing the keyhole opening as ovoid in Claim 2, and using the term "slot" in Claim 9.

defined by the dictionary as simply "a thing or part that extends outward beyond a prevailing line or surface." *American Heritage College Dictionary*, (3d. Ed. 1997). "Headed projections" are simply projections with a head on them.

Nor did Wilson ever disclaim the broader meaning of the general term "headed projections" such that it would be defined in all instances as "having a half-moon base." PAG does not cite, nor does the patent reveal, any such disclaimer. In fact, the '204 Patent belies any argument that Wilson acted as his own lexicographer. When Wilson wanted to refer to "headed projections" terminating in a half-moon base, he used modifying language, he did not redefine the term. That is, each and every time he wanted to describe the "headed projection" with a half-moon shape, he used those words.[4] By contrast, when he described the functionality of the "headed projections," over one hundred times in the Patent, he did not use those words. Were Wilson, as PAG suggests, "acting as his own lexicographer" in the '204 to describe a "headed projection" to mean one with both a head and particularly shaped foot, he would be applying a different, unique and limiting meaning to the same term in two different patents he wrote and a third which his company owned. Moreover, if Wilson were offering unique meaning to the term "headed projection" as one with leg and "half-moon" shaped foot, then there would be no reason to include Claim 7. The record does not support either illogical outcome. The fact is that if Wilson was his own lexicographer, it is clear that his meaning of "headed projection" in all Claims except 7 and 8 of the '204 is with head and leg portions only as Anton/Bauer contends.

---

[4]    When he wanted to define the head of the headed projection as circular, he used that word as well. '204 Patent, at Claim 2.

In this regard, it is also notable that the parties stipulated to certain facts in conjunction with the preliminary injunction hearing in this matter. They agreed that the "'107 Patent discloses all aspects of the male-female battery pack connection claimed in the Patent in suit, except for the components of the 'releasable locking mechanism on said female plate' specified in Claims 9 and 11 of the Patent in suit. (Stipulation at ¶ 20.) PAG thus admitted then, and has offered no proof to the contrary now, that the Claim 9 of the Patent in suit is the '107 Patent core combination (i.e. without "headed projections" having a half-moon base) but with the addition of the "releasable locking mechanism". The Markman construction process is directed to interpreting claims, not adding words to a claim as PAG would have the Court do by importing Claim 8 language into Claim 9.

PAG suggests in its brief that there are several "inventor" cases where the inventor indicated he was making improvements of the prior art, and the courts subsequently construed the claims to be limited only to those improvements. In fact, those cases are not inconsistent with the analysis conducted by the Court here, or with the principles set forth in *Phillips* and its progeny. In those cases, the Court simply found that a claim was later limited to the specific improvement noted in the Patent because that was the only possible embodiment of the invention, or some clear indication that the term was to be defined narrowly. *See, e.g.*, *The Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (limiting claim to embodiment disclosed in specification because of "clear statements of scope" in the specification and prosecution history). *Toro* was later distinguished on this basis in *Teleflex, Inc.*, 299 F.3d at 1326-27); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (limiting claim to particular construction taught by specification because inventor

specifically distinguished invention over prior art based on the narrower construction). Indeed, in several of the cases, the Court relied upon the prosecution history where broader meanings were abandoned to reject a later construction offered by the patentee to incorporate those broader meanings. *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1371 (Fed. Cir. 2003) (limiting claims based upon express statements of limitation by patentee in prosecution history).[5]

Here, while the parties agree that the prosecution history offers no express insight into the construction of the term "headed projections," we know for a fact that the Patent and Trademark Office issued each of the independent claims of the '204 without the specific structure set forth in Claim 8. Without that specific structure, it is axiomatic that the invention in Claim 9 is not the shape of the base of the "headed projection." Nor is there any disavowal of the broader reading in the Patent or prosecution history which would suggest an intended narrower reading. The '107 and '968 Patents are both cited as prior art and were therefore considered by the examiner. Both defined "headed projections" without reference to any particular structure of the base.

In point of fact, this case is very much like the *Phillips* and *Tyco* decisions referenced earlier. In *Phillips*, the Court dealt with a patent that defined the functionality of the term "Baffles" in certain claims, but not others. It concluded that the modified use of the term "in certain claim elements" accomplished the functionality that was the improvement over the prior art, but not in others, compelled the conclusion that the term, when not modified, had a broader meaning. The Court pointed out that "the fact that a patent asserts that an invention achieves several objectives does not require that

---

[5]    The Federal Circuit commented on the limited reach of its so-called inventor comes in *Liebel-Flarsheim Co.*, 358 F.3d at 906-908.

each of the claims be construed as limited to the structures that are capable of achieving all of the objectives." *Phillips*, 415 F.3d at 1327. The *Tyco* decision is also very helpful. There, the inventor sought to distinguish the prior art with an improvement which they said the invention had, to wit, a cutting jaw that has a blade surface which is curved outwardly and downwardly, which , in turn, was described and depicted in the specification in the figures. Judge Arterton, when construing that claim of the Patent that used the word, "Cutting Jaw," without any modifying language, rejected the argument that the jaw should have a blade that has a particular curve outwardly and downwardly, and on reconsideration, even said that the blade could curve side to side. It did so because it recognized that the inventors had knowledge of the words and used them in several dependent claims, but chose not to claim them in the independent claims. The Court also construed and reconstrued the term claim "Claim Member" to determine whether it was separate and distinct from the tissue contact surface used elsewhere in the claim. On reconsideration, it concluded that its original construction was wrong, relying in large part on the fact that in a related patent, the terminology had been used consistently, and that its reading in the patent at issue incorporated the language from a dependent claim which it recognized it should not be doing. Referring to *Omega Eng'g*, the *Tyco* Court made clear that a claimed term used in related patents is assumes to have the same meaning, just as the term "headed projections" as used in the '107, '968 and '204 Patents is presumed to have the same meaning, particularly when the author of two of those Patents knew how to modify the language when he intended to do so.

PAG's citation to *Curtis-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) as supportive of its position as misplaced. In *Curtis-Wright*, the court

dealt with the meaning of the word "adjustable" in a claim term "defining a cola drum de-heading system comprising: …an adjustable dynamic, live loaded seat coupled to said main body."   That is, the term "adjustable" was already present in the claim.  The court found that the way in which the trial court defined the term was too broad because it ignored the fact that the inventor distinguished the prior art through a particular means of adjustment and further that the trial court's construction permitted any "change" which rendered the term "adjustable" meaningless.   The Court held that this was not an instance where a claim was being imported because the term was already present in the claim.  This case is different.   Wilson did not seek to distinguish prior art; he suggested an improvement which he covered specifically as in dependant Claim 8. And, in Claim 9, unlike in *Curtiss-Wright*, the language PAG seeks to import – "half-moon shape" -- does not modify the term "headed projection."  *Curtiss-Wright* reminded us that "different claims with different words can, of course, define different subject matter within the ambit of the invention."  *Curtiss-Wright,* 438 F.3d at 1380. *Phillips* said the same thing.  *Phillips*, 415 F.3d at 1314.  PAG ignores that principle and instead defines the terms "headed projection" and "Headed-Projection with a Half-Moon Base" as the same.  They are not the same unless the court ignores the additional, modifying language which is not permissible.

For these reasons, the Court concludes that the term "headed projections" should be defined consistent with that way in which offered by Anton/Bauer, to wit, an extending element or feature that has an enlarged uppermost part relative to a low narrow portion, making them "headed projections."

**B.**      <u>Or The Like:</u>

PAG also takes issue with the Claim term "or the like."  Claim 9, Column 12 at Lines 31-32.  It offers no construction, but rather, argues that the term is too vague to be subject to construction.   Anton/Bauer argues that the term "or the like" means a structure similar in function to a battery pack, *i.e.*, a structure that furnishes power or other electronic controls.   PAG responds that one of the examples offered by Anton/Bauer is a power tap, which PAG argues is something that actually drains power, and therefore rendering Anton/Bauer's construction questionable.

In point of fact, "or the like" is commonly accepted language which is neither vague nor ambiguous, nor for that matter subject to any real dispute.  Something that is "or the like" is something similar in nature or structure to that to which it is being compared.  The '204 Patent actually gives examples in Column 11, Lines 20 through 23 - - "The invention has universal application to other power or electronic control connections such as the connections of A/C power supplies, power taps, microcontrols, camera control equipment, and the like."

PAG's definition of the power tap as something that drains power is not compelling.  Its only support is reference to the power tap receptacle in the '204 Patent, which is a receptacle by which a cable is attached to a battery connection to power some other device.  That 'receptacle' is not, however, the power tap.  The term "tap" in the electronics industry is commonly defined as "an electrical connection to some point other than the ends of a register or conductor."   *Dictionary of Electronics* at Sciencelobby.com; *Dictionary of Electronics* at Twisted.pair.com.  That is, a power tap is simply the connection that permits power to be moved from one location to another. The "releasable connection" of the '204 combination for a power tap permits the transfer

of power, through the combination of plates, to some other device. There is not an issue of furnishing versus draining. The '204 combination "for a battery pack" provides the ability to drain power from a pack of battery cells. That same connection, also, furnishes that power to the device to be operated. The same result occurs when the source of power emanates from the power tap.

Notably, the Federal Circuit was not confused when it explained this patent language in its ruling. *Anton/Bauer, Inc.*, 329 F.3d at 1346. "Generally, the claimed connection joins a battery pack to a television camera, where the female plate is attached to the camera or other electronically operated device, such as a battery charger, and the male plate is attached to the housing of a battery pack within which an electrical battery or AC/DC power source is contained."

For these reasons, Anton/Bauer's construction of the term "or the like" is credited such that it means a structure similar in function to a battery pack, *i.e.*, a structure that furnishes power or other electronic controls.

_____
Christopher F. Droney
United States District Judge

## **CERTIFICATION**

I hereby certify that on August 16, 2006, a copy of the Proposed Order For Claims Construction Filed by Anton/Bauer, Inc. was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

//s// James T. Shearin
James T. Shearin –  ct 01326
Brian C. Roche    – ct 17975

Bridgeport/57052.2/JTS/608087v1